## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **v.** | **)** | **Case No. 20-cr-00066-RDM** |
| | **)** | |
| **MURALI YAMAZULA VENKATA,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |
| _____ | **)** | |

### UNITED STATES' TRIAL BRIEF

The United States' evidence at trial will demonstrate that the defendant, Murali Yamazula Venkata, engaged in an unlawful scheme to convert government property for private gain. Venkata and his co-conspirators stole valuable software, code, and databases belonging to the government. Their plan was to repurpose and repackage the stolen property as a commercial software product, which they intended to sell back to the government at a profit. They hired a software development company in India to build the purported commercial product. To facilitate the Indian developers' work, they gave the developers access to vast amounts of sensitive information contained within the stolen databases, including the Personally Identifying Information ("PII") of hundreds of thousands of government employees. Upon learning that he was under investigation, Venkata deleted incriminating text messages and emails in an effort to obstruct the investigation.

This Trial Brief describes how the theft and fraud scheme worked, how the government will prove it, and certain legal and factual issues that may arise during trial.

## I.     RELEVANT BACKGROUND

### A.     Procedural History

On March 5, 2020, a grand jury returned an Indictment charging defendants Venkata and

Charles Kumar Edwards with conspiracy to commit offenses against the United States in violation of 18 U.S.C. § 371, theft of government property in violation of 18 U.S.C. §§ 641 & 2, wire fraud in violation of 18 U.S.C. §§ 1343 & 2, and aggravated identity theft in violation of 18 U.S.C. §§ 1028A & 2.  The Indictment also charged Venkata with destruction of records in violation of 18 U.S.C. § 1519.

On April 4, 2019, Venkata's and Edwards's co-conspirator, Sonal Patel, pleaded guilty to a separate Information charging her with one count of conspiracy to commit offenses against the United States in violation of 18 U.S.C. § 371.  On January 14, 2022, Edwards pleaded guilty to Counts One and Two of the Indictment, charging him with conspiracy and theft of government property, respectively.  Edwards and Patel are currently awaiting sentencing.  Trial of Venkata is scheduled to begin on March 28, 2022.

Currently pending before the Court are Venkata's Motions to Dismiss the Indictment (ECF Nos. 59–63), Venkata's Motions *in Limine* (ECF Nos. 67, 69), and the United States' Motions *in Limine* Nos. 1 and 2 to Preclude Unavailable Affirmative Defenses (ECF No. 98).

**B.     Facts**

**1.     The Conspirators**

From 2008 to 2013, Charles Kumar Edwards worked at the Department of Homeland Security - Office of Inspector General ("DHS-OIG"), where he rose to the post of Acting Inspector General.   During Edwards's tenure at DHS-OIG, the agency acquired an electronic case management system known as the Enforcement Database System ("EDS") at a cost of approximately $3.16 million.  EDS is DHS-OIG's platform for creating, managing, and storing investigative records.  As such, it contains large amounts of sensitive information relating to investigations and audits of DHS programs, as well as PII of DHS employees—such as name,

2

social security number, and home address.

Beginning in June 2010, Venkata was employed as an Information Technology ("IT") Specialist at DHS-OIG.  Venkata's responsibilities included maintaining and developing DHS-OIG's IT systems and serving as a team lead for the IT Division's support group.  Venkata was well aware of his duty to protect government computer systems and information: when he joined DHS-OIG, he signed a Computer Access Agreement, in which he agreed that he would "not remove DHS computer systems or software from Government work spaces without expressed written permission" and that he would "use only DHS IT equipment to access DHS & OIG systems and information."

Venkata reported to Sonal Patel, the Enterprise Applications Branch Chief in the IT Division at DHS-OIG Headquarters.  Patel's responsibilities at DHS-OIG included developing and enhancing EDS to better serve the office's investigatory needs.  One of the enhancements she supervised was the creation of a new application known as eSubpoena, which automatically generated subpoenas based on input from the user.  Venkata was eSubpoena's lead developer. Venkata acknowledged in statements to DHS-OIG investigators that EDS, including the eSubpoena application that he had developed, was the property of the United States government.

Before joining DHS-OIG, Edwards, Patel, and Venkata had all previously worked at the United States Postal Service – Office of Inspector General ("USPS-OIG").  While at USPS-OIG, Patel helped to develop USPS-OIG's case management systems.  Those systems included the STARS database, which housed investigation and audit data, as well as human resources data, including PII of USPS employees, and the Performance and Results Information System ("PARIS"), an interface that allowed users to access information stored in the STARS database.

