UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.             )<br>)<br>MURALI YAMAZULA VENKATA, )<br>)<br>Defendant.        )<br>_____ ) | Case No. 20-cr-00066-RDM |

**GOVERNMENT'S SUPPLEMENTAL BRIEF REGARDING *CIMINELLI v. UNITED STATES*, 598 U.S. 306 (2023)**

On August 29, 2023, the Court held oral argument on defendant Murali Venkata's Motions for Judgment of Acquittal and New Trial. During oral argument, the Court invited the parties to submit supplemental briefing regarding the Supreme Court's decision in *Ciminelli v. United States*, 598 U.S. 306 (2023), which invalidated the Second Circuit's "right to control" theory of wire fraud. The government respectfully submits that *Ciminelli* is not applicable to this case because the government has consistently relied on a traditional property-fraud theory, not a "right to control" theory.

**DISCUSSION**

**I.   *Ciminelli* Invalidated a Fraud Theory Based on Deprivation of the Intangible Right to Control One's Assets**

For decades, the Second Circuit recognized a theory of wire fraud known as the "right to control" theory. That theory held that "[s]ince a defining feature of most property is the right to control the asset in question, . . . property interests protected by the wire fraud statute include the interest of a victim in controlling his or her own assets." *United States v. Percoco*, 13 F.4th 158, 170 (2d Cir. 2021) (quoting *United States v. Lebedev*, 932 F.3d 40, 48 (2d Cir. 2019)), *vacated*

1

*and remanded*, *Kaloyeros v. United States*, 143 S. Ct. 2490 (2023).  Under that theory, the Second Circuit upheld wire fraud convictions based on "a showing that the defendant, through the withholding or inaccurate reporting of information that could impact on economic decisions, deprived some person or entity of potentially valuable economic information." *Id.* (internal quotation marks omitted).  In *Ciminelli*, the Supreme Court held that the right-to-control theory is invalid because the wire fraud statute "criminalizes only schemes to deprive people of traditional property interests," and does not protect an intangible interest in "'potentially valuable economic information' 'necessary to make discretionary economic decisions.'"  598 U.S. at 309.

In *Ciminelli*, the government relied on the right-to-control theory "[t]hroughout the grand jury proceedings, trial, and appeal."  *Id.* at 310.  The government "successfully defeated [the defendants'] motion to dismiss by relying on that theory," "successfully moved the District Court to exclude certain defense evidence as irrelevant to that theory," and "relied on that theory in its summation to the jury."  *Id.* at 310–11.  Consistent with the right-to-control theory, the district court instructed the jury that "the term 'property' in § 1343 'includes intangible interests such as the right to control the use of one's assets'" and that it could find the defendants guilty if it found that they "'deprived [the victim] of potentially valuable economic information that it would consider valuable in deciding how to use its assets.'"  *Id.* at 311.  On appeal, the government "relied solely on the right-to-control theory" and the Second Circuit affirmed the convictions "based on its longstanding right-to-control precedents."  *Id.*

Before the Supreme Court, the government conceded that the right-to-control theory is invalid.  *Id.* at 316.  It nonetheless asked the Court to affirm the petitioner's convictions on the alternative ground that the evidence was sufficient to establish wire fraud under a traditional property-fraud theory.  *Id.*  Specifically, the government argued that the petitioner schemed to

2

obtain a traditional property interest, namely, "hundreds of millions of dollars in contract funds," through fraud. *See* Brief for the United States at 32, *Ciminelli v. United States*, No. 21-1170 (filed Oct. 12, 2022). The Court rejected the government's argument because that alternative theory was not presented to the jury or the lower courts. *Id.* at 316–17. It reversed the Second Circuit's judgment and remanded for further proceedings. *Id.* at 317. In a concurring opinion, Justice Alito expressed his understanding that the Court's opinion did not address "fact-specific issues on remedy outside the question presented," including "the Government's ability to retry petitioner on the theory that he conspired to obtain, and did in fact obtain, by fraud, a traditional form of property, viz., valuable contracts." *Id.* at 317–18.

## II. The Government Has Consistently Advanced a Traditional Property-Fraud Theory in this Case

*Ciminelli* has no application to this case because the government has never relied on the right-to-control theory. At every stage of the proceedings, the government has advanced a traditional property-fraud theory: that the defendants schemed to defraud USDA-OIG of a traditional form of property — money — by inducing it to purchase EDS 2.0 while misrepresenting and concealing the fact that EDS 2.0 was being developed using stolen government software, source code, and databases. The government alleged this property-fraud theory in the Indictment, *see* ECF No. 1, ¶¶ 11(b), 12, 15(g), and relied on it in opposing the defendants' Rule 12 motions, *see* ECF No. 66, at 11–15. It argued the same property-fraud theory to the jury in its opening statement, *see* Mar. 29, 2022 AM Trial Tr. 9:21–10:23, and in summation, *see* Apr. 6, 2022 PM Trial Tr. 14:5–14, 57:5–58:10.

