**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 20-cr-00066-RDM |
| v. | Honorable Randolph D. Moss |
| MURALI YAMAZULA VENKATA, | |
| Defendant. | |

**REPLY TO GOVERNMENT'S SUPPLEMENTAL BRIEF
REGARDING *CIMINELLI* v. *UNITED STATES***

On August 29, 2023, the Court held oral argument on Murali Venkata's Motions for Judgment of Acquittal and New Trial.  During oral argument, the Court invited the parties to submit supplemental briefing regarding the Supreme Court's decision in *Ciminelli* v. *United States*, 598 U.S. 306 (2023).  On September 6, 2023, the government submitted a supplemental brief.  On September 7, 2023, Mr. Venkata sought leave to file a reply, which the Court permitted.

Murali Venkata respectfully submits this reply memorandum of law in response to the government's supplemental brief regarding *Ciminelli*, and in further support of his Motion for Judgment of Acquittal and for a New Trial.

**DISCUSSION**

As the Court noted during oral argument, the government's fraud theory comes down to a "conceptual question about whether the jury could have found beyond a reasonable doubt that the product . . . that was being sold was at least, in part, stolen."  Oral Arg. Tr. 47:23-58:3, Aug. 29, 2023.  The Court invited the government to identify trial evidence showing that the

defendants schemed to sell back stolen property rather than a truly new case management system, thereby potentially misrepresenting the product they were selling.  The government failed to identify any such evidence at argument or in its supplemental brief, however, because there is no such evidence.  Rather, the evidence introduced at trial makes clear that Charles Edwards did not incorporate stolen government code into the new case management system he was building, including because he and his team re-wrote the new system using an entirely different programming language.

During their meetings to discuss the project, Mr. Edwards told Peter Paradis that DHS's current version of EDS was "built in cold fusion," an older programming language, and "the coding is way old."  Def. Ex. 28A at 35, 2.  By contrast, he explained that EDS 2.0 was written in C#, a newer programming language.  *Id.* at 2 ("You can try mine out and you see mine is completely every word of it, every sentence in C# is written completely with security testing in it."); *accord* Gov't Ex. 10A at 4 ("EDS is, the way it's designed is the design, the original design is like technology like, the architecture is 10, 12 years, 15 years old.  So, with this new thing that I'm talking about, the architecture is more like um, current in 5 years former."); Def. Ex. 26A at 2 ("It, it's not like DHS because DHS code is so, you know, cobbled together, you would get lots of issues.  It's not, it's not that version.  It's later and it's, it's, it's something that any, you know, regardless of where you are, you'll be able to customize it and figure it for your organization.").  The government has never characterized these statements about the programming language as misrepresentations or offered any evidence that they are untrue or were intended to be misleading.[1]

---

[1]    Indeed, Mr. Edwards even promised Mr. Paradis the opportunity to look at the code and test out the system before paying for it, which would have exposed Mr. Edwards if the new system had contained proprietary government code.  Def. Ex. 28A at 23 ("You

Regarding the development process, Mr. Edwards told Mr. Paradis:  "I took me a long time because I completely re-wrote investigations, hotline, admin, and subpoena.  The e-subpoena has a better look and flow.  It looks, it runs exactly almost the same like how DHS OIG runs, but the load is faster because the way I'm bringing the templates down.  So, mine is a faster handshake."  Def. Ex. 28A at 4.  Again, the government has never characterized the statement that Mr. Edwards completely re-wrote EDS 2.0 as a misrepresentation.  It is also consistent with Mr. Edwards's trial testimony, during which he explained:  "I wanted to build a case management system that regardless of which agency you worked in, it will not be written just for that agency.  Any agency can share that and get that -- fill in certain information and build for them so they don't have to spend a lot of resources trying to configure it just for that organization.  It will be easily adaptable, or you can use that case management across all inspector general offices.  That was my plan. . . . I wanted to sell the latest technology."  Trial Tr. Afternoon Session, 29:20-30:6, Mar. 29, 2022.

