UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 20-66-2 (RDM) |
| | : | |
| v. | : | Sentencing: January 4, 2023 |
| | : | |
| MURALI VENKATA, | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States respectfully submits this memorandum in aid of sentencing for Murali Venkata (hereinafter "the defendant," "Venkata," or "Defendant Venkata"). Defendant Venkata was found guilty following a jury trial of engaging in a theft and fraud scheme together with Charles Edwards (hereinafter "Edwards" or "Defendant Edwards") and Sonal Patel (hereinafter "Patel" or "Defendant Patel") and of obstructing the investigation of that scheme.[1] The government respectfully requests a sentence of 37 months' imprisonment, which is the low end of the applicable Guidelines range, and a 3-year term of supervised release.

### I. BACKGROUND

**A. The Theft and Fraud Scheme**

The defendants, Charles Edwards, Sonal Patel, and Murali Venkata, engaged in an unlawful scheme to convert proprietary government software and databases to their own use, for the purpose of developing a commercial software product that they intended to sell back to the government at a profit. To accomplish that unlawful end, they disclosed vast amounts of sensitive information contained within the stolen databases, including the Personally Identifying Information ("PII") of over 200,000 government employees, to foreign software developers. They

---

[1] Charles Edwards is also charged in 20-cr-66. The case number for Defendant Patel is 19-cr-81.

1

marketed their new case management system to a representative of another government agency, all the while concealing and failing to disclose the fact that it was being built using stolen government property. Upon learning that he was under investigation, Venkata deleted incriminating text messages and emails in an effort to obstruct the investigation.

Edwards previously worked at the Department of Homeland Security – Office of Inspector General ("DHS-OIG"), where he rose to the post of Acting Inspector General. *See* Trial Tr. 3/29/22 PM, 6:18–24 (Edwards). Edwards left DHS-OIG following allegations that he engaged in a conflict of interest and misused government property. *Id.* at 7:2–15. Venkata was employed at DHS-OIG as an Information Technology ("IT") Specialist. He reported to Patel, a supervisor in the IT Division at DHS-OIG Headquarters. *See* Trial Tr. 4/5/22 PM, 41:6–9 (Patel). Edwards, Patel, and Venkata had all previously been employed at the United States Postal Service – Office of Inspector General ("USPS-OIG"). *See* Trial Tr. 3/29/22 PM, 19:18–22 (Edwards); Trial Tr. 4/5/22 PM, 41:3 (Patel).

DHS-OIG used a case management system known as the Enforcement Database System ("EDS"). *See* Trial Tr. 3/29/22 AM, 31:11–32:13 (Steel). EDS's database housed sensitive information about DHS-OIG's investigations as well as PII of government employees. *Id.* USPS-OIG's case management system was known as PARIS, and its associated database was known as STARS. *See* Trial Tr. 99:11–16 (Edwards). Like EDS's database, STARS contained law-enforcement sensitive data and PII. *Id.* at 99:18.

After Edwards left DHS-OIG, he started his own business, Delta Business Solutions. *See* Trial Tr. 3/29/22 PM, 9:22–24 (Edwards). His plan was to develop a new case management system that he could market to Offices of Inspector General across the federal government. *Id.* at 11:6–15. Edwards hired software developers in India to build his new commercial case management

system. *Id.* at 56:20–24. Edwards decided to steal DHS-OIG's and USPS-OIG's existing systems to show the developers in India how the new system should work. *Id.* at 11:17–13:20. Edwards enlisted Patel and Venkata, who were still employed at DHS-OIG, to help him procure the government's software systems to provide technical expertise. *Id.* In a phone call in early May 2016, Edwards and Venkata discussed their unlawful agreement to use stolen government software to build the new case management system. *See* Trial Tr. 3/29/22 PM, 30:7–37:12 (Edwards); *id.* at 43:13–44:11.

On May 26, 2016, Edwards and Patel met with Peter Paradis, an official at the U.S. Department of Agriculture – Office of Inspector General ("USDA-OIG"), to pitch him on their new case management system. *See* Trial Tr. 3/29/22 PM, 35:12–36:4 (Edwards). The following day, Patel copied the EDS source code and databases from the DHS-OIG computer network and copied them onto optical disks to provide to Edwards. *See* Trial Tr. 3/29/22 PM, 39:25–40:3 (Edwards); Trial Tr. 3/31/22 PM, 93:14–95:25 (Reynolds); Trial Tr. 4/1/22 AM, 37:7–38:16 (Reynolds). She also emailed him an internal DHS-OIG document containing instructions for installing EDS on his home server. *See* Trial Tr. 3/29/22 PM, 39:3–12 (Edwards); GEX 30.