## 2.     The Conspiracy

In September 2015, after Edwards left DHS-OIG, he founded a company called Delta Business Solutions.  His plan was to develop a privately owned, commercial competitor to EDS, which he hoped to sell to Inspector General offices across the federal government.  Rather than create his product from scratch, which would have consumed considerably more time and resources, Edwards decided to build on the government-owned software systems that he had helped to develop during his time at USPS-OIG and DHS-OIG.  But Edwards could not do it alone. He enlisted Patel and Venkata, who were still government employees, to steal the source code and databases that he needed to develop his commercial product and to provide vital technical assistance.

### i.     Edwards and Patel Pitch Next Gen EDS to Peter Paradis.

In late 2015, Peter Paradis, a senior official and veteran investigator at USDA-OIG, had been tasked with acquiring a case management system for USDA-OIG.  Having previously worked at DHS-OIG, Paradis was familiar with EDS and wanted to explore whether USDA-OIG could acquire EDS free of charge from its sister Inspector General's office.  Paradis reached out to his former colleagues at DHS-OIG, including Patel.  On December 1, 2015, Paradis scheduled a telephone call with Patel, expecting to discuss the systems that would be required to implement EDS at USDA-OIG.  To his surprise, Patel quickly pivoted to pitching a commercial product that, she said, Edwards was developing with assistance from herself and Venkata.  Patel told Paradis that she and Edwards would like to meet with him to discuss their alternative to EDS.  On May 6, 2016, Patel and Paradis again spoke by telephone.  Patel told Paradis that the system Edwards was developing had similar functionality to EDS but had a more flexible, modular design to facilitate

maintenance and improvements.

On May 26, 2016, Edwards and Patel met Paradis over lunch at Matchbox Pizza in Chinatown.  During that meeting, Edwards and Patel pitched Paradis on their commercial product, which they termed "Next Gen EDS" or "22nd century EDS."  Edwards and Patel described the benefits of Edwards's product, including the "newly created" eSubpoena module.  Patel told Paradis that "Murali" could "give [him] the concept" of their eSubpoena application.  Edwards agreed to put together a cost estimate for Next Gen EDS, with input from Patel.

Over the remainder of 2016 and into early 2017, Edwards continued to liaise with Paradis. During two telephone calls in October 2016 and an in-person meeting at USDA-OIG headquarters in November 2016, Edwards made various representations about the system he was building, including that "it's not like DHS because DHS code is so, you know, cobbled together," that his program was "going to do the e-subpoena, just like DHS IG has," that he "completely re-wrote investigations, hotline, admin, and subpoena," and that his team "went through and broke it apart, and each template we built back the way it's supposed to load."  Meanwhile, Edwards and Patel researched pricing for Next Gen EDS.  In January 2017, Edwards left Paradis a voicemail telling him the system would be ready for him to test that month.

> ii.    *The Conspirators Steal Government-Owned Software, Databases, and Source Code.*

What the conspirators did not tell Paradis was that the system they were building was based on code and databases they had stolen from DHS-OIG and USPS-OIG.  In fact, Patel and Edwards had been stealing code and other materials from the government for quite some time.  In October 2014, Patel copied the EDS source code, including the eSubpoena module, and database files from the DHS-OIG computer network onto an optical disk, which she provided to Edwards.  Not long

thereafter, she asked Judy Kuo, a subordinate at DHS-OIG, to send her a government document containing instructions on how to rebuild the EDS system on an alternate server.

On May 27, 2016, just one day after the Matchbox Pizza lunch at which they pitched Next Gen EDS to Paradis, Patel again copied the EDS source code and databases from the DHS-OIG computer network onto two optical disks to provide to Edwards. The same day, Patel emailed a government document containing detailed, step-by-step instructions for building EDS on an alternate server from her government email to her personal email account, and then forwarded the document from her personal email to Edwards.

In March 2017, Edwards could not find his copy of the CD containing the USPS-OIG STARS database, scripts, source code, and file server contents. On March 21, 2017, Edwards reached out to Patel, who copied the folder containing that information from the DHS-OIG server onto two DVDs. Patel put the DVDs in an envelope and gave them to Venkata to deliver to Edwards. The following day, Venkata met Edwards outside DHS-OIG headquarters and gave him the envelope.

The computer forensic evidence demonstrates the extraordinary extent of the theft. On April 19, 2017, pursuant to a search warrant, DHS-OIG investigators seized numerous computing devices, including server towers, a laptop, and various optical disks and other storage media from Edwards's home. The forensic examination of the seized devices revealed that they contained extensive property belonging to DHS-OIG and USPS-OIG, including multiple versions of the source code for EDS and PARIS, coding software used for EDS development with an access key registered to DHS, and various non-public technical documents relating to the systems. The investigators also found numerous copies of DHS-OIG- and USPS-OIG-owned database files

containing sensitive investigatory information and the PII of hundreds of thousands of employees of the respective agencies, including names, dates of birth, social security numbers, and home addresses.