Consistent with the government's property-fraud theory, the Court charged the jury with respect to Count One that "[t]o 'defraud the United States' means to cheat the United States

3

government or any of its agencies out of money or property." ECF No. 146, at 33. Similarly, with respect to Count Eleven, the Court charged the jury that "[a] 'scheme to defraud' means any plan, pattern, or course of action intended to deprive another of money or property or bring about some financial gain to the person engaged in the scheme." ECF No. 146, at 43. These instructions required the jury to find that the defendant schemed to defraud the government of money or property. They did not permit the jury to convict if it found that the defendants intended to deprive the government of nothing more than "'potentially valuable economic information' 'necessary to make discretionary economic decisions.'" *Ciminelli*, 598 U.S. at 309.

Finally, the government reiterated its property-fraud theory in its affirmative arguments in response to the defendant's Motion for Judgment of Acquittal. *See* ECF No. 169, at 4–9. To the extent the government addressed the right-to-control caselaw, it did so only in response to defense arguments regarding those cases. *See* ECF No. 169, at 12–13. In sum, the government has consistently relied on the traditional property-fraud theory that the defendants schemed to obtain government funds by inducing USDA-OIG to purchase EDS 2.0 based on material misrepresentations and omissions about their methods of developing that product.

Courts routinely affirm wire fraud and conspiracy convictions based on the theory that the defendant schemed to obtain government contracts by misrepresenting the contractor's qualifications or business practices. For example, in *United States v. Leahy*, 464 F.3d 773 (7th Cir. 2006), the defendants misrepresented businesses that they controlled as minority-owned or women-owned to take advantage of a Chicago ordinance granting preference to such businesses in city contracting. *Id.* at 778–81. Based on those misrepresentations, they won millions of dollars in City contracts and subcontracts. *Id.* at 780–81. Similarly, in *United States v. Maxwell*, 579 F.3d 1282 (11th Cir. 2009), the defendants fraudulently obtained contract funds set

aside under Miami-Dade County's Community Small Business Enterprise program and the federal "disadvantaged business enterprise" ("DBE") program by falsely representing that certain electrical work called for under the contracts would be performed by a qualifying small business or DBE.  *Id.* at 1288–93.  Other circuits have similarly affirmed convictions of defendants who misrepresented their compliance with the federal DBE program to win government contracts. *See, e.g.*, *United States v. Nagle*, 803 F.3d 167, 171–73 (3d Cir. 2015); *United States v. Brothers Construction Company of Ohio, Inc.*, 219 F.3d 300, 304–08 (4th Cir. 2000).  In each of these cases, as here, the defendants schemed to deprive the government of a traditional form of property — money paid under government contracts — and they did so by misrepresenting the contractor's qualifications or business practices.  The defendants' schemes were criminal because, under some circumstances, a prospective contractor's qualifications or business practices are material to the counterparty.  *See, e.g.*, *Nagle*, 803 F.3d at 181 ("The DBE program cares about who performs the work.").

      Notably, several of the defendants in these fraudulent inducement cases, like the defendant here, challenged their convictions on the ground that the government received the economic benefits of the bargain.  For example, in *Leahy*, the defendants argued that the indictment failed to allege a deprivation of money or property because their companies, despite having misrepresented themselves as minority-owned or women-owned, nonetheless "fulfilled their obligations under the relevant contracts or subcontracts."  464 F.3d at 787.  They asserted that "because the city would ostensibly have paid the same for the provided services regardless, Chicago lost no money."  *Id.*  The Seventh Circuit rejected that argument.  It noted that, under established precedent, the mail and wire fraud statutes "do not require the government to prove either contemplated harm to the victim or any loss," and that "a defendant's honest belief that his

5

actions will ultimately result in a profit and not a loss is irrelevant for determining whether a violation has occurred." *Id.* at 786–87 (collecting cases). The court concluded that "it does not matter that [the defendant] and his cronies thought that Chicago was getting a service worth every dime in the contracts." *Id.* at 789. All that was required was "a willful act with the intent to deceive or cheat," which was demonstrated in that case by the fact that the defendant "deceived Chicago regarding the true status of his companies." *Id.*