On direct, Mr. Edwards testified several times about why he needed to show his team of developers the existing version of EDS, which was so that they could see how the program looked and behaved, in order to reverse engineer a visually similar program with newer code:

Q. And why did you need a functioning version of EDS on your laptop?

A. To see how different people within the OIG would use the system to get from -- you know, how they would input information, how they would retrieve information, how they would be executing it.

Q. What were you going to do with the laptop, sir?

A. I was going to give it to the Indian developers for them to look at it.

---

don't, you have nothing to lose. We'll build it and give it to you, make changes, put in the demo environment, run it.  And then when you're fine with it, go through the procurement thing so you have nothing to do lose at that time.").

Trial Tr. Afternoon Session, 62:10-18, Mar. 29, 2022; *see also id.* 45:12-17 ("I wanted to see a working version of how EDS worked so I can look at that and then see what did not work and then tie it into my new system so I can go back to Pete and say this is what my new system is going to be and build a commercially viable system and sell it to -- to him and the rest of the OIG community."); *id.* 61:3-4 ("I actually wanted to see how a working version is; so based on that, *I would build my -- my own*." (emphasis added)); *id.* 72:2-10 ("I wanted to see and I wanted the Indian programmers to see the same way how EDS functioned at DHS-OIG, that would function in my home server.  So they can see how the EDS functioned, how an investigator would see it and how an analyst would see it and how a manager would see it.  *So they can take a look at that and then build my next version of EDS.*" (emphasis added)).

Mr. Edwards also testified that, without more, having a copy of only the existing EDS code would not have been helpful, further reinforcing that his programmers were not merely copying old code.

> Q. If you just uploaded the EDS source code on to your server, would the Indian developers be able to work and develop your product?
>
> A. No.
>
> Q. Why not?
>
> A. Because they needed to see how the old EDS system functioned so they can look at it and then see what's working.  And then with my ideas and his and Ms. Patel's ideas, will be able to incorporate that into the next generation EDS.

*Id.* 94:24-95:7.  In the face of this evidence, no reasonable juror could have concluded that the defendants were attempting to sell back a copy or portions of the existing EDS code to the government.[2]

---

[2]      The government continues to point to Mr. Paradis's testimony that it would have mattered to him if he knew the new system "had been built using" stolen software and

4

Perhaps recognizing this, the government now attempts to pivot to a new theory of the scheme to defraud—that defendants misrepresented their qualifications or business practices.  As the Court recognized during oral argument, however, this new theory is different than what the government asserted at trial.

> THE COURT: But is there any reason to think that Mr. Edwards indicated to Department of Agriculture that the coding was done solely in the United States and that there were not any Indian or other foreign coders involved in writing the code?
>
> MR. SALGADO: Mr. Paradis testified, I believe, that he did not find out that there were coders in India involved until later on in the investigation.
>
> THE COURT: Right.  But the question is whether Mr. Edwards misled him in any way with respect to who was writing the code or what was being written.
>
> MR. SALGADO:  That's part of the government's theory, that by not disclosing the involvement of Indian coders in developing this new product that – once again, was going to be sold to the USDA-OIG for purposes of housing sensitive information, PII, and the coders could have –
>
> THE COURT: This does strike me as a very different theory from the one that I heard from the government at trial.  If the government's theory is that the fraud was misleading the Department of Agriculture by not disclosing to the Department of Agriculture that there were Indian programmers who were writing the code – I tried this case a long time ago, but I don't recall anything about that in the trial.

Oral Arg. Tr. 48:16-49:13, Aug. 29, 2023.

Even if the government had advanced this theory at trial, it did not offer evidence to support it.  Mr. Edwards told Mr. Paradis that he was using a team of developers to build EDS 2.0, *see* Def. Ex. 28A at 2 ("I have 12 programmers working on this."); *id.* at 35 ("It's just one man trying to build this with 12 programmers."), but Mr. Paradis never asked for any additional details about the programmers or their business practices, nor did he describe any requirements regarding their qualifications.  For this reason, the government's cites to *United States* v. *Leahy*,

---

source code, but this testimony is rendered purely hypothetical by the government's own evidence, which showed that the EDS 2.0 was not in fact built with stolen code.