On May 30, 2016, which was Memorial Day, the conspirators met at Patel's home to discuss the plan. *See* Trial Tr. 3/29/22 PM, 42:3–18 (Edwards); Trial Tr. 5/4/22 PM, 85:12–88:10 (Patel). Patel showed a demo of EDS to Edwards, and Venkata explained new features and technological trends. *See* Trial Tr. 5/4/22 PM, 87:3–87:21 (Patel). At that meeting, Venkata agreed to help Edwards set up the code that Patel had stolen on Edwards's home servers to show the Indian software developers. *See* Trial Tr. 3/29/22 PM, 44:18–45:24 (Edwards). Venkata subsequently assisted Edwards in setting up the stolen code and databases on Edwards's home

servers and on a laptop that Edwards brought with him to India to show the programmers. *See id*. at 52:15–53:25, 57:20–63:3, 71:1–88:12; GEX 19, at 1–5; GEX 31.

In March 2017, Edwards decided to set up PARIS and STARS on a server located in his home to show the programmers in India how the audit module should work. *See* Trial Tr. 3/29/22 PM, 98:25–99:4 (Edwards). Edwards reached out to Patel to copy PARIS and STARS from the DHS-OIG server onto DVDs, which he could use to reboot the program on his home server. Trial Tr. 3/29/22 PM, 106:4–12 (Edwards); GEX 18, at 55–56. Because she was teleworking, Patel asked Venkata to deliver the DVDs to Edwards. *See* Trial Tr. 3/29/22 PM, 106:4–12 (Edwards); GEX 17, at 9. Venkata delivered the package containing the DVDs to Edwards outside DHS-OIG's offices. *See* Trial Tr. 3/29/22 PM, 107:11–19, 109:15–110:1 (Edwards); GEX 84. Venkata then assisted Edwards in installing PARIS and STARS from the DVDs and getting the server up and running. *See* Trial Tr. 3/29/22 PM, 110:17–111:1 (Edwards).

Edwards met with Paradis on multiple occasions to try to sell his new case management system to USDA-OIG. At no point did Edwards disclose that his "new" case management system was being developed with stolen proprietary code and sensitive databases, including PII. *See* Trial Tr. 3/31/22 AM, 79:1–15 (Paradis). Edwards and Patel did, however, make many statements about the nature and development of their commercial version of EDS that were so incomplete as to be misleading. *See, e.g.*, GEX 10A, at 5 (stating that the "new concept . . . is the same thing [as EDS]" but "it's more modularized"); *id.* at 5 (stating that "the functionality [of EDS] is there but current times and user management and maintenance is easier in the long term"); GEX 11A, at 15 (describing Next Gen EDS as "similar in concept" to EDS); *id.* at 16 (stating he was "not wanting to rebuild EDS because I've seen the flaws"); *id.* at 20 (describing new system as "22nd century EDS"); *id.* at 29 (stating that Venkata could "give [Paradis] the concept" of eSubpoena); DEX

4

26A, at 2 (stating that the new version is "not like DHS because DHS code is so, you know, cobbled together, you would get lots of issues . . . it's not that version").

After the scheme was uncovered, in interviews with DHS-OIG, Venkata made multiple false statements, including providing a sworn statement in which he declared, falsely, that he had never attempted to log into Edwards's home servers. *See* Trial Tr. 4/4/22 AM, 31:2–33:16 (Steel); GEX 35. In addition, during one of his interviews, Venkata consented to a review of his call logs, emails, and text messages on his phone. *See* Trial Tr. 4/4/22 AM, 44:12–15 (Steel). The agent who reviewed Venkata's phone did not find any communications between Venkata and Edwards, even though that the two had in fact exchanged hundreds of text messages. *Id*. at 44:15–45:16. Venkata later acknowledged that he had deleted those communications to distance himself from Edwards and Patel. *Id.* at 46:2–5.