On April 20, 2017, during an interview with DHS-OIG investigators, Venkata gave his consent to the seizure and forensic examination of three of his personal computing devices, consisting of two hard drives and a USB drive. Investigators discovered that Venkata, too, had extensive content belonging to DHS-OIG and USPS-OIG on his personal devices. That content included portions of the source code for EDS and PARIS, complaint documents belonging to USPS-OIG containing employee PII, and a product key for coding software registered to DHS-OIG.

        iii.    *The Conspirators Disclose Sensitive Investigatory Information and PII to Software Developers in India.*

In June 2016, Edwards entered discussions with a software development company in Bangalore, India about developing Next Gen EDS. Edwards finalized his contract with the company on July 9, 2016. He told the Indian software developers that he would provide them with the requirements document for eSubpoena. He also promised that when he visited India for in-person meetings about the project in August, he would "take a laptop with a complete working version aling [*sic*] with code and leave it with the team." As witnesses will confirm, Edwards did in fact provide the developers with a laptop containing the stolen code. After he arrived in Bangalore on August 8, 2016, he told his contact at the company that he would "have the use case and well as [*sic*] screen shots and laptop" to deliver at their meeting. Edwards also provided the Indian software developers login credentials so that they could remotely access the versions of EDS and PARIS that he had installed on his home servers, complete with the stolen databases

containing sensitive law enforcement information and PII of federal employees. Documentary evidence confirms that the developers did, in fact, log into Edwards's home servers.

In the fall of 2016, Edwards reached out to Russell Barbee, a retired investigator from DHS-OIG. Edwards asked Barbee, with his extensive investigatory background, to serve as a consultant regarding the user requirements for Next Gen EDS. He did not tell Barbee that he was building the system using stolen source code and databases. The two agreed that, if Edwards was able to sell Next Gen EDS, he would reimburse Barbee for his time. Barbee reviewed the demo version of Next Gen EDS and provided feedback to the Indian developers. In March and April 2017, Edwards and Barbee traveled to India together to meet with the developers and provide in-person feedback regarding revisions to the system.

Text message evidence confirms that Venkata was well aware of the involvement of the Indian developers, as well as the fact that Edwards had given them access to government property and PII. In March 2017, Edwards requested Venkata's assistance in setting up PARIS on a new server at his home. Edwards explained that he wanted "to show the programmers how the Audit module should work," noting that he "Imported all the data from stars"—referring to USPS-OIG's STARS database that houses USPS employees' PII. Venkata's response: "Ok." Later that month, Venkata was having trouble logging into Edwards's home server. Edwards sent Venkata a series of usernames and passwords to try. "If none is working," he said, "then there is a problem at ur end. Coz the folks from India are logged in." Venkata expressed no surprise that "folks from India" were, at that very moment, accessing the government-owned systems and sensitive databases installed on Edwards's home server.

*iv.    Venkata Provides Technical Assistance and Support for the Scheme.*

Venkata played an integral role in the scheme beginning in at least May 2016.  On Monday, May 30, 2016, which was Memorial Day, Edwards, Patel, and Venkata met at Patel's home.  At the meeting, the three discussed Edwards's plan to develop a commercial competitor to EDS.  Patel and Venkata showed Edwards the latest version of EDS, including eSubpoena, which Patel pulled up on a government-issued laptop at her home.  Venkata explained some of the technologies used in the current version of EDS and suggested alternatives that Edwards could incorporate into Next Gen EDS.

Venkata then assisted Edwards in installing the stolen software on his home servers.  On June 27, 2016, Venkata sent an email from his government email account to Patel's government email account containing instructions, together with screenshots, on how to resolve a problem that Edwards had encountered in setting up EDS on his home servers.  Patel forwarded Venkata's instructions first to her personal email account and then to Edwards's email account.

Edwards also enlisted Venkata's help in providing the resources he had promised to the Indian developers, namely the eSubpoena requirements document and the laptop containing a working copy of EDS.  On July 8, 2016, Venkata sent an email from his government account to Patel's attaching a DHS document titled "Functional Requirements Document eSubpoena."  Patel again forwarded the document from her government email to her personal email, and then to Edwards.  On July 13, 2016, Edwards delivered a laptop to Patel at DHS-OIG headquarters, who in turn gave it to Venkata.  Patel and Venkata exchanged text messages about whether they would need to copy source code and database files so that EDS could be deployed on the laptop.  Venkata then took the laptop home to configure it and test the EDS program installed on it.  After he had

finished, Venkata delivered the laptop to Edwards at a jewelry store in Tyson's Corner, Virginia.