The Eleventh Circuit rejected a similar argument in *Maxwell*. There, the defendant asserted that "he did not deprive the County or the United States of money or property, because, in the end, the County and the United States received the electrical work they sought." 579 F.3d at 1302. The Eleventh Circuit disagreed. It noted that "financial loss is not at the core of these mail and wire frauds." *Id.* Rather, the mail and wire fraud statutes "seek to punish the intent to obtain money or property from a victim by means of fraud and deceit." *Id.* Thus, "[r]egardless of the quality or cost of the work completed by [the defendant's company]," the defendant committed fraud by "obtain[ing] construction contracts and substantial payments from the County and the United States for which [his company] was not eligible." *Id.* at 1302–03. Finally, in *Brothers Construction*, the Fourth Circuit rejected the defendants' argument that the government suffered no loss for sentencing purposes because the state agency victim ultimately "received exactly what it bargained for" and "at no additional cost." 219 F.3d at 317–18. The court concluded that "there was certainly loss as contemplated by the guidelines" because "the funds were not put to the intended use." *Id.* at 318.

These holdings are consistent with recent Supreme Court precedent reaffirming that the "scheme to defraud" element of the bank fraud statute, which is similarly worded to the wire fraud statute, "demands neither a showing of ultimate financial loss nor a showing of intent to cause

6

financial loss." *Shaw v. United States*, 137 S. Ct. 462, 467 (2016). The Court observed that "'[a] man is none the less cheated out of his property, when he is induced to part with it by fraud,' even if 'he gets a quid pro quo of equal value.'" *Id.* (quoting *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932) (Hand, J.)). Similarly, in the context of the wire fraud statute, the Court has rejected the proposition that "a scheme to defraud requires a monetary loss." *Carpenter v. United States*, 484 U.S. 19, 26 (1987).

In arguing for an economic-loss requirement, the defendant largely relies on a line of Second Circuit precedent that attempts to distinguish "between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007); *see* ECF No. 166, at 3–6. But the reasoning behind that distinction is unclear. As the Second Circuit itself recognizes, the wire fraud statute requires only that the misrepresentation be material. *See United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) (listing the elements of wire fraud). The definition of materiality is well-established. *See Neder v. United States*, 527 U.S. 1, 16 (1999) ("[A] false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995))). The Second Circuit's additional requirement that the misrepresentation go to "an essential element of the bargain" functions as a kind of super-materiality requirement. In his concurring opinion in *United States v. Feldman*, 931 F.3d 1245 (11th Cir. 2019), now-Chief Judge Pryor of the Eleventh Circuit observed that this requirement has no basis in either the statutory text or the common law. *See id.* at 1265–74 (W. Pryor, J., concurring). Moreover, the Second

7

Circuit's "essential element of the bargain" requirement is difficult to square with the fraudulent inducement cases cited above, which are based on well-established principles of fraud.

The only D.C. Circuit precedent that defendant cites is *United States v. Lemire*, 720 F.2d 1327 (D.C. Cir. 1983); *see* ECF No. 166, at 3. But *Lemire* is not applicable. *Lemire* is an honest-services fraud case predating *McNally v. United States*, 483 U.S. 350 (1987). Before *McNally*, the courts of appeals construed the mail and wire fraud statutes to reach schemes to deprive the victim not only of money and property, but also of the intangible right to honest services. *See Skilling v. United States*, 561 U.S. 358, 400 (2010). The courts construed this honest-services fraud doctrine to reach intentional failures to disclose conflicts of interest in both the public and private sectors. *Id.* at 409–10.

*Lemire* is a private-sector honest-services fraud case. The government charged the defendant with wire fraud based on his failure to disclose to his employer that he had a financial interest in a transaction that he worked on in the course of his employment. *See* 720 F.2d at 1332–34. The court, consistent with the then-valid honest-services fraud doctrine, stated that "although the scheme to defraud must threaten some cognizable harm to its target, that harm need not be a deprivation of tangible property or money; criminal fraud encompasses schemes to defraud persons of significant intangibles as well." *Id.* at 1336. To avoid concerns about criminalizing "any intentional undisclosed breach of duty to an employer," the court limited private-sector honest-services fraud prosecutions based on undisclosed conflicts of interest to cases involving "failure to disclose something which in the knowledge or contemplation of the employee poses an independent business risk to the employer." *Id.* at 1337.