464 F.3d 773 (7th Cir. 2006), and *United States* v. *Maxwell*, 579 F.3d 1282 (11th Cir. 2009), are inapposite.  In *Leahy*, the defendants explicitly misrepresented that businesses they controlled were minority-owned or women-owned in order to take advantage of a Chicago ordinance granting preference to such businesses in city contracting, and they ultimately won the contract *on the basis of* those misrepresentations.  464 F.3d at 778-81.  Similarly, in *Maxwell*, the defendants explicitly misrepresented that certain electrical work called for under the contracts would be performed by a qualifying small business, which was a specific requirement of the contract.  579 F.3d at 1288-93.

As the jury was instructed here, the government was required to prove a scheme "to obtain property *by means of materially* false" statements or half-truths—in other words, proof that the defendants' false statements were the mechanism naturally inducing the victim to part with their money.  *See* Brief of United States at 47, *Ciminelli* v. *United States*, 598 U.S. 306 (2023) (No. 21-1170).  Unlike in *Leahy* and *Maxwell*, however, there were no specific qualifications or contractual stipulations that Mr. Edwards and his team of developers were required to satisfy, and therefore no causal link between any alleged misrepresentations about their qualifications and the inducement of Mr. Paradis to purchase their new case management system.  Unsurprisingly, there is also no evidence that Mr. Edwards made any such misrepresentations about qualifications, since he had no reason to do so.

In advancing this new theory, the government also seemingly attempts to downplay the materiality requirement.  In its briefs in *Ciminelli*, the government acknowledged that, "[i]n the contracting context, the materiality requirement requires the government to prove that a reasonable person would attach, or it was evident that the victim did attach, *critical importance* to the existence or nonexistence of a misrepresented fact in determining his choice of action in

the transaction—that is, that *the misrepresentation went to the essence of the contract*."  Brief of United States at 11, 18-19, *Ciminelli*, 598 U.S. 306 (No. 21-1170).  Here, by contrast, the government attempts to disclaim this same "essence of the contract" formulation as an unfounded "super-materiality requirement" and avoid it entirely.  The government contends that, based on purely hypothetical testimony by Mr. Paradis, "the jury could properly conclude that the defendants' misrepresentations and omissions regarding their business practices and the manner in which they were developing EDS 2.0" were material under a less rigorous standard used outside of the contracting context and that "[n]o more was required to establish the existence" of a scheme to defraud.  Not only does this formulation misstate the relevant standard for materiality and flatly ignore the causation requirement, but it also misstates the evidence.

In holding that "[t]he right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest," the *Ciminelli* Court recognized that pure omissions of information unrelated to the quality, adequacy, or price of goods being sold, or to any other aspect of a contract—such as the alleged omissions at issue here—cannot form the basis of a scheme to defraud.  598 U.S. at 316.  Indeed, as the government acknowledged in its brief in *Ciminelli*, "[w]ithout a 'duty to speak,' a 'nondisclosure' may well not be fraudulent in the first place."  Brief of United States at 47, *Ciminelli*, 598 U.S. 306 (No. 21-1170) (citing *Chiarella* v. *United States*, 445 U.S. 222, 235 (1980)).  Although it does not say so directly, the government here relies almost entirely on a pure omissions theory, as it has been unable to identify any actual misrepresentations.  Adopting the government's theory here would "vastly expand[] federal jurisdiction without statutory authorization.  Because the theory treats mere information as the protected interest, almost any deceptive act could be criminal.  The

theory thus makes a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law." *Ciminelli*, 598 U.S. at 315.

For the foregoing reasons, Mr. Venkata respectfully requests that the Court dismiss the scheme to defraud and wire fraud charges.

Respectfully submitted,

*/s/ Katherine M. Savarese*

Katherine M. Savarese (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: savaresek@sullcrom.com

Kamil R. Shields
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W. Suite 700
Washington, D.C. 20006-5215
Telephone: (202) 956-7040
Facsimile: (202) 956-7676
Email: shieldska@sullcrom.com