### B. Defendant Venkata's Role in the Scheme

Although Venkata was the most junior member of the conspiracy, he nonetheless played an essential role in the scheme. As Edwards explained at trial, Edwards lacked the technological know-how to set up the stolen software on his private computer systems. He needed someone with both technical skills and inside knowledge of the systems at issue to assist him. That person was Venkata. *See* Trial Tr. 3/29/22 PM, 13:10–19 (Edwards). And, as established at trial, Venkata readily agreed. Venkata set up working versions of EDS on Edwards's home servers and on a laptop that Edwards brought with him to India to show the programmers. *See id.* at 52:15–53:25, 57:20–63:3, 71:1–88:12. He also set up a working version of PARIS and STARS on a third server at Edwards's home. *See id.* at 98:25–99:4. In addition, Venkata agreed to help Edwards build a version of EDS's eSubpoena module — a module that Venkata had developed in his official capacity at DHS-OIG — for Edwards's commercial version of EDS. *Id*. at 36:19–37:12.

In sum, the scheme could not have succeeded without Venkata. Had Venkata refused to participate, Edwards would not have been able to set up the stolen software on his private systems. Had Edwards been unable to get the stolen software to function, there would have been no reason to share the software and associated databases with the developers in India, and the extensive damage caused by that breach would not have occurred.

### C. Procedural History

On April 4, 2019, Patel pleaded guilty, pursuant to a plea agreement, to an Information charging her with one count of Conspiracy to Commit Theft of Government Property in violation of 18 U.S.C. § 371.

On March 5, 2020, a grand jury returned an Indictment charging defendants Venkata and Edwards with Conspiracy to Commit Theft of Government Property and to defraud the United States in violation of 18 U.S.C. § 371 (Count One), Theft of Government Property in violation of 18 U.S.C. §§ 641 & 2 (Count Two), Wire Fraud in violation of 18 U.S.C. § 1343 (Counts Three through Ten (Edwards) and Eleven (Edwards and Venkata)), and Aggravated Identity Theft in violation of 18 U.S.C. §§ 1028A & 2 (Counts Twelve through Fifteen). The Indictment also charged Venkata with Destruction of Records in violation of 18 U.S.C. § 1519 (Count Sixteen).

On January 14, 2022, Edwards pleaded guilty, pursuant to a plea agreement, to Counts One and Two of the Indictment, charging him with Conspiracy and Theft of Government Property, respectively.

Venkata proceeded to a jury trial beginning on March 28, 2022. During trial, the Court decided to submit only one Count of Aggravated Identity Theft (Count Thirteen) to the jury. On April 11, 2022, the jury returned a verdict finding Venkata guilty of all counts submitted to it: Counts One, Two, Eleven, Thirteen, and Sixteen.

On May 20, 2022, Venkata filed Motions for Judgment of Acquittal and New Trial pursuant to Federal Rules of Criminal Procedure 29 and 33. On November 16, 2022, the Court stayed proceedings on Venkata's Motions pending the Supreme Court's decision in *Dubin v. United States*, No. 22-10. On June 8, 2023, the Supreme Court issued its ruling in *Dubin*. *See* 599 U.S. 110 (2023). On August 10, 2023, the Court granted the government's motion to dismiss Count Thirteen based on *Dubin*. On November 14, 2023, the Court dismissed the remaining counts of Aggravated Identity Theft. Venkata's remaining Rule 29 and 33 Motions are pending.

## II.   DISCUSSION AND RECOMMENDATION

### A. Sentencing Guidelines Calculation

1. Guidelines Calculation

The government submits that the following offense level calculation applies to Defendant Venkata:

| | | |
|---|---|---|
| U.S.S.G. § 2B1.1 | Base Offense Level | 7 |
| U.S.S.G. § 2B1.1(b)(1)(G) | Loss more than $250,000 but less than $550,000 | +12 |
| U.S.S.G. § 3B1.3 | Use of Special Skill | +2 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| U.S.S.G. § 4C1.1 | Zero-Point Offender | -2 |
| | Total | 21 |

Defendant Venkata has a criminal history score of zero (PSR at ¶ 85-91) and, therefore, is in criminal history category I.

With a total offense level of 21 and a criminal history category of I, Defendant Venkata's Guidelines range is 37 to 46 months of incarceration. The Court may also impose a term of supervised release of not more than three years. 18 U.S.C. § 3583(b).