Venkata continued to provide technical support to Edwards.  On July 20, 2016, Edwards sent Venkata instructions on how to log in remotely to Edwards's home servers.  Over the following weeks, Venkata provided programming and troubleshooting assistance.  He updated Edwards via text messages as he worked on "adding attorney as user," "fbi notification," "subpoena templates," "investigations," "ad hoc reporting," and other issues.  Venkata also texted Patel the login credentials that he had received from Edwards to login to Edwards's home server. Consistent with the text messages, the forensic examination of Edwards's laptop and home servers found that they were installed with software to allow for remote access.

In March 2017, Edwards again turned to Venkata for assistance.  On March 4, 2017, Edwards and Venkata corresponded via text message about Venkata's efforts to log in and restore an EDS database on Edwards's home server.  As noted above, that same month, Venkata helped Edwards install PARIS on a new server so that Edwards could "show the programmers how the Audit module should work."  On March 15, 2017, Edwards emailed Venkata remote login credentials and administration information for his PARIS server.  Venkata responded to Edwards's email two days later by providing a user manual for PARIS audit projects with a note, "Charles, I am working on it.  I found user manual, may be useful to you.  attached audit file."  From March 15 through 29, 2017, Venkata and Edwards exchanged numerous text messages about work that Venkata was performing on the stolen programs and databases installed on Edwards's home server.

### C.      Venkata's False Statements and Destruction of Evidence

Venkata participated in three interviews with investigators from DHS-OIG, in which he

made a series of false statements and repeatedly changed his story.  In his first interview, on April 20, 2017, Venkata acknowledged that EDS, and eSubpoena specifically, were owned by the U.S. government.  But he denied providing a copy of the EDS source code to anyone or being asked to do so by anyone.  Venkata further stated that he had never heard of Delta Business Solutions and denied having a second job in which he worked for Edwards.

In his second interview, on May 16, 2017, Venkata stated that all software development work related to his official duties would occur on a government laptop or server.  He admitted that he was not authorized to take copies of the development work or code, and that it would be wrong to take database data.  Venkata falsely stated that he was unaware if Edwards had an outside company and denied that Edwards had ever asked him to work on personal servers or to review software that Edwards was developing.  Later in the interview, Venkata admitted that Edwards had requested assistance with a PARIS server and provided Venkata with login information, but falsely claimed that he never attempted to log in.  During the interview, Venkata consented to a review of his call records, text messages, and personal email records on his phone.  The agent who reviewed his phone observed that the phone contained neither emails nor phone log records with Edwards.

Venkata's third interview took place on May 31, 2017.  During that interview, Venkata admitted for the first time that he knew that Edwards was interested in developing a case management system when he left DHS-OIG and that Patel and Edwards had contemplated building a system based on PARIS.  But Venkata continued to falsely claim that neither Patel nor Edwards had ever asked him to assist with the development of an investigative case management system and disclaimed any knowledge of Patel and Edwards's development of such a system.  When

11

questioned about the absence of call logs and emails with Edwards on his personal phone, Venkata admitted that he had intentionally deleted his communications with Edwards and Patel in an effort to distance himself from them.  Venkata further admitted that he did so within a week of being notified that he needed to report any communications with Edwards or Patel to DHS-OIG.

## II.    THE UNITED STATES' EVIDENTIARY PRESENTATION

### A.    Witness Testimony

At trial, the witnesses that the United States intends to call include (1) Venkata's co-conspirators, Edwards and Patel, who pleaded guilty to their participation in the conspiracy to commit theft of government property; (2) Peter Paradis, the USDA-OIG official whom Edwards and Patel attempted to induce to purchase Next Gen EDS; (3) Russell Barbee, the former DHS-OIG investigator whom Edwards hired to consult on the software development; (4) one or more of Venkata's former colleagues from the IT Division of DHS-OIG; (5) Special Agents from DHS-OIG and USPS-OIG who will present documentary evidence relating to the charged offenses, testimony regarding the forensic examination of Venkata's and Edwards's computing devices, and testimony regarding statements made by Venkata during voluntary interviews conducted as part of their investigation; and (6) the four victims of the aggravated identity theft, who will testify that Venkata's use, possession, and transfer of their PII was unauthorized.