Four years later, in *McNally*, the Supreme Court invalidated the honest-services fraud doctrine on the ground that the mail fraud statute protects only "property rights," which did not

include an intangible right to honest services. *See* 483 U.S. at 360. In response to *McNally*, Congress enacted 18 U.S.C. § 1346, which provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." Then, in *Skilling*, the Supreme Court held that Section 1346 reaches only schemes involving bribes and kickbacks and does not apply to undisclosed conflicts of interest. *See* 561 U.S. at 410. Thus, *Lemire* addresses a theory of wire fraud — deprivation of honest services through failure to disclose a conflict of interest — that has been twice invalidated by the Supreme Court. *Lemire* is not relevant to the traditional property-fraud theory at issue in this case.

Here, the Court correctly and without objection instructed the jury that, to convict the defendant of wire fraud, it had to find that he knowingly devised or intended to devise a "scheme to defraud . . . by means of materially false or fraudulent pretenses, representations, or promises, or by concealing material facts." ECF No. 146, at 43. The Court defined "scheme to defraud" as "any plan, pattern, or course of action intended to deprive another of money or property or bring about some financial gain to the person engaged in the scheme" and defined "material" as having "a natural tendency to influence, or is capable of influencing, the decision of the person or entity to which it is addressed." ECF No. 146, at 43–44; *see also United States v. Coughlin*, 610 F.3d 89, 107 n.11 (D.C. Cir. 2010) (approving similar jury instruction).

The evidence was more than sufficient to support the jury's verdict on the "scheme to defraud" element. As discussed in the government's Opposition to Defendant's Motion for Judgment of Acquittal, the evidence showed that the defendants' scheme contemplated economic loss to the government because a product that is based on stolen property is worth less than a product that is developed in a legitimate manner. *See* ECF No. 169, at 9–14. But it was not necessary for the jury to make that finding. All that the jury was required to find was that the

9

scheme sought to obtain government property — money — based on material misrepresentations or omissions. As to materiality, the jury heard the following testimony from Special Agent Peter Paradis:

> Q. If you knew the new system had been built using software copied from case management systems used at DHS-OIG and USPS-OIG, would it have mattered to you?
>
> A. Yes.
>
> Q. Why?
>
> A. It would have been illegal, and it would have resulted in multiple procurement acquisition violations, ethics violations, conflict of interest, et cetera. And I would have immediately contacted Mr. Horton directly, absent my chain of command, in order to make him aware of that, of the seriousness of it.
>
> Q. If you knew the new system had been built using source code transferred to another country along with U.S. Government employees' personal information, would it have mattered to you?
>
> A. Yes.
>
> Q. Why?
>
> A. For the same reasons, that that would be a violation of ethics rules, conflict of interest, multiple laws. And it would have been – I would have been concerned about my own involvement at that point in engaging in furtherance of the pursuit.

Mar. 31, 2022 AM Trial Tr. 79:16–80:12. Based on this testimony, the jury could properly conclude that the defendants' misrepresentations and omissions regarding their business practices and the manner in which they were developing EDS 2.0 had a "natural tendency to influence, or [was] capable of influencing" the government's decision to purchase that product. No more was required to establish the existence of a "scheme to defraud" under a traditional property-fraud theory.

## CONCLUSION

*Ciminelli* is not applicable to this case because the government advanced a traditional property-fraud theory. The government presented sufficient evidence of that theory to support the jury's verdict. The defendant's Motion for Judgment of Acquittal on Counts One and Eleven should be denied.

Respectfully submitted,

| | |
|---|---|
| MATTHEW M. GRAVES<br>UNITED STATES ATTORNEY<br>For the District of Columbia | COREY R. AMUNDSON<br>CHIEF, Public Integrity Section<br>U.S. Department of Justice |
| By: */s/ Christine M. Macey*<br>CHRISTINE M. MACEY<br>D.C. Bar No. 1010730<br>Assistant United States Attorney<br>Fraud, Public Corruption, and Civil Rights Section<br>601 D Street NW<br>Washington, D.C. 20530<br>(202) 252-7058<br>christine.macey@usdoj.gov | By: */s/ Victor R. Salgado*<br>VICTOR R. SALGADO<br>D.C. Bar No. 975013<br>Senior Litigation Counsel<br>Public Integrity Section<br>U.S. Department of Justice<br>1301 New York Avenue, NW<br>Washington, D.C. 20530<br>(202) 353-4580<br>victor.salgado@usdoj.gov |
| | By: */s/ Celia R. Choy*<br>CELIA R. CHOY<br>D.C. Bar No. 1017211<br>Trial Attorney<br>Public Integrity Section<br>U.S. Department of Justice<br>1301 New York Avenue, NW<br>Washington, D.C. 20530<br>(202) 875-1557<br>celia.choy@usdoj.gov |