2. Issues in Dispute

a) Loss Amount

The PSR calculates the loss amount as $3,511,620.30 based on the value of the stolen property and applies an 18-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(J). *See* PSR ¶ 77.[2] Venkata objected to this increase, arguing that the loss amount should be zero or, in the alternative, should be $400,000 based on the cost of remediating the data breach. *See* Defendant's Objections to the May 20, 2022 Presentence Investigation Report dated November 28, 2023 ("Obj."), at 4–5.

The government submits that the loss amount is properly calculated based on the cost of remediation, which was approximately $400,000. The commentary to Section 2B1.1 provides that loss is "the greater of the actual loss or intended loss." U.S.S.G. § 2B1.1 n.3(A). Actual loss "means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1 n.3(A)(i). Pecuniary harm, in turn, "means harm that is monetary or that otherwise is readily measurable in money" and not "non-economic harm." *Id.* § 2B1.1 n.3(A)(iii). And "reasonably foreseeable pecuniary harm" means "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* § 2B1.1 n.3(A)(iv).

---

[2] The PSR's loss calculation is consistent with the plea agreements entered by Edwards and Patel. *See* ECF No. 79, at 3; No. 19-cr-81, ECF No. 4, at 2–3. The government subsequently determined that the value of the stolen property is not an appropriate measure of loss under U.S.S.G. § 2B1.1 for the reasons stated herein.

8

Although the evidence at trial established that the property converted by the defendants had a value of at least $2.3 million, *see* Trial Tr. 3/29/22 AM, 52:23–54:7 (Steel); GEX 16A, the offense conduct involved copying rather than removing the property and therefore did not result in the actual loss of its full value.  Rather, the government's out-of-pocket loss consisted of approximately $400,000 spent on notifying the victims and providing them credit monitoring services.  *See* Trial Tr. 3/29/22 AM, 63:6–67:8 (Steel); GEX 82.  These costs were reasonably foreseeable to Venkata.  The Computer Access Agreement that Venkata signed made clear the importance of protecting PII: "I will follow OIG policy for transmitting sensitive data (such as name, ssn, home address, etc.) by utilizing WinZip or other OIG standard encryption software." GEX 1.  The trial evidence established that a developer in Venkata's position would have known that the databases that the defendants made available to the foreign programmers contained sensitive PII.  *See* Trial Tr. 3/29/22 AM, 67:9–19 (Steel).  Moreover, data breaches are increasingly common, and it is common knowledge that the holders of the data often provide credit monitoring services to the victims in the wake of a breach.  *See, e.g.*, Equifax Data Breach Settlement, https://www.equifaxbreachsettlement.com/ (last visited Nov. 15, 2023); OPM Data Breach Settlement, https://www.opmdatabreach.com/ (last visited Nov. 15, 2023).  Accordingly, Venkata should have anticipated that his conduct could result in significant remediation costs.

Finally, the Guidelines also permit calculation of loss amount based on the "intended loss," U.S.S.G. § 2B1.1 n.3(A)(ii), or the "gain that resulted from the offense," *id.* n.3(B).  However, there was no evidence at trial to establish either of those alternative measures of loss.  Accordingly, the loss amount attributable to Venkata's conduct was the "actual loss" of approximately $400,000, resulting in a 12-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(G).

### b) Role adjustment for use of a special skill

Venkata objects to the application of the two-level increase for abuse of a position of trust and use of a special skill pursuant to U.S.S.G. § 3B1.3. *See* Obj. at 4. Venkata contends that the two-level increase is based solely on the allegation that Venkata stole Microsoft Activation Keys from DHS-OIG, which the government did not prove at trial. *Id*. That is incorrect. The evidence presented at trial supports application of the two-level enhancement.

The evidence shows that Venkata used a special skill, namely his expertise in computer programming generally and his knowledge of EDS in particular. The application notes define "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." U.S.S.G. § 3B1.2 n.4. Special Agent Steel testified that Venkata's "capabilities as a technical person" were "[v]ery high." *Id.* at 80:9–81:7. Edwards testified that his and Patel's earlier effort to set up EDS on his home server failed because he "did not have the knowledge, inside knowledge, on how to configure" the program. Trial Tr. 3/29/22 PM, 23:13–20 (Edwards). Edwards recruited Venkata to join the conspiracy because he realized that "[s]omebody had to be within DHS to know how it worked, how it was configured, and how it operated." Trial Tr. 3/29/22 PM, 13:10–19 (Edwards). Because Venkata "was the lead developer" and had "built many applications within DHS-OIG," Edwards concluded that "he's the one [Edwards] was going to rely on to get this working." *Id.* at 41:23–42:1. Of particular significance, Venkata had been the lead developer of the eSubpoena module, in which Peter Paradis had expressed interest. *Id*. at 36:21–37:8, 42:8–18; Trial Tr. 3/29/22 AM, 54:8–17 (Steel). All this evidence indicates that Venkata used his special skill to further the offense.