### B.    Text Messages and Emails

The United States will introduce text messages and emails among the conspirators demonstrating that Venkata was a knowing and active participant in the scheme from its early days.  These communications will corroborate witness testimony that Venkata participated in the Memorial Day 2016 planning meeting at Patel's home, that he repeatedly logged into Edwards's

home server to provide troubleshooting and development assistance, that he provided sensitive technical documents relating to government-owned software systems to Edwards, and that he delivered stolen government property to Edwards on a laptop in July 2016 and again on DVDs in March 2017. They also demonstrate Venkata's awareness of the extent of the scheme, including the presence of PII in the stolen databases and the involvement of the Indian software developers.

The admissibility of documentary evidence involves three questions: first, whether the document contains relevant evidence; second, whether the document is authentic; and third, whether the statements contained within the document are non-hearsay or excepted from hearsay, and therefore admissible. The relevance of the text messages and emails is explained above.

To authenticate a document, its proponent need only "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a); *United States v. Safavian*, 435 F. Supp. 2d 36, 39 (D.D.C. 2006) ("[T]he Court need not find that the emails are necessarily what the proponent claims, only that there is evidence sufficient for the jury to make such a finding." (citation omitted)). Authenticity can be established through the testimony of a witness with knowledge that "an item is what it claimed to be," Fed. R. Evid. 901(b)(1), or through the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item," Fed. R. Evid. 902(b)(4). The United States will authenticate the text message and email communications through the testimony of one of the parties to the communications. *See Klayman v. Judicial Watch, Inc*., 297 F. Supp. 3d 80, 85–87 (D.D.C. 2018) (holding that email records were adequately authenticated by testimony of party to email chains).

The statements contained within the text messages and emails among the conspirators are non-hearsay. Venkata's own statements are admissible as statements of a party opponent. Fed. R.

Evid. 801(d)(2)(A).  Statements by Patel and Edwards are admissible as co-conspirator statements made "during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E); *United States v. Gatling*, 96 F.3d 1511, 1520 (D.C. Cir. 1996) (noting that court "must find by a preponderance of the evidence that the person making the statement was a co-conspirator and that the statement was made during and in furtherance of the conspiracy").  If necessary, the Court may admit such statements provisionally, subject to the government's subsequent introduction of sufficient evidence to demonstrate that the requirements of Rule 801(d)(2)(E) are met.  *See United States v. Loza*, 763 F. Supp. 2d 108, 112 (D.D.C. 2011).

The United States may also introduce text messages and emails between members of the conspiracy and non-members, such as the developers in India and Russell Barbee.  These communications will also be authenticated by a party to the communication.  Statements by Edwards or Patel are admissible as co-conspirator statements pursuant to Rule 801(d)(2)(E).  Statements by non-members of the conspiracy will either be non-hearsay because they do not contain an "assertion" or will be offered for a non-hearsay purpose.  Fed. R. Evid. 801(a) (defining hearsay as a "[s]tatement" that constitutes an "assertion"); Fed. R. Evid. 801(c)(2) (defining hearsay as a statement offered "to prove the truth of the matter asserted").

### C.     Venkata's Statements to Investigators

The United States will introduce statements made by Venkata during his interviews with DHS-OIG investigators, including false statements denying his involvement in the scheme, admissions that he knew EDS was government property and that he was not authorized to remove source code and databases, and his admission that he deleted text messages and emails with Edwards and Patel in an effort to distance himself from them.  When offered by the United States,

Venkata's statements are admissible as statements of party opponent.   *See* Fed. R. Evid. 801(d)(2)(A); *Safavian*, 435 F. Supp. at 43 (holding that "statements attributed directly to [the defendant] come in as admissions by a party opponent under Rule 801(d)(2)(A)").

### D.   Audio Recordings and Transcripts

At trial, the United States will offer into evidence audio recordings of telephone calls, meetings, and voice messages between Peter Paradis, Edwards, and Patel, which were consensually monitored and recorded by law enforcement.   The recordings will be on CDs that will be marked and offered as exhibits.   With the CDs, transcripts will be offered as an aid to be used while the recorded conversations are being played for the jury.   The transcripts will also be offered into evidence for submission to the jury with the CDs to aid the jury in its deliberations.

To be admissible, an audio recording must be (1) "authentic, accurate, and trustworthy"; and (2) "audible and comprehensible enough for the jury to consider the contents."   *United States v. Slade*, 627 F.2d 293, 301 (D.C. Cir. 1980).   The United States will authenticate the recordings via "testimony from parties to the conversation" affirming that the recording "contained an accurate record of what was said."   *United States v. Strothers*, 77 F.3d 1389, 1392 (D.C. Cir. 1996). As to audibility, recordings are admissible unless "the unintelligible portions are so substantial as to render the recording as a whole untrustworthy."   *Slade*, 627 F.2d at 301 (internal quotation marks omitted).   Indistinct portions may be clarified by playing the recordings for the jury more than once or, as discussed below, by reference to transcripts to "guide [the jury] past the background noise and irrelevant conversation."   *Id.* at 302.   Although the recordings at issue have some indistinct portions, they are for the most part readily comprehensible.