10

### c) Minimal or minor role adjustment

Venkata also argues that the Court should apply a four-level reduction pursuant to U.S.S.G. § 3B1.2 because he played a "minimal role in the criminal activity." Obj. at 3. His primary argument is that he had "limited knowledge of the scope of the scheme." *Id.* That argument is belied by the evidence. At trial, both Edwards and Patel testified that Venkata knew full well that Edwards was building a commercial version of EDS to sell back to the government. *See* Trial Tr. 3/29/22 PM, 33:19–35:11 (Edwards); Trial Tr. 4/5/22 PM, 87:3–89:18 (Patel). Indeed, Venkata told Edwards that if he "built a commercially viable case management system, [he]'d be making millions." *See* Trial Tr. 3/29/22 PM, 36:4–7 (Edwards). Edwards further testified that he told Venkata that he would be meeting with Peter Paradis to give a "great sales pitch," and that the purpose of the Memorial Day meeting was to solicit Venkata's and Patel's ideas. *Id.* at 44:1–8. The evidence also demonstrated that Venkata was aware that Edwards had shared the stolen software and data with the developers in India. *See id.* at 62:16–21; 91:11–92:20; GEX 19, at 6 (text message from Venkata to Edwards referring to "programmer[s]" accessing Edwards's server); *id.* at 17 (text message from Edwards to Venkata stating "the folks from India are logged in").

Furthermore, the evidence showed that Venkata participated in the planning of the scheme and influenced the exercise of decision-making authority. Specifically, Venkata proactively participated in the design of the commercial case management system. At the Memorial Day meeting in 2016, Venkata demonstrated EDS's new features that Edwards could incorporate into the system. *See* Trial Tr. 3/29/22 PM, 40:2–18, 43:4–12 (Edwards). Subsequently, Venkata proactively suggested adding certain features to the system, such as the ad hoc reporting feature. Edwards testified that he had not asked Venkata to add that feature, but that Venkata had come up

11

with and implemented the idea because "we wanted to make sure that we had the best product out there." *See id.* at 84:8–85:3. Because of his active participation in the planning and execution of the scheme, Venkata is not entitled to a reduction for role in the offense pursuant to Section 3B1.2.

**B. The 18 U.S.C. § 3553(a) Factors**

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(1) and (2). The Court also must consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a)(1)-(7).

  1. <u>The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense</u>

This scheme involved coordination by current and former government employees who had a duty to uphold the law and work in the interest of the agency, DHS-OIG. Instead, they worked to convert government resources – software and databases containing the PII of hundreds of thousands of their fellow employees – for their own use. The goal to develop a commercial software product that could be sold back to the government was directly at odds with the oath they each took as DHS-OIG employees. It was also directly at odds with the very mission of DHS-OIG: "[t]o provide independent oversight and promote excellence, integrity, and accountability within DHS." U.S. Dep't of Homeland Security Office of Inspector General, https://www.oig.dhs.gov/about (last visited Nov. 13, 2023). As stated in the DHS-OIG victim

12

impact statement by the current DHS Inspector General, Dr. Joseph Cuffari, "the Inspectors General exist to help *protect the integrity* of government, *improve program efficiency and effectiveness*, and *prevent and detect fraud, waste, and abuse* in Federal agencies. The defendant's crimes are the antithesis of DHS OIG's mandate." (emphasis in original). Venkata's involvement spanned from May 2016 to April 2017, giving him ample time to reflect on his actions as the scheme continued.

The defendants' use of the DHS-OIG and USPS-OIG information for their self-serving ends also exposed the PII of hundreds of thousands of their colleagues and other individuals to foreign software developers.[3] This breach exposed those individuals to the risk that their PII would be used improperly.