The Court has discretion to permit the jury to refer to transcripts during trial and to admit

such transcripts into evidence to aid the jury in its deliberations.  *See United States v. Holton*, 116 F.3d 1536, 1543 (D.C. Cir. 1997).  It is appropriate to do so here because the recordings in some instances have background noise and indistinct portions.  Permitting the jury to refer to transcripts will "help prevent jury confusion and wasted time as a tape is being played."  *Id.* at 1542.  The transcripts are merely guides to the evidence and "it is important that the judge instruct the jurors that their personal understanding of the tape supersedes the text in a transcript."  *Slade*, 627 F.2d at 302.  The United States has proposed giving the standard Red Book instruction to that effect. *See* 1 Criminal Jury Instructions for the District of Columbia 2.310 (2021); ECF No. 97.  The government provided the defense with draft transcripts on February 28, 2022.  If the parties are unable to agree on stipulated transcripts, then the Court may admit two versions of the transcripts and instruct the jury that it is up to them to decide which version, if any, to accept.  *See Holton*, 116 F.3d at 1343.

      **E.**    **Computer Forensic Evidence**

At trial, the United States will also introduce the results of searches performed on computing devices and storage media belonging to or used by Edwards and Venkata.  The devices and media belonging to Edwards were seized at his home pursuant to a search warrant on April 19, 2017, and consist of computer servers, a laptop computer, and various optical disks and hard drives.  The devices and media associated with Venkata consist of two hard drives and a USB drive seized at Venkata's home with his consent on April 20, 2017, and a government-issued USB drive recovered from Venkata's office.  After seizing the devices and media, agents from DHS-OIG and USPS-OIG created a forensic image, meaning an exact copy, of each item.  They then ran forensic software, such as Blacklight or EnCase, on the forensic images to extract and analyze

their contents.  Finally, they wrote Computer Forensic Reports summarizing the results of their analysis.  Images of the extracted contents of the devices and media are included as attachments to the corresponding Computer Forensic Reports.

The United States will introduce the testimony of the DHS-OIG and USPS-OIG agents who performed the forensic analysis and offer into evidence the relevant portions of the attachments to the Computer Forensic Reports.  The agents will describe the forensic examination process and testify as to what they found.  *See, e.g.*, *United States v. Soto*, 720 F.3d 51, 59–60 (1st Cir. 2013) (holding that the government may introduce the testimony of an agent who "conducts and independent examination" of computer evidence "and testifies to his own results").  Through the agents' testimony, the United States will offer excerpts from the attachments to the Computer Forensic Reports containing the underlying data.  For example, the United States will offer images of source code, folder structures, and PII discovered on Edwards's and Venkata's devices.  The United States will authenticate the attachment excerpts through agent testimony regarding the extraction process.  The material contained in the excerpts either is not hearsay because it is not an "assertion" within the meaning of Rule 801(a) or is not made by a "declarant" within the meaning of Rule 801(b), or will be offered for a non-hearsay purpose, *see* Fed. R. Evid. 801(c)(2).

The agents' testimony is admissible as lay testimony.  *See* Fed. R. Evid. 701.  Like a police officer who searches a car and discovers contraband, the agents will testify as to their personal knowledge of the search and the material that they recovered.  In conducting the searches, the agents employed familiar processes such as copying files, searching data, and reviewing the results.  *See United States v. McLeod*, 755 F. App'x 670, 673 (9th Cir. 2019).  And although the search process in this case involved "particularized knowledge" that the agents have gained

through experience, courts have long held that such testimony is admissible as lay testimony.   *See*

*United States v. Montijo-Maysonet*, 974 F.3d 34, 48 (1st Cir. 2020), *cert. denied*, 142 S. Ct. 145

(2021).   Nonetheless, in an abundance of caution, the United States noticed the agents pursuant to

Rule 16(1)(a)(G), *see*, ECF Nos. 44, 64, and is prepared to qualify them as experts should the

Court determine that it is necessary to do so.   *See United States v. Ganier*, 468 F.3d 920, 926–27

(6th Cir. 2006).

## III.   ANTICIPATED DEFENSES AND LEGAL ISSUES

### A.   Criminal Intent

The United States anticipates that Venkata will argue that he is not guilty of the charged

offenses because he was acting on the instructions of his supervisor, Patel.   For the reasons set

forth in the United States' Motions *in Limine* Nos. 1 and 2 to Preclude Unavailable Affirmative

Defenses, ECF No. 98, that line of argument is not a valid affirmative defense.   Venkata may argue

instead that his reliance on Patel's instructions negates the *mens rea* element of the charged

offenses.   But Venkata's criminal intent is evident from his concealment and deception.