After the theft of the personal identifying information was discovered, DHS-OIG had to notify Congress, the public, and individuals affected by the breach. Trial Tr. 3/29/22 AM at 60:14–23 (Steel). The agency notified affected individuals and offered them credit monitoring services at a cost of over $400,000. *Id.* at 63:14–67:8; GEX 82. DHS-OIG had to pay for a security assessment to "come in and evaluate EDS front end to back end . . . as well as procedures." Trial Tr. 4/4/22 AM, 99:3–5 (Steel). The theft also affected DHS-OIG's operations, in that whistleblowers felt a chilling effect and DHS-OIG's law-enforcement partners were hesitant to work with them. *See id.* 82:13–21. As stated in the DHS-OIG victim impact statement by Inspector General Cuffari, "[t]he harm to DHS OIG's reputation and the morale of its employees

---

[3] As of the time of filing this memorandum, the only victim impact statement information the government has received is a courtesy copy of the victim impact statement DHS-OIG provided to the Probation Office. S.B., the Aggravated Identity Theft victim in Count Thirteen, also informed undersigned counsel that he submitted a declaration of victim losses to the Probation Office as is referenced in the PSR.

13

is manifest," with the defendant's actions causing "real and continuing" harm. In addition to the expenses discussed above, Dr. Cuffari described, "Conservatively, [DHS-OIG] alone spent approximately 3,686 man-hours on the underlying investigation at a taxpayer cost of more than $237,000. These costs do not account for the hundreds of manhours expended by *other* DHS OIG program offices dedicated to containing the breach and dealing with the aftermath of the defendant's crimes" (emphasis in original).

USPS-OIG's PARIS system and STARS database were similar to EDS and housed similar types of information, including law-enforcement information and PII. *See id.* 37:3–18; Trial Tr. 3/30/22 PM, 67:23–70:5 (Lowder). And, like DHS-OIG, USPS-OIG had to provide credit monitoring services to the individuals whose data was breached, at a cost of $33,147.04. *See* Trial Tr. 3/31/22 AM, 9:4–7 (Balfour); Exhibit A (invoices to USPS for notification and credit monitoring services).

The offense and its aftermath caused a lot of harm. It caused financial and reputational consequences to the affected agencies, exposed personal information of the affected individuals, and violated the core principles of the agency that the defendant and his co-conspirators were entrusted to protect. Accordingly, a sentence of incarceration is warranted to reflect the seriousness, nature, and circumstances of the offense.

2. The History and Characteristics of the Defendant

Defendant Venkata was born and raised in Chennai, India. PSR ¶¶ 93, 100. He had a positive childhood and "loving" family. *Id.* at ¶ 96. He has been married since 1997 to his wife, who recently started working as a teacher's assistant. *Id.* at ¶ 97. They have one daughter, who is approximately 17 years old. *Id.* at ¶ 98. The defendant's wife describes him as a "family man," "responsible," and a "good father." *Id.* at ¶ 99.

Defendant Venkata graduated in 1987 with a bachelor's degree in commerce from the University of Madras in India. *Id.* at ¶ 112. He subsequently moved to the United States at age 34 and became a naturalized citizen in 2010. *Id.* at ¶ 100. He has several computer certifications in programming and specializes in IT, with a long career of working in IT. *Id.* at ¶ 114. Defendant Venkata started working at DHS-OIG in June 12, 2010, and resigned in Spring 2022 as a result of this case. *Id.* at ¶¶ 92, 117. Prior to that, he worked as a SharePoint Developer at Northrup Grumman Information Systems; software development analyst staff at Lockheed Martin; programmer at Serco, Inc.; and programming analyst at Objects Worldwide, Inc. *Id.* at ¶¶ 121-123, 126. He also served as a contractor for USPS-OIG over the years. *Id.* at ¶ 124. His resume reflects 20 years of software industry experience and over 15 years of experience as a consultant at different federal agencies. *Id.* at ¶ 128.