When Venkata was approached by agents from DHS-OIG, he falsely denied his

involvement in the scheme and destroyed evidence in an effort to obstruct the investigation.

Venkata initially denied any knowledge of Edwards's plans to build a commercial case

management system.   He stated that all software development work related to his official duties

would occur on a government laptop or server, and that Edwards had never asked him to work on

personal servers or to review software that Edwards was developing.   Venkata later admitted that

Edwards had requested his assistance with a PARIS server and provided him with login

information, but falsely stated that he never actually attempted to login to the server.   When

18

investigators questioned him about the absence of call records and emails with his co-conspirators on his personal phone, Venkata admitted that he intentionally deleted those records within a week of receiving notification that he needed to report any communications with Edwards or Patel to DHS-OIG.  In a moment of candor, Venkata stated that he deleted the messages in an attempt to distance himself from Edwards and Patel.

Venkata's conduct during the scheme confirms that he knew his activities were not authorized.  He used his personal phone to communicate with his co-conspirators and met with them away from DHS-OIG premises to avoid detection.  For instance, the conspirators met at Patel's home on Memorial Day 2016 to discuss their plans to develop Next Gen EDS.  When Venkata delivered the laptop containing EDS to Edwards in July 2016, he met him after work hours at a jewelry store in Tyson's Corner.  And when Venkata delivered the envelope with CDs containing USPS-OIG data to Edwards in March 2017, he met Edwards outside the building for the handoff.

Further, Venkata did not reveal his involvement with Edwards's project to DHS-OIG, even when it would have been natural to do so.  In November 2016, in a routine meeting with an agent from DHS-OIG's Office of Investigations, Venkata provided an overview of the development of the eSubpoena module and stated that he was not aware of any other case management software that includes eSubpoena functionality.  Venkata explained that all coding for the system was stored on DHS-OIG's server.  He told the agent that EDS source code had to be checked out individually to work on it, then checked back in for testing and migration to production.  But Venkata made no mention of the fact that he, Edwards, and Patel were at that time developing a commercial version of EDS using DHS-OIG-owned source code stored on Edwards's private servers, as would have

been expected if Venkata believed it was an officially sanctioned DHS-OIG project.

In short, Venkata willingly participated in the scheme and provided extensive assistance to Edwards and Patel to accomplish its objectives.  Venkata's concealment, lies, and obstruction demonstrate that he was well aware that DHS-OIG had not authorized the removal and private use of its property and belie any argument that he lacked criminal intent.

## B.    Arguments Regarding Covert Law Enforcement Techniques

In his Motions to Dismiss the Indictment and reply brief in support thereof, Venkata indicated that he intends to argue that the covert techniques employed by law enforcement in the investigation of this matter somehow amounted to foul play.  *See, e.g.*, ECF No. 71, at 7 n.1 (arguing that the sale of Next Gen EDS "was never going to happen, because Witness One's feigned interest in purchasing a new case management system from Mr. Edwards was a law enforcement sting operation from the very beginning"); ECF No. 60, at 5 n.4 (arguing that "Witness One aggressively pursued Ms. Patel and Mr. Edwards about creating a new case management system for USDA-OIG, including to ensure that it shared many of the same features as DHS-OIG's existing case management system, EDS").  Such arguments are irrelevant to Venkata's guilt or innocence and can only be understood as encouragement of jury nullification. Therefore, the Court should not permit Venkata to argue to the jury that the covert law enforcement techniques employed in this case were improper or to use the terms "sting," "set up," "lure," "trick," "ruse," or similarly pejorative terms to describe those techniques.

The government may lawfully use a wide variety of techniques to root out crime.  *See Sorrells v. United States*, 287 U.S. 435, 441 (1932) ("Artifice and stratagem may be employed to catch those engaged in criminal enterprises.").  Law enforcement agents do nothing wrong when

they use undercover agents, work with confidential informants, or obtain consensual recordings of their investigatory targets. *See United States v. Quinn*, 543 F.2d 640, 648 (8th Cir. 1976). While in exceedingly rare cases, the government's conduct may be deemed so outrageous as to violate due process, the techniques employed in this case did not remotely approach that standard, nor has Venkata contended that they did. *See United States v. Combs*, 827 F.3d 790, 795 (8th Cir. 2016) (noting that court was aware of "only two reported court of appeals decisions—both from the 1970s—that have deemed the government's conduct so outrageous as to violate due process"). And even when a defendant has a credible claim of government misconduct—which Venkata does not—that is an issue for the court, not the jury, and must be raised by pretrial motion if at all. *See United States v. Swiatek*, 819 F.2d 721, 726 (7th Cir. 1987); *United States v. Nunez-Rios*, 622 F.2d 1093, 1098 (2d Cir. 1980).