        3. <u>The Need to Promote Respect for the Law and Deter the Defendant and Others from this Type of Criminal Conduct</u>

Defendant Venkata and his co-conspirators engaged in an ongoing scheme that caused harm in a multitude of ways. It eroded the sense of security of government employees that their most sensitive employee data would be protected by their colleagues, and it exposed those same employees to risk that their data would be misused after landing in the hands of the foreign software developers. The scheme harmed DHS-OIG and USPS-OIG financially by requiring them to provide notice and credit monitoring to affected individuals. It also caused reputational harm, particularly to DHS-OIG, to the point that whistleblowers and law-enforcement partners were hesitant to work with them. *See* Trial Tr. 3/29/22 AM, 82:13–21 (Steel). This scheme also sowed greater distrust by the public in offices of inspector general more broadly given employees of the OIG who were entrusted to root out waste, fraud, and abuse were themselves

15

conspiring to misappropriate government resources for personal gain. For all of these reasons, individuals need to be deterred from committing crimes of this nature.

### 4. Unwarranted Sentencing Disparities

The defendant's sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The District of Columbia Circuit has recognized that there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." *United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008); *see also United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("[W]ith different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second."). The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences." *Id.* at 533.

A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

In fashioning its sentencing recommendations for the defendants in this scheme, the government considered each defendant's conduct in the theft and fraud scheme, culpability relative to the other co-conspirators, and, for Defendants Edwards and Patel, their cooperation. The

government's goal in taking a holistic view of all the defendants' circumstances was for its requested sentences to reflect a fair sentence for each defendant and avoid unwarranted sentencing disparities across the cases.

### 5. Restitution and Forfeiture

As noted in the PSR, the government is not seeking restitution in this case. *See* PSR ¶ 62. Although the two victim agencies incurred substantial costs to notify the victims of the data breach and provide them credit monitoring services, the Mandatory Victims Restitution Act ("MVRA") authorizes restitution only in cases of "damage to or loss or destruction of property" or "bodily injury." *See* 18 U.S.C. § 3663A(b); *see also* 18 U.S.C. § 3663(b) (same). For cases involving property damage or loss, the authorized forms of restitution are limited to return of the lost or damaged property and payment for the value of the lost or damaged property. *Id.* § 3663A(b)(1). Here, the case management systems were neither lost nor damaged. No provision of the statute authorizes restitution for the cost of victim notification and credit monitoring. *See United States v. Mitchell*, 876 F.2d 1178, 1184 (5th Cir. 1989) (holding that Section 3663(b)(1) does not authorize restitution for consequential costs associated with property loss); *but cf. United States v. De La Fuente*, 353 F.3d 766, 773 (9th Cir. 2003) (holding that the MVRA authorizes restitution for "cleanup and decontamination" costs).

However, the government notes that one victim, S.B., submitted a victim impact statement seeking restitution in the amount of $296, representing lost income due to attendance at the trial in this case. *See* PSR ¶ 63. Although the government has not received the victim impact statement at the time of filing, an order of restitution to S.B. would appear to be appropriate under the provision of the MVRA that requires the order of restitution to "reimburse the victim for lost

17

income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(B)(4).

Finally, because Venkata did not receive any "proceeds" from his offense conduct, the government is not seeking forfeiture. *See* 18 U.S.C. § 981(a)(1)(C) (authorizing forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" the offense).

6. Special Conditions of the Sentence

The government agrees with the Probation Office's recommendation that the defendant participate in the Bureau of Prisons Parenting Program. *See* PSR at ¶¶ 166–67. The government also requests the following as conditions of supervised release: financial information disclosure, financial restrictions, and maintaining or seeking employment.

III. CONCLUSION

For the foregoing reasons, the government requests that the Court sentence the defendant to 37 months' imprisonment on each count, to run concurrently, and a 3-year term of supervised release.

Respectfully submitted,

| | |
|---|---|
| MATTHEW M. GRAVES<br>UNITED STATES ATTORNEY<br>For the District of Columbia | COREY R. AMUNDSON<br>CHIEF, Public Integrity Section<br>U.S. Department of Justice |
| By: /s/ *Christine M. Macey*<br>CHRISTINE M. MACEY<br>D.C. Bar No. 1010730<br>Assistant United States Attorney<br>Fraud, Public Corruption, and Civil Rights Section<br>601 D Street, NW<br>Washington, D.C. 20530<br>(202) 252-7058<br>christine.macey@usdoj.gov | By: *s/ Celia R. Choy*<br>CELIA R. CHOY<br>D.C. Bar No. 1017211<br>Trial Attorney<br>Public Integrity Section<br>Criminal Division<br>1301 New York Avenue, NW<br>Washington, D.C. 20530<br>(202) 875-1557<br>celia.choy@usdoj.gov |