To insinuate, therefore, that the government engaged in misconduct by using covert law enforcement techniques to investigate this case would be both irrelevant and improper. The government's use of such techniques has no bearing on the defendant's guilt or innocence. *See* Fed. R. Evid. 401 (defining relevant facts as those that are "of consequence in determining the action"). Nonetheless, some jurors may be uncomfortable with the use of law enforcement techniques that involve deception. Accordingly, the only possible purpose for commenting on the government's use of such techniques is to inflame the jury's emotions and encourage nullification. But the law is clear that arguments in favor of jury nullification are improper. *See United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983) ("Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power."). Venkata should not be permitted to make them.

### C.      Evidence of Prior Good Acts

Venkata has indicated his intention to introduce evidence of prior good acts.  Specifically, his exhibit list includes his past performance evaluations at DHS-OIG and an email chain dating from the time of his first interview with DHS-OIG agents in which Venkata notified those agents that Edwards had called him.  Evidence of specific instances of prior good conduct is inadmissible character evidence and should be excluded.  *See* Fed. R. Evid. 401(a)(1).

Rule 404(a)(2) permits a criminal defendant to offer evidence of his pertinent character trait.  However, such evidence is subject to the stringent requirements of Rule 405.  Generally, character evidence may be presented only by testimony about the defendant's reputation or in the form of an opinion.  *See* Fed. R. Evid. 405(a).  A narrow exception exists, however, when "a person's character or character trait is an essential element of a charge, claim, or defense." Fed. R. Evid. 405(b).  Where that exception applies, the party may introduce "relevant specific instances of the person's conduct."  *Id.*; *see also United States v. Brown*, 503 F. Supp. 2d 239, 241 (D.D.C. 2007).  Prior good acts evidence may also be admissible under Rule 404(b), provided it meets other requirements for admissibility and is offered for a purpose other than "to show that on a particular occasion the person acted in accordance with the character."

Venkata may offer his prior good acts evidence under Rules 404(b) or 405(b) on the theory that it is relevant to the lack-of-predisposition prong of his entrapment defense.  *See United States v. Thomas*, 134 F.3d 975, 979–80 (9th Cir. 1998) (holding that prior good acts evidence is admissible under Rules 404(b) and 405(b) when defendant asserts a valid entrapment defense). However, for the reasons explained in the United States' Motion *in Limine* No. 2, *see* ECF No. 98, Venkata does not have a valid an entrapment defense.  His prior good acts evidence is therefore

not admissible under Rules 404(b) or 405(b).   Nor is evidence of specific prior good acts admissible to prove character for truthfulness under Rule 608.   Accordingly, Venkata's prior good acts evidence should not be admitted.

## IV.   CONCLUSION

Venkata engaged in an unlawful scheme to profit from government property and misuse the PII of hundreds of thousands of government employees.   When he realized he had been caught, he lied to investigators and attempted to obstruct the investigation.   Edwards and Patel have pleaded guilty to their roles in the scheme.   On March 28, Venkata will stand trial for his crimes. The government's evidence will prove his guilt beyond a reasonable doubt.

Respectfully submitted,

MATTHEW M. GRAVES                              COREY R. AMUNDSON
UNITED STATES ATTORNEY                         CHIEF
For the District of Columbia                   Public Integrity Section

By: */s/ Christine M. Macey*            By:    */s/ Victor R. Salgado*
    CHRISTINE M. MACEY                         VICTOR R. SALGADO
    D.C. Bar No. 1010730                       D.C. Bar No. 975013
    Assistant United States Attorney           Senior Litigation Counsel
    Fraud, Public Corruption, and Civil Rights Section   Public Integrity Section
    555 4th Street, NW                         Criminal Division
    Washington, D.C. 20530                     1301 New York Avenue, NW
    (202) 252-7058                             Washington, D.C. 20530
    christine.macey@usdoj.gov                  (202) 353-4580
                                               victor.salgado@usdoj.gov

                                        By:    */s/ Celia R. Choy*
                                               CELIA R. CHOY
                                               D.C. Bar No. 1017211
                                               Trial Attorney
                                               Public Integrity Section
                                               Criminal Division
                                               1301 New York Avenue, NW
                                               Washington, D.C. 20530
                                               (202) 875-1557
                                               celia.choy@usdoj.gov