IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, ) Criminal Action
) No. 1:20-CR-66
Plaintiff, )
) **SENTENCING HEARING**
vs. )
)
MURALI YAMAZULA VENKATA, )
) Washington, D.C.
) January 4, 2024
Defendant. ) Time: 2:20 P.M.

TRANSCRIPT OF SENTENCING HEARING
HELD BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE

---

**A P P E A R A N C E S**

For Plaintiff: CHRISTINE MICHELLE MACEY
DOJ-USAO
601 D Street, NW
Washington, DC 20530

CELIA RUTH CHOY
DOJ-CRM
Public Integrity Section
1301 New York Avenue, NW
Washington, DC 20530

For Defendant: KATHERINE SAVARESE
Sullivan & Cromwell, LLP
125 Broad Street
Suite 4000
New York, NY 10004

KAMIL R. SHIELDS
Sullivan & Cromwell, LLP
1700 New York Avenue, NW
Suite 700
Washington, DC 20006

**A P P E A R A N C E S - (CONT'D.)**

For Defendant: MICHELLE M. PETERSON
Federal Public Defender for the District of Columbia
625 Indiana Avenue, NW
Suite 550
Washington, DC 20004

Also Present: Sherry Baker, Probation Office

Court Reporter: Tamara M. Sefranek, RMR, CRR, CRC
Official Court Reporter
United States Courthouse, Room 6714
333 Constitution Avenue, NW
Washington, D.C. 20001
202-354-3246

P R O C E E D I N G S

THE COURTROOM DEPUTY: Criminal Case 20-66, United States of America v. Murali Yamazula Venkata.

Would counsel please approach the podium, state your name for the record, starting with government counsel.

MS. MACEY: Good afternoon, Your Honor. Christine Macey and Celia Choy on behalf of the United States.

THE COURT: Good afternoon.

MS. SAVARESE: Good afternoon, Your Honor. Katherine Savarese and Kamil Shields on behalf of Mr. Venkata.

THE COURT: Good afternoon.

THE PROBATION OFFICER: Good afternoon, Your Honor. Probation Officer Sherry Baker. And I have a new officer with me. Christiana [sic] -- I'll let her introduce herself. Christina.

THE COURT: Well, thank you. And welcome to the court.

THE PROBATION OFFICER: Thank you.

THE COURT: All right. So we're here this afternoon for the sentencing of the defendant, Murali Venkata, who has been found guilty after a jury trial on five counts:

Conspiracy to commit theft of government property and to defraud the United States; theft of government property and aiding and abetting, causing an act to be done; wire fraud; aggravated identity theft -- I'm sorry -- not aggravated

identity theft. Well, he was found guilty of that, but that has been set aside -- and destruction of records. So it's on four counts.

I have received and I have reviewed the presentence report from the probation office, as well as the recommendation from the probation office; the government's sentencing memorandum and supplement; and Mr. Venkata's sentencing memorandum, as well as the letters of support that have been submitted.

So, Ms. Macey, are there any additional materials the government would request me to consider today?

MS. MACEY: Your Honor, there are no additional materials submitted by government, but we did notice in preparation for today that the presentence report references a declaration of victim losses submitted by Victim S.B., Mr. Balfour, who testified at the trial.

THE COURT: Yes.

MS. MACEY: It appears that that never made it onto the docket. I know Ms. Baker has a copy that counsel was able to review, but I'm not sure if the Court received that.

THE COURT: All right. Thank you.

Ms. Savarese, is there anything else that the defense is requesting me to consider today?

MS. SAVARESE: No additional materials, Your Honor.

THE COURT: Okay. Thank you.

So, Mr. Venkata, the proceeding this afternoon is going to go through a number of steps, and I'm sure you're anxious just to get to the bottom line, but I have to go through all these steps because I need to make sure that there is agreement with respect to the facts and the law, and where there's not agreement, I have to resolve those issues. And, as you know, there are some areas where there is going to be disagreements, so we'll have to work through that and resolve those issues.

So the first step will be for me to review the presentence report and determine what, if any, issues need to be resolved with respect to that. The second step will be the calculation of the guidelines and resolving those issues. The third step will be for me to hear from the government, from your counsel, from you, if you'd like to address the Court, anyone else you want me to hear from. And then as the final step, I have to fashion a just and fair sentence in light of the factors that Congress has specified in a statute, which is at 18 U.S.C. Section 3553(a). And as part of that last step, I'll actually impose the sentence in the case.

So let's start with the presentence report, which was filed with the Court on December 1st, 2023. And I guess one thing that is a little bit trickier here is that I think that the presentence report -- the factual materials set forth in the presentence report relating to the offense doesn't

necessarily track all of the evidence that came in at trial.

So I don't know if you have a view, Ms. Macey, about what I should do about that.

MS. MACEY: Your Honor, I think it's appropriate for the Court to consider whatever evidence was presented in the course of the trial.

THE COURT: Yes.

MS. MACEY: I think, in terms of my understanding of where the disputes lie, it's pretty narrowed at this point in terms of being, I believe, only, maybe, three paragraphs by the defense. I think those are all issues that can be resolved quite quickly.

THE COURT: Okay. So why don't I then just hear from Ms. Savarese about those issues; if you want to just walk me through where the defense disagrees with the factual descriptions set forth in the presentence report.

MS. SAVARESE: Sure. I think, in general, as outlined in our sentencing memo, the issues of dispute have to do with, one, the loss amount; two, the application of an additional two points for use of a special skill; and then whether or not Mr. Venkata is eligible for a minimal or minor role adjustment.

In terms of the factual portion of the presentence report, I'm not sure that any of those issues really turn on our objections in the presentence report.

THE COURT: Okay. That's really -- as far as you're concerned then, those are issues that we can just take up in the calculation or determination of the proper guideline sentence?

MS. SAVARESE: Yes.

THE COURT: All right. Otherwise, you're satisfied with the factual descriptions as set forth in the presentence report?

MS. SAVARESE: We don't think that any -- to the extent that we had objections, we don't think that the issues that matter to us turn on those.

THE COURT: Okay. Any objection to me relying on the presentence report, the factual assertions, as my findings of facts for purposes of the sentencing today?

MS. SAVARESE: Will you give me one moment, please?

THE COURT: Of course, yes. If there's anything you need to correct, I should do that.

MS. SAVARESE: No, we have no objection to that, Your Honor.

THE COURT: All right. Mr. Venkata, you can pull the microphone closer to you.

Have you had enough time to review the presentence report?

THE DEFENDANT: Yes. Judge Moss, I have a chance to look into this, yes.

THE COURT: Have you had enough time to review it?
THE DEFENDANT: Yes.
THE COURT: Okay. And have you had enough time to discuss it with your lawyers?
THE DEFENDANT: Yes --
THE COURT: If you'd like to, you're welcome to take more time.
MS. SHIELDS: Court's brief indulgence?
THE COURT: Of course.
MS. SHIELDS: Thank you, Your Honor. We can go back on the record. It has been some time since Mr. Venkata reviewed the presentence report.
THE COURT: Okay. Have you had enough time to review it, Mr. Venkata?
THE DEFENDANT: Yes.
THE COURT: And have you had enough time to discuss it with your lawyers?
THE DEFENDANT: Yes.
THE COURT: Are you fully satisfied with the assistance of your lawyers in the case?
THE DEFENDANT: Yes.
THE COURT: Is it acceptable for you then if I accept the statements or descriptions of fact as set forth in the presentence report as my findings of fact for purposes of the sentencing today?

THE DEFENDANT: Yes.

THE COURT: Okay. Then I will accept the description, statement of facts, as set forth in the presentence report as my findings of fact for the case; subject, of course, to any issues that may come up with respect to the guidelines calculation, which we'll take up in just a few minutes. And, of course, subject to my understanding of the evidence as it came in at trial.

All right. So then that does bring us to the guidelines calculation where I know there are a number of differences of opinion, and I think probably the most efficient way for us to do this is just to take them one at a time, and I can hear from both of you with respect to each of those.

Before we turn to that, just as a preliminary matter, Congress has imposed a statutory maximum sentence for a violation of 18 U.S.C. 1343 of 20 years of incarceration and a maximum sentence for a violation of 18 U.S.C. Section 371 is 5 years, and the maximum sentence for a violation of 18 U.S.C. 641 is 10 years.

I think the parties are in agreement that the base offense level under 2B1.1 of the guidelines is 7. But that brings us to the first, I think, major difference of opinion as to what is the appropriate loss amount in this case.

And I've spent some time thinking about this question already, and I'd very much appreciate some help from all of you

on this. My understanding is that the government takes the view that the loss amount or the remediation costs are approximately $400,000. And since that loss category is between $250,000 and $550,000, I don't think we have to be precise to the penny with respect to that. And that would add 12 levels.

The defense thinks that there should not be any loss amount because the remediation costs are all tied to the disclosure of PII. And according to the defense, before Mr. Venkata was involved in the conspiracy and before he engaged in any misconduct, that both the U.S. Postal Service PII and the Department of Homeland Security PII had been disclosed.

I think I'm correct in understanding that the parties don't disagree with the general legal principles or the reading of the guidelines, which is that if the damage was caused or the loss was caused by actions for which Mr. Venkata is not responsible, even though he may have later joined the conspiracy or joined the conspiracy, that under the guidelines that loss amount is not attributable to him.

But it would have to be -- in order to be attributable to him, it would have to be some loss that was incurred after he became a member of the conspiracy or after he engaged in conduct himself that contributed to that loss. But if I'm wrong about that understanding of how the guidelines

apply here, you should all definitely bring that to my attention.

But I think that it's set forth in the defense sentencing memorandum on pages 8, 9, and onto 10 with respect to what the relevant legal rules are. And I'm quoting from the guidelines where it says, even after joining the conspiracy, quote, the accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake in the particular criminal activity, acts of others that were not within the scope of the defendant's agreement if -- even if those acts were known or reasonably foreseeable to the defendant are not relevant conduct.

And the defense points to two disclosures of PII; one, I guess, from the postal service and one from DHS-OIG, that occurred before Mr. Venkata joined the conspiracy. And one was in 2009 and one was in 2014. I need to know a little bit more about those and what the government's theory is with respect to those and, more generally, just what the parties' views are.

But I do wonder, to the extent that the 2009 disclosure was simply from the postal service to DHS, it's hard for me to believe that that would have resulted in the need for remediation. And so it may be that it's really -- what we're really kind of focusing on is whatever happened in 2014 and thereafter and the extent to which any of those losses can be

attributable to Mr. Venkata.

Why don't I start with Ms. Macey, and then I'm happy to hear from Ms. Savarese on this. I think this is, candidly, an issue; I don't have a bottom line. I need your help.

MS. MACEY: Thank you, Your Honor. Yes, the government agrees with the Court's last proposition in terms of this being a matter where any initial earlier disclosure prior to the involvement of Mr. Venkata would have only involved the former employees of that very agency.

So Mr. Patel -- excuse me, Mr. Edwards, Ms. Patel, and then, ultimately, once Mr. Venkata got involved, Mr. Venkata. So the government submits that that is not the source or the basis for any of the remediation costs that the government agencies incurred. Those all happened because of the disclosure of the PII through the database information when that material was sent to the software developers in India.

That occurred after Mr. Venkata joined the conspiracy, and that happened as a direct result of his involvement in the conspiracy such that only he had the technological wherewithal to make that happen, to set up the information on Mr. Edwards' servers and laptops so that that could be facilitated.

THE COURT: But -- and there's no briefing on this issue. But this turns, in part, on just what the government's legal obligations were with respect to notification. And I

wouldn't be surprised if the law was that any breach of security requires notification. And so that simply disclosing to Mr. Edwards, when he was no longer a DHS employee, the DHS-OIG PII would have required, under the federal statute, that the government make notification, but there's no briefing on that.

Quite frankly, I'm not entirely clear in my own mind about what happened in 2014 because that's not what the case was about that was in front of me. That deals with Mr. Edwards and perhaps Ms. Patel's conduct, but not Mr. Venkata's conduct. There's not much, if any, evidence on those issues.

MS. MACEY: Right. And, Your Honor, I'm not sure that the government is in a position to offer much more factual light on that issue right now. What I will say is, in terms of what the Court's inquiry is about whether that sort of disclosure prior to Mr. Venkata's involvement would also mandate a notice to the victims, I, frankly, don't know the answer to that.

I do remember when Agent Steel testified, he referenced, when there's a disclosure that's large enough, it implicates congressional rules that require disclosure and notice. I don't know -- of course, his testimony was in the context of what was before the Court for purposes of this trial.

So I -- unfortunately, I don't know factually, if

that had been realized at that time, what the agency requirements would have been. But I think what the facts established at trial is that, when the agencies learned of this, it was after the disclosure that was made with Mr. Venkata's involvement in the conspiracy and as a result of his additions to that conspiracy.

THE COURT: That's sort of a tricky question for me because if the government was required -- was required as a matter of law to make the -- to make the disclosures and to incur the costs as soon as Ms. Patel gave Mr. Edwards the material in 2014 -- was he still at DHS in 2014; Mr. Edwards? Do you know? I think he may have been, but in a different section at that point in time?

MS. MACEY: I don't trust my memory on that, Your Honor. I'd have to look at the transcript. We do have those available on our computer.

THE COURT: I want to hear from Ms. Savarese about this as well, but -- and I'm not quite sure of the best way to proceed. I guess I'm not convinced that I have enough information in front of me to make a conclusion that the costs with respect to the DHS PII remediation were incurred because of actions in which Mr. Patel -- I mean, Mr. Venkata was involved. They may have been; I just don't know.

I think it's clearer to my mind with respect to the postal service because he actually carried the disk containing

the postal service PII out of the building and delivered it. You may also be right just that the real problem was providing the information to the programmers who were in India. That's certainly where you can imagine that the greatest concerns would arise, just because the government has no idea how that information was then used. It may have been that they were entirely trustworthy, but it's just beyond the jurisdiction of the United States; who knows?

But I may need to look at or just have someone point me to whatever the statutes or whatever the rules are that deal with remediation so I can figure out what event it was that triggered the obligation to take the remedial steps.

MS. MACEY: I would just make one other factual-like statement along those lines, which is I anticipate -- I don't know that we have evidence of this in the record. But when the breach came to light that led to the -- sort of, these efforts to do notification, it seems at least possible that the agency would not even have known at that time about the prior breaches; that those would have only been learned through the course of the investigation.

THE COURT: Right.

MS. MACEY: Again, I'm not trying to state something that I don't know definitively. But it seems very possible that that process was undertaken in light of only the breach to India versus the ultimate understanding of the total factual

scenario here.

THE COURT: That raises sort of a slightly mind-numbing question of causation where there was an act that might well have required the notification, but you were ignorant of it, and then the defendant does something else that brings -- and it comes to your attention and, therefore, you know you have this obligation that you previously had; you just weren't aware of it.

Why don't I hear from Ms. Savarese and then we can kind of figure out the best way for me to try to drill down further on this question.

MS. MACEY: Very well.

MS. SAVARESE: Thank you, Your Honor. We agree that it's a somewhat mind-numbing question as well.

As alleged in the indictment and as proven at trial, the 2019 theft of PII was accomplished by Mr. Edwards and Ms. Patel.

THE COURT: I don't think you mean -- you mean 2009?

MS. SAVARESE: Forgive me. 2009. Paragraph 5 of the indictment describes that.

THE COURT: But wasn't that simply that he had -- Mr. Edwards had gone to DHS and that she, then, transferred the postal service material to Mr. Edwards at DHS for him to use at DHS?

MS. SAVARESE: She provided a copy. She made a copy

and put it on a CD and handed it to him. I don't think that we know necessarily what he did with that. I think, in addition to providing that CD, there was testimony at trial that that was stored on DHS-OIG systems.

THE COURT: Right.

MS. SAVARESE: I think the upshot, as far as we're concerned, is that it wasn't being provided through ordinary government channels in a secure manner. It wasn't -- this is a CD that I think was later then found in Mr. Edwards' house among his -- there were many CDs containing PII found at --

THE COURT: I'm not sure that was evidence in the case, that that particular CD was -- or DVD was found in his house, or CD. I don't remember that.

MS. SAVARESE: I think it was part of the photographs and lists of evidence that the agents discussed during their testimony. I could be --

THE COURT: Do we know that was the disk, the actual version that he removed, or that Ms. Patel gave him when he was at DHS?

Because, I mean, the way I understood the evidence was that DHS used the postal service program as the basis for developing its EDS system, and EDS was an outgrowth of PARIS. And so it's not surprising -- frankly, I don't have a reason to think there was anything -- if my understanding is right, I don't have any reason to think there was anything unlawful or

improper with somebody at the postal service giving someone at DHS the software to help DHS then develop its software.

MS. SAVARESE: I take your point completely as to the software, but he also took the PII, and that is what was alleged --

THE COURT: I see.

MS. SAVARESE: -- in the indictment and shown at trial. I think that's a bit more of a stretch. Because why would DHS-OIG want the PII of thousands of USPS-OIG employees and -- and, again, we don't --

THE COURT: Do we even know there was -- I mean, we know there were 6,000 or so, but that was, I assume, on the version that Mr. Venkata removed from DHS and gave -- do we know that this earlier version had thousands or 6,000 pieces of PII on them?

MS. SAVARESE: I know it had PII on it. I don't have the number at my fingertips. I apologize, Your Honor.

THE COURT: Again, I just don't know the answer to this. I mean, it's not briefed. I don't know the answer as to whether that sort of disclosure would trigger a notification requirement or a need for remediation versus a tsk-tsk, you shouldn't have done that.

MS. SAVARESE: We'd be happy to look into that question and submit additional briefing. I think our understanding, based on the testimony of the agents at trial,

was that any type of breach would trigger the notification obligations, and I don't recall them describing thresholds of, if it just went to somebody's house who wasn't an employee versus was shared with software developers in India, and that it doesn't stand really to reason that there would be such a threshold. I think it would be if PII is taken off the premises without authorization, presumably, that would qualify as a breach.

THE COURT: Well, I mean --

MS. SAVARESE: But we'd be happy to -- I think none of us in this room right now know the answer.

THE COURT: I think it's a fair --

MS. SAVARESE: I'm sure there is an answer.

THE COURT: That is a fair statement.

What I will say, though, is that I'd be surprised if a disclosure of PII from the postal service OIG to the Department of Homeland Security's OIG that is not otherwise disclosed would require notification. Maybe I'm wrong about that.

I know that there have been cases, for example, where someone has stolen a laptop out of a government employee's car and the laptop had PII on it. And when it's stolen out of a car, that's regarded to be a breach, which would require notification.

I don't think the fact that, if someone said, oh, I'm

a numbskull, I brought my computer home last night, and it had PII on it; what was I thinking? We now have to send out thousands of notifications to people because I brought my computer home last night.

MS. SAVARESE: Certainly. My recollection of the evidence as it came in at trial was that the initial copying of the PII was not entirely innocent. It wasn't just bringing my computer home. It was the early stages of Mr. Edwards and Ms. Patel's broader plan.

THE COURT: Okay.

MS. SAVARESE: So our understanding was that that would have always been considered to be a breach of the USPS PII. We agree with you, Your Honor, that the 2014 copying of the OIG PII was certainly --

THE COURT: What is your understanding of what happened in 2014? Was Mr. Edwards still at DHS, or was he --

MS. SAVARESE: No. He had left DHS, and he had Ms. Patel copy it for him at that point in time.

THE COURT: Do you know when he started his business or when his plan developed to start this business?

MS. SAVARESE: I believe -- I have a copy of the indictment if you --

THE COURT: Sure, if you want to look. I think -- I mean, I welcome the parties' views on this. I feel as though maybe I should put this one question aside, and we ought to go

through the rest of everything else and then figure out what to do about the loss amount. I'm not certain that I have a sufficient law or facts in front of me to make a determination.

MS. SAVARESE: One point I would just make as to the loss amount is I believe the bulk of the loss amount is attributed to the DHS-OIG --

THE COURT: That's true.

MS. SAVARESE: -- remediation. So to the extent that you agree that the 2014 theft of PII contributed to the -- is what triggered the need for that remediation, we would propose setting aside the DHS-OIG costs, which are considerably more significant than the USPS-OIG costs. But we'd be happy to take up the issue.

THE COURT: On that, even with respect to what happened in 2014, I know there's an allegation that there was a disclosure, but I don't really know anything beyond that because, as I said before, that just wasn't an issue in the case that was tried.

MS. SAVARESE: Mr. Venkata was not involved. So we don't know about it either.

THE COURT: Right. Fair enough.

Ms. Macey, do you have any further thoughts on this issue, or do you agree that I ought to just put this to the side for the moment?

MS. MACEY: Just one point, Your Honor. In thinking

more about this, it's the government's position that, even if there had been a notification obligation by the government agencies due to any prior disclosure, it still doesn't change the fact that Mr. Venkata's actions in terms of being part of the conspiracy that led to the disclosure to the software developers would certainly trigger those notification requirements.

So the government submits that, even if the agencies had had a prior obligation that they, presumably, didn't know about, it doesn't change the fact that his actions still led to that same mandate and, therefore, we submit he shouldn't be absolved from that in light of --

THE COURT: You may be right about that. But, again, on that one, there's no briefing. I haven't at least studied the guidelines carefully enough.

I suspect they probably don't answer that question terribly clearly, or I don't know if there's any case law that speaks to that question of multiple causation, of that nature. It may be that that's also an issue I need to hear a little bit more about.

MS. MACEY: Understood.

THE COURT: Okay. Thank you. Unless anyone has anything else they want to add on the loss amount, I'm inclined to put that aside for the moment.

And the next question is whether the enhancement for

special skills should apply. And why don't I hear from the government on that one.

MS. MACEY: Your Honor, the government relies on what we submitted in our sentencing memorandum. I'm happy to highlight any points, but I don't think we have anything more to add.

We addressed this issue on page 10 of our memorandum. In short, it's along the lines that I referenced a couple of minutes ago in terms of Mr. Venkata was instrumental in this conspiracy in terms of bringing his expertise with the IT systems and his ability to help Mr. Edwards with the coding development, and also the implementation of that software onto Mr. Edwards' computer system so that it could be used to advance his cause of creating a competitor product.

So for those -- for all the reasons that we list out on our -- in our sentencing memorandum, we submit that Mr. Venkata's involvement did bring a special skill to the conspiracy, and he should, accordingly, receive that enhancement.

THE COURT: All right. Ms. Savarese?

MS. SAVARESE: Similarly, we also primarily laid this out in our written submission. But we just wanted to point out that, as it was demonstrated at trial and as the government described in its sentencing memo, Mr. Venkata's primary purpose in the conspiracy was to help Mr. Edwards configure his home

servers and his laptop.

I don't actually recall there being any evidence that Mr. Venkata was doing any of the coding. That was all outsourced to the software developers in India.

THE COURT: The only thing I -- maybe that -- hinted at that a little bit was, I think that there was some discussion of Mr. Venkata helping to build the eSubpoena.

MS. SAVARESE: He had done that at DHS-OIG, and, therefore, had --

THE COURT: Right. But I think there was some talk about whether he would help with that with the EDS 2. That was, at least, my impression was that he might help to try and develop that as well as part of the --

MS. SAVARESE: I would want to go back to the transcript, but I believe that Mr. Edwards was clear that Mr. Venkata was not a software coder for the project.

THE COURT: Okay. Obviously, there were other coders; I understand that.

MS. SAVARESE: Certainly. There was a team of them. And we just wanted to emphasize Mr. Venkata's degree -- his college degree was in commerce. He's not received any other licenses or other specialized education. He is an IT guy. He's like the geek squad. He's good at helping to configure laptops to set up servers.

But in today's times, many people have the expertise

to set up a laptop, and we would submit that this doesn't rise to the kind of qualifications possessed by a pilot or a lawyer or a chemist. And, indeed, if we're looking at his ability to set up the servers in Mr. Edwards' home, there's not any evidence that Mr. Venkata had any particular expertise with those servers.

And, indeed, if you look at the text messages, there was a lot of back and forth and troubleshooting and guesswork involved. So all that's to say it doesn't -- to us, his involvement doesn't appear, actually, to have involved any special skills or knowledge. It was just, he was good with computers.

But that seems far removed from what this enhancement is intended to capture.

THE COURT: All right. Well, I understand your point. I do think that the enhancement applies here because he did have an applied skill not possessed by members of the general public. And you're right, that it may not be to the level of an airline pilot or even a doctor, but it may be closer to an accountant, and I will apply the special skill enhancement.

And, among other things, Mr. Edwards himself was not somebody who was entirely illiterate in the world of technology, but he still needed Mr. Venkata's help with the technology, and that was principally what Mr. Venkata's role

was. It may have been that he had a very limited role, and we'll get to that in just a minute, but I think that the special skill enhancement applies.

I do think that, because he is on the lower end of that spectrum, that I will take that into consideration with respect to a variance. I think the skill -- I think the enhancement is literally satisfied, but I think you're right, he's towards the lower end of it. I'll take that into consideration for purposes of a variance.

MS. SAVARESE: Thank you, Your Honor.

THE COURT: That does bring us, then, to the minimal or minor role. And on this one, I would like to hear from the parties.

As I think I just perhaps alluded to a second ago, I do think that Mr. Venkata's role here was a limited role, certainly. He certainly -- and I think the government conceded as much -- was the junior member of the alleged conspiracy. And if one looks to the factors that the Court is supposed to consider, I'm supposed to consider the degree to which the defendant understood the scope and structure of the criminal activity, the degree to which he participated in planning or organizing the activity, the degree to which he exercised decision-making authority or influenced the exercise of decision-making authority, the nature and extent of his participation in the commission of the criminal activity,

including the acts that he performed and the responsibility and discretion the defendant had in performing those acts, and the degree to which the defendant stood to benefit from that criminal activity.

I think most of those factors tip towards the view that his role was either minimal or minor. There's no evidence that he stood, at least directly, to benefit economically. I think that there, perhaps, might be an inference that he hoped that, if Mr. Edwards' business took off, that Mr. Edwards then might hire him, and he might be able to join him in that business.

But there's no evidence that Mr. Venkata was doing this for his own financial benefit in the way that, obviously, Mr. Edwards, and perhaps Ms. Patel, were. And although I think he did have some understanding with respect to what the general plan was, I don't think he was nearly as involved as Ms. Patel and Mr. Edwards. I think his participation was substantially more limited.

He wasn't at any of the meetings and had no discussions with Mr. Paradis. I think he really was, as sort of my last determination, the tech guy. He wasn't even the core tech guy since there were coders in India to do that work, but he was the tech assistant.

He may have played a necessary role because there may have been times in which Mr. Edwards would have been shut down

and unable to proceed without help from Mr. Venkata. And I also think that the hierarchical role that the defense featured at trial and as raised in the past -- although it doesn't, in my view, absolve Mr. Venkata -- I think it probably does go to his level of participation in his role.

So to my mind, the real question is, is he a minor participant, a minimal participant, or somewhere in between the two. And I suppose, why don't I start with Ms. Savarese since it's the defense that's seeking to apply this mitigating circumstance.

MS. SAVARESE: Certainly, Your Honor. The guidelines, when defining a distinguishing minimal and minor participant, state that minimal participants are among the least culpable of those involved in the conduct of a group, and minor participants are those who are less culpable than most other. I think there's no dispute here that, among the three participants, Mr. Venkata was, by far, far and away the least culpable.

So our position would be that, using the commentary in the guidelines and that distinguishing point, Mr. Venkata would be eligible for a minimal participant adjustment.

THE COURT: All right. Ms. Macey.

MS. MACEY: Your Honor, again, I'd just ask to incorporate the arguments we made in our sentencing memorandum.

THE COURT: Yes.

MS. MACEY: This is page 11 predominantly and onto page 12.

To address the Court's question of where on the spectrum Mr. Venkata falls once the Court's made the determination that Mr. Venkata should either be a minimum or minor role participant, we would suggest, in terms of addressing the factors that the Court has to consider, in terms of the degree to which the defendant understood the scope and structure of the criminal activity, the evidence at trial established that Mr. Venkata did know very well what was going on.

We heard from Ms. Patel, who explained that even -- there may not have been a direct text message saying that this is what was going on, but they were all in agreement in understanding that the mission here was to help develop this competing software program.

In terms of the second prong --

THE COURT: So I understand that and that he understood that the whole point here of Mr. Edwards creating this new business was to create a government tool. It wasn't really a tool, but was designed for public -- or for the commercial world.

It was for a government tool that he was creating and, therefore, the plan was to sell it at some point to the government and understood that government resources were being

used to create this new tool.

Where I guess I'm less sure is whether he knew these are the people in the government we're seeking to sell it to; was it -- I don't even, frankly, know -- was it just USDA-OIG?

I suspect Mr. Edwards' plan was actually across the government. I don't know -- frankly, because it didn't really involve Mr. Venkata -- whether there was planning about selling it to other agencies; any discussions about selling it to different agencies; whether Mr. Edwards and Ms. Patel had a list of all the agencies that they were going to go to.

And if their plan was, if we're successful with USDA, that's going to be our foot in the door. And so that's the aspect in which I just don't know that Mr. Venkata had any role in it.

MS. MACEY: Well, what I would point the Court to is we do have the statement that Mr. Venkata made to Mr. Edwards where -- that if Mr. Edwards built a commercially viable case management system, he'd be making millions. So that reflects that Mr. Venkata did appreciate, even if he didn't know the details of the sale approach or marketing approach, if you will, that there was large money in this.

And to be clear, the government is not submitting Mr. Venkata was necessarily motivated by money given he wasn't receiving a financial cut from the agreement as was established at that point. But I think the evidence at trial did establish

that he had many other reasons, as the Court alluded to, perhaps future aspirations of thinking that this could pay off, but even just reputationally on an interpersonal level.

Ms. Patel and Mr. Edwards had been allies of Mr. Venkata and had recruited him for positions. I think it's an easy inference from the evidence that Mr. Venkata may have had a sense of wanting to make them happy and stay on their good side whether out of, sort of, repayment or future prospects.

THE COURT: Right. But I guess what I don't understand is how any of all this differs from the drug mule who sees that the drug dealer, the big-time -- the drug kingpin has massive quantities of drugs, but the drug mule's job is a relatively little one, or more, maybe it's not a drug mule but somebody who is sitting in a warehouse cutting the cocaine with baby powder; and that person might say to the drug dealer or the kingpin, you're going to make millions doing this.

And they have some sense that they must be out distributing this to people across the country because there's a lot of drugs there. But I still think that person would be a minor or minimal participant if their job was just to sit there and say, you know, you're the person who is in charge of cutting the drugs.

MS. MACEY: Understood, Your Honor. I think this is distinguishable because it's not -- Mr. Venkata was not simply

a soldier that could be replaced by the next person who could go in and then do X, Y, Z, and facilitate this. I mean, it did involve his specialized skill, as we just talked about.

And, relatedly, Mr. Venkata did take steps to help advance the product itself in terms of making suggestions about what could go into the new software.

THE COURT: That testimony was all pretty vague. I mean, it was just that there was a meeting in which it was discussed and Mr. Venkata was a participant in that meeting.

There's not, for example, any testimony -- there wasn't any testimony, Mr. Venkata suggested the following or Mr. Venkata suggested this. He was there at one meeting where they -- there's allusion to discussions before that, but that he was there at the May 28th meeting, or 30th. I can't remember. Late May --

MS. MACEY: May 31st.

THE COURT: May 31st, yeah, that meeting. He was there and they discussed it.

The impression I had there is perhaps the biggest role that Mr. Venkata had at that meeting was showing Mr. Edwards how a subpoena worked because Mr. Edwards wasn't familiar with eSubpoena because it had been developed afterwards.

He may have participated more generally in the discussion, but there's not anything more tangible than that in

the record.

MS. MACEY: I think that's right, Your Honor. I know the Court has scoured the record recently in terms of all the litigation.

I think what we point to in our sentencing memorandum is, yes, just generally, like, new features that could be incorporated, but Mr. Venkata did suggest adding a feature such as the ad hoc reporting feature. I think that was one specific thing that was referenced in the course of the testimony.

But I think in terms of making any --

THE COURT: Of course, the irony of that is that wasn't criminal. I mean, that was not -- that was, actually, the opposite of criminal. He was talking about making a new product rather than the stealing of the government's product.

MS. MACEY: Yeah. That's an interesting point. You're right.

THE COURT: Yeah.

MS. MACEY: In terms of the remaining factors, Your Honor, I think we've covered most of them. I don't think we have anything more to add.

THE COURT: Okay. Well, I do think that both sides' arguments, there's some overlap between the minimal participant and the special skill enhancement.

One of the reasons I think that the government thinks that Mr. Venkata was more than a minimal participant was

because he had special skills, but I think I've already accounted for that with the special skills enhancement. So I'm going to apply the 4-level minimal participant adjustment.

I think everyone is in agreement that the obstruction of justice applies, plus 2. Everyone agrees that the zero-point applies at negative 2.

Am I missing anything other than just figuring out the loss amount? Have we finished with the guidelines?

MS. MACEY: Yes, Your Honor.

THE COURT: Okay. So Mr. Venkata has no criminal history. So he's in Criminal History Category I. Under 18 U.S.C. Section 3583(b)(2), the Court may impose a sentence of supervised release of up to 3 years, and the guidelines recommend a term of supervised release between 1 and 3 years.

He's eligible under Section 3561(c)(1) to a term of probation of between 1 and 5 years and multiple terms of probation shall run concurrently.

The guidelines do not recommend a term of probation, at least -- well, maybe I have to hold off on doing that until I know exactly where he falls in the guidelines based on the loss amount. And also, the same thing with the fine; I have to figure out the loss amount first.

There is a mandatory special assessment of $100. Let me ask what the parties' views are on the $296 of restitution that is sought. Ms. Savarese?

Obviously, not the most important issue today, but I still have to resolve it.

MS. SAVARESE: Certainly, Your Honor. So we received today a copy of the declaration of victim losses of Mr. Balfour. And the losses to us here appear speculative. He doesn't claim that he actually sustained any losses. He says that he might have been able to umpire two baseball games, and he might have been able to do additional FBI work had he not had to attend trial. But he doesn't claim that this was -- that he had plans to do either of those things.

So we would, actually, oppose the restitution in this case because it appears speculative, and it doesn't represent actual losses.

THE COURT: I had it in front of me here, I thought.

MS. SAVARESE: You can have my copy.

THE COURT: Okay. Thank you. Actually, I do have it here. Never mind. I think I've got it here. I thought I had it, but I don't think I do.

What's the government's view? I'm sorry. Ms. Shields, you're welcome to confer.

MS. SHIELDS: Court's indulgence?

THE COURT: Yes.

(Brief pause.)

MS. SAVARESE: One final point to add, Your Honor, which is that it's our understanding that this is the type of

fee that the government would typically pay in connection with a witness that --

THE COURT: For lost wages?

MS. SAVARESE: Yes. Just for witness fees incurred attending -- there's no allegation as to how much he might have been paid by the government. But as a government witness, these are the types of losses that are very frequently incurred by government witnesses and not typically --

THE COURT: Although, he's a contractor. It's not like he's a government employee where --

MS. SHIELDS: Your Honor, if I could speak to this issue?

THE COURT: Yes.

MS. SHIELDS: Typically, as Your Honor knows, the government will pay for witnesses to attend trial. He's no longer law enforcement. This is not a situation in which this is someone who would be exempt from that.

It's our understanding that the government is not sure whether or not he received this fee, but he is the kind of person who would receive a witness fee.

THE COURT: I see. A witness fee is what you're talking about rather than compensation for his lost wages. I see.

MS. SHIELDS: Exactly.

THE COURT: I see. What is that witness fee? How

much does that come to?

MS. SHIELDS: To my knowledge, typically, the witness fee is about $75 a day.

THE COURT: Okay. He's still out of pocket a little bit even if he gets that. I suppose, if the government didn't provide it, it's still -- I'm not sure that he's not still entitled to restitution even though he may have had another alternative source of getting the compensation.

MS. SHIELDS: Certainly, Your Honor. If we look at the kinds of witnesses that receive restitution, it is where there's been a loss that is incurred.

As relayed in the statement, this is a very hypothetical loss. It's that he could have earned these wages, he could have umpired.

THE COURT: Right.

MS. SHIELDS: There's no definitive statement that he actually sustained a loss here.

THE COURT: That's what I wanted to look at here. If you wouldn't mind handing up the affidavit to me.

(Tendering document.)

THE COURT: Thank you.

All right. Anything else on this? It does seem to me, frankly, it's a little less speculative than you say. What he says is that he does generally work about two hours per day on average and that this is what he -- doing background checks.

And that he umpires baseball games, and he's paid $60 per game.

He then says, as a result of my travel to appear in court, I was unable to earn any income from the FBI or umpire any baseball games on March 30th or 31st.

MS. SHIELDS: I think, Your Honor, it's the last sentence we're very focused on in which he talks about that he could have done this. That's the hypothetical language.

The other thing, Your Honor, if I may --

THE COURT: Do we know what days of the week -- I guess there could be a little league game any day of the week. I'm not sure that makes a difference.

MS. SHIELDS: The other thing, Your Honor, I was going to add is that, in connection with some sort of victim restitution, it's where the actions of the defendant have caused the loss. Here, it is that he was required to appear for a trial.

THE COURT: Right.

MS. SHIELDS: It is not the actions of Mr. Venkata. It is that the government called him as a witness. That is the kind of situation in which -- that's why the government provides witnesses with witness fees.

In our view, this would not qualify for appropriate restitution by Mr. Venkata.

THE COURT: Okay. All right. Thank you.

Ms. Macey, do you know if there are other cases --

have courts ever addressed the question of whether someone who just lost time coming to testify entitles them to restitution?

MS. MACEY: I don't know the answer to that question, Your Honor. I was just looking to see what we -- I remember we put a footnote on this issue or perhaps just a reference to the -- yeah. It's the MVRA statutory provision that seems that it would apply here. It's 18 United States Code Section 3663(a) and then Subsection (b)(4).

And that reads that in any case -- let me go back. One moment. So Section (b), lowercase, reads, the order of restitution shall require that such defendant -- then if you go to Subsection 4, it reads, in any case, reimburse the victim for lost income and necessary child care, and transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

It seems like it is contemplated by the MVRA. Again, the government didn't have a copy of the victim impact statement -- or declaration, rather, until looking at it right before court. We didn't ask S.B. those particular questions about -- you know, any more beyond what he wrote there.

We submit that the defense argument about witness fees cover that, it does seem like a different issue. Witness fees are what are entitled to everyone and the MVRA contemplates this particular provision.

With that being said, the government did initially take the position that we were not seeking restitution before we knew, other than the reference in the presentence report draft, that Mr. -- that our victim, S.B., was making this request at all.

THE COURT: So it does seem to me, just reading the statute, that the government is right in that losses of this type are covered under the statute. And I suppose the question is just whether S.B. has offered enough -- yes, Ms. Shields?

MS. SHIELDS: Your Honor, at this point this is academic, but I do think it's important that the provision that Ms. Macey just cited, the definition of victim is relevant to this.

If Your Honor would -- the subsection states, in any case reimburse the victim for lost income and necessary child care. Victim is defined in the statute as a person directly or proximately harmed as a result of the commission of an offense for which restitution may be ordered. That language about directly or proximately harmed would go to whether that person was harmed by the perpetrator of the offense.

In our view, Mr. Venkata did not harm S.B.

THE COURT: Well, that gets back to the question of whether he's -- maybe it relates to the loss calculation -- but whether he's responsible for the disclosure of the PII. Because I do think that disclosing someone's PII, even if they

were not victims of identity theft, is harm. And, in fact, I think there's Supreme Court precedent in the civil context indicating that that certainly is enough; just the emotional damage of knowing that your personal information has been disclosed is enough for Article III purposes.

I don't know why it would be any different in this context, that you're a victim if you -- even if your PII is not, to your knowledge, used just because of the stress you don't know whether it's used. You know that there's somebody in India who now has your PII, and you don't have any control over that.

MS. SHIELDS: Your Honor, respectfully, we disagree. The language around the direct harm, there's no evidence that there's been a direct harm by Mr. Venkata to S.B.

We understand that the Court could disagree, but that would be the defense's position.

THE COURT: Okay. Fair enough. All right. Anything else from the government on this one?

MS. MACEY: Just on these issues, Your Honor?

THE COURT: Yes, just on this issue.

MS. MACEY: No, Your Honor.

THE COURT: I'll think a little bit about that issue further.

MS. SAVARESE: Your Honor, to the extent that it's helpful, we actually slightly briefed this issue, if you

recall, when we opposed the --

THE COURT: I do.

MS. SAVARESE: -- victim notification. We went into a bit more detail about all of the provisions we were just discussing about exactly the nature of the harm and what qualifies somebody as a victim, particularly in the context of PII.

And we would take the position that Mr. Balfour was not harmed specifically. I think the attorney general's manual specifies that merely the fact of somebody's PII being wrongfully held but not used by someone else doesn't necessarily qualify them as a victim, but we'd just refer to our previous --

THE COURT: Okay. I'll go back and take another look at that. I appreciate that. Thank you.

All right. So is anyone seeking a departure?

MS. MACEY: The government is not.

THE COURT: Okay. Ms. Savarese?

MS. SAVARESE: No. The defense is not.

THE COURT: Okay. So as I indicated previously, the probation office has recommended a sentence of 36 months' imprisonment with the sentences to run concurrently; 2 years of supervised release, again, concurrent; has recommended the $296 in restitution; no fine; and a special assessment of $400. And that is based purely on the information that is in the

presentence report.

I suppose at this point, I'm getting ready to turn to the 3553(a) factors and would want to hear from the parties with respect to those factors. But I just want to pause to make sure that you want to go -- I'm sorry.

(Brief pause.)

THE COURT: So I don't know if you-all have had a chance to do this in the midst of things -- there's a pretty big team for the defense here -- but my law clerk has gone back and looked at the transcript from trial about what happened in 2014. And the testimony, it appears to be, was that the disclosure was made to Mr. Edwards.

He was still employed by DHS, although he was in a different office at DHS at that point. But, more importantly, it appears from the transcript that the disclosure was only of the source code and not the PII and that it -- there's some subsequent testimony which indicates that there were dummy variables included rather than actual PII in that.

You-all may want to have a chance to go back and look at the transcript yourself on that, as well as figure out whether there's any other evidence or argument on the law that you want me to consider with respect to the loss amount.

The question I was getting ready to ask was whether you-all want to go ahead and address the 3553(a) factors now or whether you feel as though it would be somehow prejudicial to

do that before you know what the loss amount is -- calculation. It seems to me these are probably independent issues, although, obviously, the guidelines are one of the 3553(a) factors. I'm not going to impose sentence until we figure out what the guidelines are.

I'm happy to do whatever you-all prefer today. If you'd like to address the 3553(a) factors, we can do so. If you want to adjourn to look further into this loss calculation thing and figure out a schedule for doing that, and then come back and address the 3553(a) factors after we've done that, that's okay with me as well. Ms. Macey?

MS. MACEY: Thank you, Your Honor. I think it would be the government's preference to try to determine the loss calculation just so we know what the guidelines range is and can allocute appropriately.

I don't have a problem in terms of making other arguments, but the way that I was planning to do allocution was just really in sort of one address referencing what we -- what sentence we're requesting and support for that. So that would be the government's preference.

THE COURT: All right. Let me see what the defense's preference is.

MS. SAVARESE: Our preference would also be to determine the loss amount prior to addressing the 3553(a) factors.

THE COURT: Okay. What is your suggestion about what we do? I think what I'm going to do, to the -- I'm convinced, I'm sure, to the dismay of Mr. Edwards and Ms. Patel, is we're going to continue, I think, the sentencing. And we can do it before I turn to the -- but the same day when I'm going to do the sentencing in those other cases.

We can do this one first, and that way we'll know what sentence I imposed here first before then. I, frankly, have never been overwhelmed by the argument that they need to go later anyway. I've never really quite understood why that was necessary.

MS. SAVARESE: Nor have we, Your Honor.

THE COURT: What day was -- the 26th is probably when we should come back. If you want to submit any additional materials before then, that would be fine. I assume government counsel is available because they'll be here for the other sentencing.

MS. MACEY: It does cause a little bit of a wrinkle, Your Honor. I expect to be in trial. So this would mean that it falls on Ms. Choy. I'm scheduled to start trial on the 22nd before Judge Nichols.

THE COURT: I see.

MS. MACEY: I don't know what his schedule is in terms of, you know, if he has any wiggle room or not for me to ask if he's able to accommodate the scheduling. But the

government can make it work, but it is less than ideal.

THE COURT: Okay. What would you suggest alternatively? The problem is that I'm unavailable for the next two weeks. I'm picking a jury tomorrow and then I'm not available for the next two weeks. I think this was the first availability after that period of time that I had. I really hate to push the other sentencings again.

MS. MACEY: Understood, Your Honor. The government will be prepared. We'll proceed on the 26th. We'll make it work.

THE COURT: If you'd like -- also, if you do want to address, at least in part -- I mean, you can circle back and do it again -- but if you want to start with some of the 3553(a) factors now so we can be briefer when we come back, I'm happy to do that. And then that way at least you can cut to the core issue when we come back.

I'm even happy to try and schedule it perhaps during -- if it's just a half an hour -- during the lunch break in Judge Nichols' trial or something like that so that you -- you're not in an awkward position.

MS. MACEY: I appreciate the accommodation. I'm fine with us waiting and doing it. I was expecting to be quite brief. If I'm able to make it on the 26th, great. If not, Ms. Choy will, obviously, be able to handle things.

THE COURT: That's fine. She's, obviously, more than

capable.

Is that what the defense wants to do as well?

MS. SAVARESE: Yes.

THE COURT: Okay. So when would you like to submit anything else on this question?

What I'm interested in, I guess, are three questions, at least to my mind now. What are the rules with respect to remediation; two, what are the standards or rules with respect to what I'm referring to as a shorthand as multiple causation, but where there are multiple events that lead to the harm? And this is just one of those independent events that leads to the harm. And three, what does the record show, or is there additional evidence that I need to consider with respect to any harm caused by Mr. Venkata's participation in the conspiracy or his personal conduct?

And you're welcome to tell me any other issues that you think should be on that list.

All right. I'm also open to your arguments or your positions with respect to whether we should do this in a staggered fashion or whether we should just have simultaneous briefing at this point; and, if so, when those briefs should be due. Ms. Macey?

MS. SAVARESE: It's our position that the briefing should be staggered and that the government should try to establish its burden first, and then we'd like the opportunity

to respond.

THE COURT: That's fine. But I also will then give the opportunity for the government to file a reply if they go first. That's fine with me.

So when would the government like to file? I guess if we're going to have three briefs, we need to do it not too long from now. Just to make sure we have enough time.

MS. MACEY: If we could please have until next Friday.

THE COURT: That's fine with me. The government will file by the 12th of January. And then why doesn't the defendant file by the 17th, and then a reply by the 19th. Okay?

MS. MACEY: That's fine. Thank you, Your Honor.

MS. SAVARESE: In light of the intervening holiday, we were wondering if the Court would give us one more business day. It's Martin Luther King weekend that weekend.

THE COURT: It is the 15th?

MS. SAVARESE: Yes.

THE COURT: So I'll give you until the 18th and give the government then until COB on the 22nd.

All right. Anything else, then, before we adjourn?

MS. MACEY: Not from the government. Thank you, Your Honor.

THE COURT: Well, this has certainly been a

thoroughly litigated case. We're continuing that tradition. Ms. Savarese, anything else?

MS. SAVARESE: Nothing from the defense, Your Honor. Thank you.

THE COURT: Okay. Thank you, all. This has been helpful, and I will see you later this month.

(The hearing adjourned at 3:30 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, TAMARA M. SEFRANEK, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true, and complete transcript of the proceedings to the best of my ability.

Dated this 13th day of January, 2024.

/s/ Tamara M. Sefranek___________

Tamara M. Sefranek, RMR, CRR, CRC
Official Court Reporter
Room 6714
333 Constitution Avenue, N.W.
Washington, D.C. 20001

## $

**$100** [1] - 34:23
**$250,000** [1] - 10:4
**$296** [2] - 34:24, 42:23
**$400** [1] - 42:24
**$400,000** [1] - 10:3
**$550,000** [1] - 10:4
**$60** [1] - 38:1
**$75** [1] - 37:3

## /

**/s** [1] - 50:9

## 1

**1** [2] - 34:14, 34:16
**10** [3] - 9:19, 11:4, 23:7
**10004** [1] - 1:21
**11** [1] - 29:1
**12** [2] - 10:6, 29:2
**125** [1] - 1:20
**12th** [1] - 48:11
**1301** [1] - 1:17
**1343** [1] - 9:16
**13th** [1] - 50:7
**15th** [1] - 48:18
**1700** [1] - 1:23
**17th** [1] - 48:12
**18** [6] - 5:19, 9:16, 9:17, 9:18, 34:11, 39:7
**18th** [1] - 48:20
**19th** [1] - 48:12
**1:20-CR-66** [1] - 1:3
**1st** [1] - 5:22

## 2

**2** [4] - 24:11, 34:5, 34:6, 42:22
**20** [1] - 9:16
**20-66** [1] - 3:2
**20001** [2] - 2:23, 50:11
**20004** [1] - 2:5
**20006** [1] - 1:24
**2009** [4] - 11:16, 11:20, 16:18, 16:19
**2014** [10] - 11:16, 11:24, 13:8, 14:11, 20:13, 20:16, 21:9, 21:15, 43:11
**2019** [1] - 16:16
**202-354-3246** [1] - 2:23
**2023** [1] - 5:22
**2024** [2] - 1:7, 50:7
**20530** [2] - 1:15, 1:18
**22nd** [2] - 45:20, 48:21
**26th** [3] - 45:13, 46:9, 46:23
**28th** [1] - 32:14
**2:20** [1] - 1:7
**2B1.1** [1] - 9:21

## 3

**3** [2] - 34:13, 34:14
**30th** [2] - 32:14, 38:4
**31st** [3] - 32:16, 32:17, 38:4
**333** [2] - 2:22, 50:11
**3553(a** [7] - 43:3, 43:24, 44:3, 44:7, 44:10, 44:24, 46:13
**3553(a)** [1] - 5:19
**3561(c)(1** [1] - 34:15
**3583(b)(2** [1] - 34:12
**36** [1] - 42:21
**3663(a** [1] - 39:8
**371** [1] - 9:17
**3:30** [1] - 49:7

## 4

**4** [2] - 1:7, 39:12
**4-level** [1] - 34:3
**4000** [1] - 1:21

## 5

**5** [3] - 9:17, 16:19, 34:16
**550** [1] - 2:4

## 6

**6,000** [2] - 18:12, 18:14
**601** [1] - 1:14
**625** [1] - 2:4
**641** [1] - 9:19
**6714** [2] - 2:22, 50:10

## 7

**7** [1] - 9:21
**700** [1] - 1:24

## 8

**8** [1] - 11:4

## 9

**9** [1] - 11:4

## A

**abetting** [1] - 3:24
**ability** [3] - 23:11, 25:3, 50:6
**able** [7] - 4:19, 27:10, 35:7, 35:8, 45:25, 46:23, 46:24
**absolve** [1] - 28:4
**absolved** [1] - 22:12
**academic** [1] - 40:11
**accept** [2] - 8:22, 9:2
**acceptable** [1] - 8:22
**accommodate** [1] - 45:25
**accommodation** [1] - 46:21
**accomplished** [1] - 16:16
**according** [1] - 10:9
**accordingly** [1] - 23:18
**accountability** [1] - 11:7
**accountant** [1] - 25:20
**accounted** [1] - 34:2
**accurate** [1] - 50:4
**act** [2] - 3:24, 16:3
**Action** [1] - 1:3
**actions** [6] - 10:17, 14:22, 22:4, 22:10, 38:14, 38:18
**activity** [6] - 11:9, 26:21, 26:22, 26:25, 27:4, 29:9
**acts** [5] - 11:7, 11:9, 11:11, 27:1, 27:2
**actual** [3] - 17:17, 35:13, 43:18
**ad** [1] - 33:8
**add** [6] - 10:5, 22:23, 23:6, 33:20, 35:24, 38:13
**adding** [1] - 33:7
**addition** [1] - 17:2
**additional** [8] - 4:10, 4:12, 4:24, 6:20, 18:24, 35:8, 45:14, 47:13
**additions** [1] - 14:6
**address** [7] - 5:15, 29:3, 43:24, 44:7, 44:10, 44:18, 46:12
**addressed** [2] - 23:7, 39:1
**addressing** [2] - 29:7, 44:24
**adjourn** [2] - 44:8, 48:22
**adjourned** [1] - 49:7
**adjustment** [3] - 6:22, 28:21, 34:3
**advance** [2] - 23:14, 32:5
**affidavit** [1] - 37:19
**afternoon** [7] - 3:6, 3:8, 3:9, 3:11, 3:12, 3:19, 5:1
**afterwards** [1] - 32:23
**agencies** [7] - 12:14, 14:3, 22:3, 22:8, 30:8, 30:9, 30:10
**agency** [3] - 12:9, 14:1, 15:17
**Agent** [1] - 13:19
**agents** [2] - 17:15, 18:25
**aggravated** [2] - 3:25
**ago** [2] - 23:9, 26:14
**agree** [4] - 16:13, 20:13, 21:9, 21:23
**agreement** [8] - 5:5, 5:6, 9:20, 11:8, 11:11, 29:14, 30:24, 34:4
**agrees** [2] - 12:6, 34:5
**ahead** [1] - 43:24
**aiding** [1] - 3:24
**airline** [1] - 25:19
**allegation** [2] - 21:15, 36:5
**alleged** [3] - 16:15, 18:5, 26:17
**allies** [1] - 31:4
**allocute** [1] - 44:15
**allocution** [1] - 44:17
**alluded** [2] - 26:14, 31:1
**allusion** [1] - 32:13
**alternative** [1] - 37:8
**alternatively** [1] - 46:3
**America** [1] - 3:3
**AMERICA** [1] - 1:3
**amount** [15] - 6:19, 9:23, 10:2, 10:8, 10:20, 21:2, 21:5, 22:23, 34:8, 34:21, 34:22, 43:22, 44:1, 44:24
**answer** [7] - 13:18, 18:18, 18:19, 19:11, 19:13, 22:16, 39:3
**anticipate** [1] - 15:14
**anxious** [1] - 5:3
**anyway** [1] - 45:10
**apologize** [1] - 18:17
**appear** [4] - 25:10, 35:5, 38:2, 38:15
**application** [1] - 6:19
**applied** [1] - 25:17
**applies** [4] - 25:16, 26:3, 34:5, 34:6
**apply** [6] - 11:1, 23:1, 25:20, 28:9, 34:3, 39:7
**appreciate** [4] - 9:25, 30:19, 42:15, 46:21
**approach** [3] - 3:4, 30:20
**appropriate** [3] - 6:4, 9:23, 38:22
**appropriately** [1] - 44:15
**areas** [1] - 5:7
**argument** [3] - 39:22, 43:21, 45:9
**arguments** [4] - 28:24, 33:22, 44:17, 47:18
**arise** [1] - 15:5
**Article** [1] - 41:5
**aside** [4] - 4:2, 20:25, 21:11, 22:24
**aspect** [1] - 30:13
**aspirations** [1] - 31:2
**assertions** [1] - 7:13
**assessment** [2] - 34:23, 42:24
**assistance** [1] - 8:20
**assistant** [1] - 27:23
**assume** [2] - 18:12, 45:15
**attend** [2] - 35:9, 36:15
**attendance** [1] - 39:15
**attending** [1] - 36:5
**attention** [2] - 11:2, 16:6
**attorney** [1] - 42:9
**attributable** [3] - 10:20, 10:22, 12:1
**attributed** [1] - 21:6
**authority** [2] - 26:23, 26:24
**authorization** [1] - 19:7
**availability** [1] - 46:6
**available** [3] - 14:16, 45:16, 46:5
**Avenue** [5] - 1:17, 1:23, 2:4, 2:22, 50:11
**average** [1] - 37:25
**aware** [1] - 16:8
**awkward** [1] - 46:20

## B

**b)(4)** [1] - 39:8
**baby** [1] - 31:16
**background** [1] -

37:25
**baker** [1] - 4:19
**Baker** [2] - 2:7, 3:13
**balfour** [1] - 42:8
**Balfour** [2] - 4:16, 35:5
**base** [1] - 9:20
**baseball** [3] - 35:7, 38:1, 38:4
**based** [3] - 18:25, 34:20, 42:25
**basis** [2] - 12:13, 17:21
**became** [1] - 10:23
**BEFORE** [1] - 1:9
**behalf** [2] - 3:7, 3:10
**benefit** [3] - 27:3, 27:7, 27:13
**best** [3] - 14:18, 16:10, 50:6
**between** [5] - 10:4, 28:7, 33:22, 34:14, 34:16
**beyond** [3] - 15:7, 21:16, 39:21
**big** [2] - 31:12, 43:9
**big-time** [1] - 31:12
**biggest** [1] - 32:19
**bit** [9] - 5:23, 11:17, 18:8, 22:19, 24:6, 37:5, 41:22, 42:4, 45:18
**bottom** [2] - 5:3, 12:4
**breach** [7] - 13:1, 15:16, 15:24, 19:1, 19:8, 19:23, 20:12
**breaches** [1] - 15:19
**break** [1] - 46:18
**brief** [4] - 8:8, 35:23, 43:6, 46:23
**briefed** [2] - 18:19, 41:25
**briefer** [1] - 46:14
**briefing** [6] - 12:23, 13:5, 18:24, 22:14, 47:21, 47:23
**briefs** [2] - 47:21, 48:6
**bring** [4] - 9:9, 11:1, 23:17, 26:11
**bringing** [2] - 20:7, 23:10
**brings** [2] - 9:22, 16:6
**Broad** [1] - 1:20
**broader** [1] - 20:9
**brought** [2] - 20:1, 20:3
**build** [1] - 24:7
**building** [1] - 15:1
**built** [1] - 30:17
**bulk** [1] - 21:5
**burden** [1] - 47:25
**business** [6] - 20:19, 20:20, 27:9, 27:11, 29:20, 48:16

## C

**calculation** [8] - 5:13, 7:3, 9:6, 9:10, 40:23, 44:1, 44:8, 44:14
**candidly** [1] - 12:3
**capable** [1] - 47:1
**capture** [1] - 25:14
**car** [2] - 19:21, 19:23
**care** [2] - 39:13, 40:16
**carefully** [1] - 22:15
**carried** [1] - 14:25
**case** [14] - 5:20, 8:20, 9:4, 9:23, 13:8, 17:12, 21:18, 22:17, 30:17, 35:12, 39:9, 39:12, 40:15, 49:1
**Case** [1] - 3:2
**cases** [3] - 19:20, 38:25, 45:6
**category** [1] - 10:3
**Category** [1] - 34:11
**causation** [3] - 16:3, 22:18, 47:9
**caused** [4] - 10:16, 10:17, 38:15, 47:14
**causing** [1] - 3:24
**CD** [5] - 17:1, 17:3, 17:9, 17:12, 17:13
**CDs** [1] - 17:10
**Celia** [1] - 3:7
**CELIA** [1] - 1:16
**certain** [1] - 21:2
**certainly** [12] - 15:4, 20:5, 20:14, 22:6, 24:19, 26:16, 28:11, 35:3, 37:9, 41:3, 48:25
**CERTIFICATE** [1] - 50:1
**certify** [1] - 50:3
**chance** [3] - 7:24, 43:8, 43:19
**change** [2] - 22:3, 22:10
**channels** [1] - 17:8
**charge** [1] - 31:22
**checks** [1] - 37:25
**chemist** [1] - 25:3
**child** [2] - 39:13, 40:15
**Choy** [3] - 3:7, 45:20, 46:24
**CHOY** [1] - 1:16
**Christiana** [1] - 3:14
**Christina** [1] - 3:15
**Christine** [1] - 3:6
**CHRISTINE** [1] - 1:13
**circle** [1] - 46:12
**circumstance** [1] - 28:10
**cited** [1] - 40:12
**civil** [1] - 41:2
**claim** [2] - 35:6, 35:9
**clear** [3] - 13:7, 24:15, 30:22
**clearer** [1] - 14:24
**clearly** [1] - 22:17
**clerk** [1] - 43:9
**closer** [2] - 7:21, 25:20
**COB** [1] - 48:21
**cocaine** [1] - 31:15
**code** [1] - 43:16
**Code** [1] - 39:7
**coder** [1] - 24:16
**coders** [2] - 24:18, 27:22
**coding** [2] - 23:11, 24:3
**college** [1] - 24:21
**COLUMBIA** [1] - 1:1
**Columbia** [1] - 2:3
**coming** [1] - 39:2
**commentary** [1] - 28:19
**commerce** [1] - 24:21
**commercial** [1] - 29:22
**commercially** [1] - 30:17
**commission** [2] - 26:25, 40:17
**commit** [1] - 3:22
**compensation** [2] - 36:22, 37:8
**competing** [1] - 29:16
**competitor** [1] - 23:14
**complete** [1] - 50:5
**completely** [1] - 18:3
**computer** [5] - 14:16, 20:1, 20:4, 20:8, 23:13
**computers** [1] - 25:12
**conceded** [1] - 26:16
**concerned** [2] - 7:2, 17:7
**concerns** [1] - 15:4
**conclusion** [1] - 14:20
**concurrent** [1] - 42:23
**concurrently** [2] - 34:17, 42:22
**conduct** [6] - 10:24, 11:12, 13:10, 28:14, 47:15
**confer** [1] - 35:20
**configure** [2] - 23:25, 24:23
**Congress** [2] - 5:18, 9:15
**congressional** [1] - 13:21
**connection** [2] - 36:1, 38:13
**consider** [8] - 4:11, 4:23, 6:5, 26:19, 29:7, 43:22, 47:13
**considerably** [1] - 21:11
**consideration** [2] - 26:5, 26:9
**considered** [1] - 20:12
**conspiracy** [17] - 3:22, 10:10, 10:19, 10:23, 11:6, 11:15, 12:18, 12:19, 14:5, 14:6, 22:5, 23:10, 23:18, 23:25, 26:17, 47:14
**constitutes** [1] - 50:4
**Constitution** [2] - 2:22, 50:11
**CONT'D** [1] - 2:1
**containing** [2] - 14:25, 17:10
**contemplated** [1] - 39:17
**contemplates** [1] - 39:25
**context** [4] - 13:23, 41:2, 41:7, 42:6
**continue** [1] - 45:4
**continuing** [1] - 49:1
**contractor** [1] - 36:9
**contributed** [2] - 10:24, 21:9
**control** [1] - 41:10
**convinced** [2] - 14:19, 45:2
**copy** [8] - 4:19, 16:25, 20:18, 20:21, 35:4, 35:15, 39:18
**copying** [2] - 20:6, 20:13
**core** [2] - 27:22, 46:15
**correct** [2] - 7:17, 10:14
**costs** [7] - 10:2, 10:8, 12:13, 14:10, 14:20, 21:11, 21:12
**counsel** [5] - 3:4, 3:5, 4:19, 5:15, 45:16
**country** [1] - 31:19
**counts** [2] - 3:21, 4:3
**couple** [1] - 23:8
**course** [9] - 6:6, 7:16, 8:9, 9:5, 9:7, 13:22, 15:20, 33:9, 33:11
**COURT** [105] - 1:1, 3:8, 3:11, 3:16, 3:19, 4:17, 4:21, 4:25, 6:7, 6:13, 7:1, 7:6, 7:12, 7:16, 7:20, 8:1, 8:3, 8:6, 8:9, 8:13, 8:16, 8:19, 8:22, 9:2, 12:23, 14:7, 14:17, 15:21, 16:2, 16:18, 16:21, 17:5, 17:11, 17:17, 18:6, 18:11, 18:18, 19:9, 19:12, 19:14, 20:10, 20:15, 20:19, 20:23, 21:7, 21:14, 21:21, 22:13, 22:22, 23:20, 24:5, 24:10, 24:17, 25:15, 26:11, 28:22, 28:25, 29:18, 31:10, 32:7, 32:17, 33:11, 33:17, 33:21, 34:10, 35:14, 35:16, 35:22, 36:3, 36:9, 36:13, 36:21, 36:25, 37:4, 37:15, 37:18, 37:21, 38:9, 38:17, 38:24, 40:6, 40:22, 41:17, 41:20, 41:22, 42:2, 42:14, 42:18, 42:20, 43:7, 44:21, 45:1, 45:13, 45:22, 46:2, 46:11, 46:25, 47:4, 48:2, 48:10, 48:18, 48:20, 48:25, 49:5, 50:1
**Court** [17] - 2:21, 2:21, 4:20, 5:15, 5:22, 6:5, 13:23, 26:18, 29:7, 30:15, 31:1, 33:3, 34:12, 41:2, 41:15, 48:16, 50:10
**court** [3] - 3:17, 38:3, 39:20
**court's** [2] - 8:8, 35:21
**Court's** [4] - 12:6, 13:15, 29:3, 29:4
**Courthouse** [1] - 2:22
**COURTROOM** [1] - 3:2
**courts** [1] - 39:1
**cover** [1] - 39:23
**covered** [2] - 33:19, 40:8
**CRC** [2] - 2:21, 50:9
**create** [2] - 29:20, 30:1
**creating** [3] - 23:14, 29:19, 29:23
**Criminal** [2] - 1:3, 34:11

**criminal** [9] - 3:2, 11:9, 26:20, 26:25, 27:4, 29:9, 33:12, 33:13, 34:10
**CRM** [1] - 1:16
**Cromwell** [2] - 1:20, 1:23
**CRR** [2] - 2:21, 50:9
**culpable** [3] - 28:14, 28:15, 28:18
**cut** [2] - 30:24, 46:15
**cutting** [2] - 31:15, 31:23

## D

**D.C** [3] - 1:6, 2:23, 50:11
**damage** [2] - 10:16, 41:4
**database** [1] - 12:15
**Dated** [1] - 50:7
**days** [1] - 38:9
**DC** [4] - 1:15, 1:18, 1:24, 2:5
**deal** [1] - 15:10
**dealer** [2] - 31:12, 31:16
**deals** [1] - 13:9
**December** [1] - 5:22
**decision** [2] - 26:23, 26:24
**decision-making** [2] - 26:23, 26:24
**declaration** [3] - 4:15, 35:4, 39:19
**Defendant** [3] - 1:7, 1:19, 2:2
**defendant** [11] - 3:20, 11:7, 11:12, 16:5, 26:20, 27:2, 27:3, 29:8, 38:14, 39:11, 48:12
**DEFENDANT** [7] - 7:24, 8:2, 8:5, 8:15, 8:18, 8:21, 9:1
**defendant's** [1] - 11:10
**Defender** [1] - 2:3
**defense** [14] - 4:22, 6:11, 6:15, 10:7, 10:9, 11:3, 11:13, 28:2, 28:9, 39:22, 42:19, 43:9, 47:2, 49:3
**defense's** [2] - 41:16, 44:21
**defined** [1] - 40:16
**defining** [1] - 28:12
**definitely** [1] - 11:1
**definition** [1] - 40:12
**definitive** [1] - 37:16
**definitively** [1] - 15:23
**defraud** [1] - 3:23
**degree** [7] - 24:20, 24:21, 26:19, 26:21, 26:22, 27:3, 29:8
**delivered** [1] - 15:1
**demonstrated** [1] - 23:23
**Department** [2] - 10:12, 19:17
**departure** [1] - 42:16
**DEPUTY** [1] - 3:2
**described** [1] - 23:24
**describes** [1] - 16:20
**describing** [1] - 19:2
**description** [1] - 9:3
**descriptions** [3] - 6:16, 7:7, 8:23
**designed** [1] - 29:21
**destruction** [1] - 4:2
**detail** [1] - 42:4
**details** [1] - 30:20
**determination** [4] - 7:3, 21:3, 27:21, 29:5
**determine** [3] - 5:11, 44:13, 44:24
**develop** [3] - 18:2, 24:13, 29:15
**developed** [2] - 20:20, 32:22
**developers** [4] - 12:16, 19:4, 22:6, 24:4
**developing** [1] - 17:22
**development** [1] - 23:12
**DHS** [23] - 11:14, 11:21, 13:3, 13:4, 14:11, 14:21, 16:22, 16:23, 16:24, 17:4, 17:19, 17:21, 18:2, 18:9, 18:13, 20:16, 20:17, 21:6, 21:11, 24:8, 43:13, 43:14
**DHS-OIG** [7] - 11:14, 13:4, 17:4, 18:9, 21:6, 21:11, 24:8
**difference** [2] - 9:22, 38:11
**differences** [1] - 9:11
**different** [5] - 14:12, 30:9, 39:23, 41:6, 43:14
**differs** [1] - 31:11
**direct** [4] - 12:18, 29:13, 41:13, 41:14
**directly** [3] - 27:7, 40:16, 40:19
**disagree** [3] - 10:15, 41:12, 41:15
**disagreements** [1] - 5:8
**disagrees** [1] - 6:15
**disclosed** [3] - 10:13, 19:18, 41:5
**disclosing** [2] - 13:2, 40:25
**disclosure** [16] - 10:9, 11:21, 12:7, 12:15, 13:16, 13:20, 13:21, 14:4, 18:20, 19:16, 21:16, 22:3, 22:5, 40:24, 43:12, 43:15
**disclosures** [2] - 11:13, 14:9
**discretion** [1] - 27:2
**discuss** [2] - 8:4, 8:16
**discussed** [3] - 17:15, 32:9, 32:18
**discussing** [1] - 42:5
**discussion** [2] - 24:7, 32:25
**discussions** [3] - 27:20, 30:8, 32:13
**disk** [2] - 14:25, 17:17
**dismay** [1] - 45:3
**dispute** [2] - 6:18, 28:16
**disputes** [1] - 6:9
**distinguishable** [1] - 31:25
**distinguishing** [2] - 28:12, 28:20
**distributing** [1] - 31:19
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [1] - 2:3
**docket** [1] - 4:19
**doctor** [1] - 25:19
**document** [1] - 37:20
**DOJ** [2] - 1:14, 1:16
**DOJ-CRM** [1] - 1:16
**DOJ-USAO** [1] - 1:14
**done** [5] - 3:24, 18:22, 24:8, 38:7, 44:10
**door** [1] - 30:12
**down** [2] - 16:10, 27:25
**draft** [1] - 40:4
**drill** [1] - 16:10
**drug** [6] - 31:11, 31:12, 31:13, 31:14, 31:16
**drugs** [3] - 31:13, 31:20, 31:23
**due** [2] - 22:3, 47:22
**dummy** [1] - 43:17
**during** [4] - 17:15, 39:14, 46:18
**DVD** [1] - 17:12

## E

**early** [1] - 20:8
**earn** [1] - 38:3
**earned** [1] - 37:13
**easy** [1] - 31:6
**economically** [1] - 27:7
**EDS** [3] - 17:22, 24:11
**education** [1] - 24:22
**Edwards** [27] - 12:10, 13:3, 13:9, 14:10, 14:11, 16:16, 16:22, 16:23, 20:8, 20:16, 23:11, 23:25, 24:15, 25:22, 27:9, 27:14, 27:17, 27:25, 29:19, 30:9, 30:16, 30:17, 31:4, 32:21, 43:12, 45:3
**Edwards'** [6] - 12:21, 17:9, 23:13, 25:4, 27:9, 30:5
**efficient** [1] - 9:11
**efforts** [1] - 15:16
**either** [4] - 21:20, 27:6, 29:5, 35:10
**eligible** [3] - 6:21, 28:21, 34:15
**emotional** [1] - 41:3
**emphasize** [1] - 24:20
**employed** [1] - 43:13
**employee** [3] - 13:3, 19:3, 36:10
**employee's** [1] - 19:21
**employees** [2] - 12:9, 18:9
**end** [2] - 26:4, 26:8
**enforcement** [1] - 36:16
**engaged** [2] - 10:11, 10:24
**enhancement** [9] - 22:25, 23:19, 25:13, 25:16, 25:21, 26:3, 26:7, 33:23, 34:2
**entirely** [4] - 13:7, 15:7, 20:7, 25:23
**entitled** [2] - 37:7, 39:24
**entitles** [1] - 39:2
**establish** [2] - 30:25, 47:25
**established** [3] - 14:3, 29:10, 30:24
**eSubpoena** [2] - 24:7, 32:22
**event** [1] - 15:11
**events** [2] - 47:10, 47:11
**evidence** [19] - 6:1, 6:5, 9:8, 13:11, 15:15, 17:11, 17:15, 17:20, 20:6, 24:2, 25:5, 27:6, 27:12, 29:9, 30:25, 31:6, 41:13, 43:21, 47:13
**exactly** [3] - 34:20, 36:24, 42:5
**example** [2] - 19:20, 32:10
**excuse** [1] - 12:10
**exempt** [1] - 36:17
**exercise** [1] - 26:23
**exercised** [1] - 26:22
**expect** [1] - 45:19
**expecting** [1] - 46:22
**expenses** [1] - 39:14
**expertise** [3] - 23:10, 24:25, 25:5
**explained** [1] - 29:12
**extent** [6] - 7:10, 11:20, 11:25, 21:8, 26:24, 41:24

## F

**facilitate** [1] - 32:2
**facilitated** [1] - 12:22
**fact** [8] - 8:23, 8:24, 9:4, 19:25, 22:4, 22:10, 41:1, 42:10
**factors** [13] - 5:18, 26:18, 27:5, 29:7, 33:18, 43:3, 43:4, 43:24, 44:3, 44:7, 44:10, 44:25, 46:14
**facts** [5] - 5:5, 7:14, 9:3, 14:2, 21:3
**factual** [8] - 5:24, 6:15, 6:23, 7:7, 7:13, 13:13, 15:13, 15:25
**factual-like** [1] - 15:13
**factually** [1] - 13:25
**fair** [5] - 5:17, 19:12, 19:14, 21:21, 41:17
**falls** [3] - 29:4, 34:20, 45:20
**familiar** [1] - 32:22
**far** [5] - 7:1, 17:6, 25:13, 28:17
**fashion** [2] - 5:17, 47:20
**FBI** [2] - 35:8, 38:3
**feature** [2] - 33:7, 33:8

**featured** [1] - 28:2
**features** [1] - 33:6
**Federal** [1] - 2:3
**federal** [1] - 13:4
**fee** [6] - 36:1, 36:19, 36:20, 36:21, 36:25, 37:3
**fees** [4] - 36:4, 38:21, 39:23, 39:24
**few** [1] - 9:7
**figure** [7] - 15:11, 16:10, 21:1, 34:22, 43:20, 44:4, 44:9
**figuring** [1] - 34:7
**file** [4] - 48:3, 48:5, 48:11, 48:12
**filed** [1] - 5:22
**final** [2] - 5:16, 35:24
**financial** [2] - 27:13, 30:24
**findings** [3] - 7:13, 8:24, 9:4
**fine** [9] - 34:21, 42:24, 45:15, 46:21, 46:25, 48:2, 48:4, 48:10, 48:14
**fingertips** [1] - 18:17
**finished** [1] - 34:8
**first** [8] - 5:10, 9:22, 34:22, 45:7, 45:8, 46:5, 47:25, 48:4
**five** [1] - 3:21
**focused** [1] - 38:6
**focusing** [1] - 11:24
**following** [1] - 32:11
**foot** [1] - 30:12
**footnote** [1] - 39:5
**FOR** [1] - 1:1
**foregoing** [1] - 50:4
**foreseeable** [1] - 11:12
**forgive** [1] - 16:19
**former** [1] - 12:9
**forth** [7] - 5:24, 6:16, 7:7, 8:23, 9:3, 11:3, 25:8
**four** [1] - 4:3
**frankly** [7] - 13:7, 13:17, 17:23, 30:4, 30:6, 37:23, 45:8
**fraud** [1] - 3:24
**frequently** [1] - 36:7
**Friday** [1] - 48:9
**front** [4] - 13:9, 14:20, 21:3, 35:14
**full** [1] - 50:5
**fully** [1] - 8:19
**future** [2] - 31:2, 31:8

## G

**game** [2] - 38:1, 38:10
**games** [3] - 35:7, 38:1, 38:4
**geek** [1] - 24:23
**general** [4] - 6:17, 10:15, 25:18, 27:15
**general's** [1] - 42:9
**generally** [4] - 11:18, 32:24, 33:6, 37:24
**given** [1] - 30:23
**government** [54] - 3:5, 3:22, 3:23, 4:11, 4:13, 5:14, 10:1, 12:6, 12:12, 12:14, 13:5, 13:13, 14:8, 15:5, 17:8, 19:21, 22:2, 22:8, 23:2, 23:3, 23:23, 26:16, 29:20, 29:23, 29:25, 30:3, 30:6, 30:22, 33:24, 36:1, 36:6, 36:8, 36:10, 36:15, 36:18, 37:5, 38:19, 38:20, 39:18, 40:1, 40:7, 41:18, 42:17, 45:15, 46:1, 46:8, 47:24, 48:3, 48:5, 48:10, 48:21, 48:23
**government's** [8] - 4:6, 11:17, 12:24, 22:1, 33:14, 35:19, 44:13, 44:20
**great** [1] - 46:23
**greatest** [1] - 15:4
**group** [1] - 28:14
**guess** [8] - 5:22, 11:14, 14:19, 30:2, 31:10, 38:10, 47:6, 48:5
**guesswork** [1] - 25:8
**guideline** [1] - 7:3
**guidelines** [18] - 5:13, 9:6, 9:10, 9:21, 10:16, 10:19, 10:25, 11:6, 22:15, 28:12, 28:20, 34:8, 34:13, 34:18, 34:20, 44:3, 44:5, 44:14
**guilty** [2] - 3:21, 4:1
**guy** [3] - 24:22, 27:21, 27:22

## H

**half** [1] - 46:18
**handed** [1] - 17:1
**handing** [1] - 37:19
**handle** [1] - 46:24
**happy** [9] - 12:2, 18:23, 19:10, 21:12, 23:4, 31:7, 44:6, 46:14, 46:17
**hard** [1] - 11:21
**harm** [8] - 40:21, 41:1, 41:13, 41:14, 42:5, 47:10, 47:12, 47:14
**harmed** [4] - 40:17, 40:19, 40:20, 42:9
**hate** [1] - 46:7
**hear** [11] - 5:14, 5:16, 6:13, 9:13, 12:3, 14:17, 16:9, 22:19, 23:1, 26:12, 43:3
**heard** [1] - 29:12
**hearing** [1] - 49:7
**HEARING** [2] - 1:4, 1:9
**held** [1] - 42:11
**HELD** [1] - 1:9
**help** [11] - 9:25, 12:4, 18:2, 23:11, 23:25, 24:11, 24:12, 25:24, 28:1, 29:15, 32:4
**helpful** [2] - 41:25, 49:6
**helping** [2] - 24:7, 24:23
**hereby** [1] - 50:3
**herself** [1] - 3:14
**hierarchical** [1] - 28:2
**highlight** [1] - 23:5
**himself** [2] - 10:24, 25:22
**hinted** [1] - 24:5
**hire** [1] - 27:10
**history** [1] - 34:11
**History** [1] - 34:11
**hoc** [1] - 33:8
**hold** [1] - 34:19
**holiday** [1] - 48:15
**home** [5] - 20:1, 20:4, 20:8, 23:25, 25:4
**Homeland** [2] - 10:12, 19:17
**Honor** [45] - 3:6, 3:9, 3:12, 4:12, 4:24, 6:4, 7:19, 8:10, 12:5, 13:12, 14:15, 16:13, 18:17, 20:13, 21:25, 23:3, 26:10, 28:11, 28:23, 31:24, 33:2, 33:19, 34:9, 35:3, 35:24, 36:11, 36:14, 37:9, 38:5, 38:8, 38:12, 39:4, 40:10, 40:14, 41:12, 41:19, 41:21, 41:24, 44:12, 45:12, 45:19, 46:8, 48:14, 48:24, 49:3
**HONORABLE** [1] - 1:9
**hoped** [1] - 27:8
**hour** [1] - 46:18
**hours** [1] - 37:24
**house** [3] - 17:9, 17:13, 19:3
**hypothetical** [2] - 37:13, 38:7

## I

**idea** [1] - 15:5
**ideal** [1] - 46:1
**identity** [3] - 3:25, 4:1, 41:1
**ignorant** [1] - 16:5
**III** [1] - 41:5
**illiterate** [1] - 25:23
**imagine** [1] - 15:4
**impact** [1] - 39:18
**implementation** [1] - 23:12
**implicates** [1] - 13:21
**important** [2] - 35:1, 40:11
**importantly** [1] - 43:14
**impose** [3] - 5:20, 34:12, 44:4
**imposed** [2] - 9:15, 45:8
**impression** [2] - 24:12, 32:19
**imprisonment** [1] - 42:22
**improper** [1] - 18:1
**IN** [1] - 1:1
**incarceration** [1] - 9:16
**inclined** [1] - 22:23
**included** [1] - 43:18
**including** [1] - 27:1
**income** [3] - 38:3, 39:13, 40:15
**incorporate** [1] - 28:24
**incorporated** [1] - 33:7
**incur** [1] - 14:10
**incurred** [7] - 10:23, 12:14, 14:21, 36:4, 36:7, 37:11, 39:14
**indeed** [2] - 25:3, 25:7
**independent** [2] - 44:2, 47:11
**India** [7] - 12:16, 15:3, 15:25, 19:4, 24:4, 27:22, 41:10
**Indiana** [1] - 2:4
**indicated** [1] - 42:20
**indicates** [1] - 43:17
**indicating** [1] - 41:3
**indictment** [4] - 16:15, 16:20, 18:7, 20:22
**indulgence** [2] - 8:8, 35:21
**inference** [2] - 27:8, 31:6
**influenced** [1] - 26:23
**information** [7] - 12:15, 12:21, 14:20, 15:3, 15:6, 41:4, 42:25
**initial** [2] - 12:7, 20:6
**innocent** [1] - 20:7
**inquiry** [1] - 13:15
**instrumental** [1] - 23:9
**Integrity** [1] - 1:17
**intended** [1] - 25:14
**interested** [1] - 47:6
**interesting** [1] - 33:15
**interpersonal** [1] - 31:3
**intervening** [1] - 48:15
**introduce** [1] - 3:14
**investigation** [2] - 15:20, 39:15
**involve** [2] - 30:7, 32:3
**involved** [9] - 10:10, 12:8, 12:11, 14:23, 21:19, 25:9, 25:10, 27:16, 28:14
**involvement** [6] - 12:8, 12:19, 13:16, 14:5, 23:17, 25:10
**irony** [1] - 33:11
**issue** [16] - 12:4, 12:24, 13:14, 21:13, 21:17, 21:23, 22:19, 23:7, 35:1, 36:12, 39:5, 39:23, 41:20, 41:22, 41:25, 46:16
**issues** [15] - 5:6, 5:9, 5:11, 5:13, 6:11, 6:14, 6:18, 6:24, 7:2, 7:10, 9:5, 13:11, 41:19, 44:2, 47:16
**IT** [2] - 23:10, 24:22
**itself** [1] - 32:5

## J

**January** [3] - 1:7, 48:11, 50:7
**job** [2] - 31:13, 31:21
**join** [1] - 27:10
**joined** [4] - 10:18, 10:19, 11:15, 12:17
**joining** [1] - 11:6

**jointly** [1] - 11:9
**Judge** [3] - 7:24, 45:21, 46:19
**JUDGE** [2] - 1:9, 1:10
**junior** [1] - 26:17
**jurisdiction** [1] - 15:7
**jury** [2] - 3:21, 46:4
**justice** [1] - 34:5

## K

**KAMIL** [1] - 1:22
**Kamil** [1] - 3:10
**KATHERINE** [1] - 1:19
**Katherine** [1] - 3:9
**kind** [5] - 11:24, 16:10, 25:2, 36:19, 38:20
**kinds** [1] - 37:10
**King** [1] - 48:17
**kingpin** [2] - 31:12, 31:17
**knowing** [1] - 41:4
**knowledge** [3] - 25:11, 37:2, 41:8
**known** [2] - 11:11, 15:18
**knows** [2] - 15:8, 36:14

## L

**laid** [1] - 23:21
**language** [3] - 38:7, 40:18, 41:13
**laptop** [4] - 19:21, 19:22, 24:1, 25:1
**laptops** [2] - 12:21, 24:24
**large** [2] - 13:20, 30:21
**last** [6] - 5:19, 12:6, 20:1, 20:4, 27:21, 38:5
**late** [1] - 32:15
**law** [8] - 5:5, 13:1, 14:9, 21:3, 22:17, 36:16, 43:9, 43:21
**lawyer** [1] - 25:2
**lawyers** [3] - 8:4, 8:17, 8:20
**lead** [1] - 47:10
**leads** [1] - 47:11
**league** [1] - 38:10
**learned** [2] - 14:3, 15:19
**least** [10] - 15:17, 22:14, 24:12, 27:7, 28:14, 28:17, 34:19, 46:12, 46:15, 47:7
**led** [3] - 15:16, 22:5, 22:10
**left** [1] - 20:17
**legal** [3] - 10:15, 11:5, 12:25
**less** [4] - 28:15, 30:2, 37:23, 46:1
**letters** [1] - 4:8
**level** [4] - 9:21, 25:19, 28:5, 31:3
**levels** [1] - 10:6
**licenses** [1] - 24:22
**lie** [1] - 6:9
**light** [6] - 5:17, 13:14, 15:16, 15:24, 22:12, 48:15
**limited** [4] - 11:8, 26:1, 26:15, 27:18
**line** [2] - 5:3, 12:4
**lines** [2] - 15:14, 23:8
**list** [3] - 23:15, 30:10, 47:17
**lists** [1] - 17:15
**literally** [1] - 26:7
**litigated** [1] - 49:1
**litigation** [1] - 33:4
**LLP** [2] - 1:20, 1:23
**look** [11] - 7:25, 14:15, 15:9, 18:23, 20:23, 25:7, 37:9, 37:18, 42:14, 43:19, 44:8
**looked** [1] - 43:10
**looking** [3] - 25:3, 39:4, 39:19
**looks** [1] - 26:18
**loss** [26] - 6:19, 9:23, 10:2, 10:3, 10:7, 10:17, 10:20, 10:22, 10:24, 21:2, 21:5, 22:23, 34:8, 34:21, 34:22, 37:11, 37:13, 37:17, 38:15, 40:23, 43:22, 44:1, 44:8, 44:13, 44:24
**losses** [8] - 4:15, 11:25, 35:4, 35:5, 35:6, 35:13, 36:7, 40:7
**lost** [5] - 36:3, 36:22, 39:2, 39:13, 40:15
**lower** [2] - 26:4, 26:8
**lowercase** [1] - 39:10
**lunch** [1] - 46:18
**Luther** [1] - 48:17

## M

**MACEY** [36] - 1:13, 3:6, 4:12, 4:18, 6:4, 6:8, 12:5, 13:12, 14:14, 15:13, 15:22, 16:12, 21:25, 22:21, 23:3, 28:23, 29:1, 30:15, 31:24, 32:16, 33:2, 33:15, 33:18, 34:9, 39:3, 41:19, 41:21, 42:17, 44:12, 45:18, 45:23, 46:8, 46:21, 48:8, 48:14, 48:23
**Macey** [10] - 3:7, 4:10, 6:2, 12:2, 21:22, 28:22, 38:25, 40:12, 44:11, 47:22
**major** [1] - 9:22
**management** [1] - 30:18
**mandate** [2] - 13:17, 22:11
**mandatory** [1] - 34:23
**manner** [1] - 17:8
**manual** [1] - 42:9
**March** [1] - 38:4
**marketing** [1] - 30:20
**Martin** [1] - 48:17
**massive** [1] - 31:13
**material** [3] - 12:16, 14:11, 16:23
**materials** [5] - 4:10, 4:13, 4:24, 5:24, 45:15
**matter** [4] - 7:11, 9:14, 12:7, 14:9
**maximum** [3] - 9:15, 9:17, 9:18
**mean** [13] - 14:22, 16:18, 17:20, 18:11, 18:19, 19:9, 20:24, 32:2, 32:8, 33:12, 45:19, 46:12
**meeting** [6] - 32:8, 32:9, 32:12, 32:14, 32:17, 32:20
**meetings** [1] - 27:19
**member** [2] - 10:23, 26:17
**members** [1] - 25:17
**memo** [2] - 6:18, 23:24
**memorandum** [8] - 4:7, 4:8, 11:4, 23:4, 23:7, 23:16, 28:24, 33:5
**memory** [1] - 14:14
**merely** [1] - 42:10
**message** [1] - 29:13
**messages** [1] - 25:7
**MICHELLE** [2] - 1:13, 2:2
**microphone** [1] - 7:21
**midst** [1] - 43:8
**might** [9] - 16:4, 24:12, 27:8, 27:10, 31:16, 35:7, 35:8, 36:5
**millions** [2] - 30:18, 31:17
**mind** [8] - 13:7, 14:24, 16:3, 16:14, 28:6, 35:17, 37:19, 47:7
**mind-numbing** [2] - 16:3, 16:14
**minimal** [11] - 6:21, 26:11, 27:6, 28:7, 28:12, 28:13, 28:21, 31:21, 33:22, 33:25, 34:3
**minimum** [1] - 29:5
**minor** [8] - 6:21, 26:12, 27:6, 28:6, 28:12, 28:15, 29:6, 31:21
**minute** [1] - 26:2
**minutes** [2] - 9:7, 23:9
**misconduct** [1] - 10:11
**missing** [1] - 34:7
**mission** [1] - 29:15
**mitigating** [1] - 28:9
**moment** [4] - 7:15, 21:24, 22:24, 39:10
**money** [2] - 30:21, 30:23
**month** [1] - 49:6
**months'** [1] - 42:21
**MOSS** [1] - 1:9
**Moss** [1] - 7:24
**most** [5] - 9:11, 27:5, 28:15, 33:19, 35:1
**motivated** [1] - 30:23
**MS** [94] - 3:6, 3:9, 4:12, 4:18, 4:24, 6:4, 6:8, 6:17, 7:5, 7:9, 7:15, 7:18, 8:8, 8:10, 12:5, 13:12, 14:14, 15:13, 15:22, 16:12, 16:13, 16:19, 16:25, 17:6, 17:14, 18:3, 18:7, 18:16, 18:23, 19:10, 19:13, 20:5, 20:11, 20:17, 20:21, 21:4, 21:8, 21:19, 21:25, 22:21, 23:3, 23:21, 24:8, 24:14, 24:19, 26:10, 28:11, 28:23, 29:1, 30:15, 31:24, 32:16, 33:2, 33:15, 33:18, 34:9, 35:3, 35:15, 35:21, 35:24, 36:4, 36:11, 36:14, 36:24, 37:2, 37:9, 37:16, 38:5, 38:12, 38:18, 39:3, 40:10, 41:12, 41:19, 41:21, 41:24, 42:3, 42:17, 42:19, 44:12, 44:23, 45:12, 45:18, 45:23, 46:8, 46:21, 47:3, 47:23, 48:8, 48:14, 48:15, 48:19, 48:23, 49:3
**mule** [2] - 31:11, 31:14
**mule's** [1] - 31:13
**multiple** [4] - 22:18, 34:16, 47:9, 47:10
**MURALI** [1] - 1:6
**Murali** [2] - 3:3, 3:20
**must** [1] - 31:18
**MVRA** [3] - 39:6, 39:17, 39:24

## N

**N.W** [1] - 50:11
**name** [1] - 3:5
**narrowed** [1] - 6:9
**nature** [3] - 22:18, 26:24, 42:5
**nearly** [1] - 27:16
**necessarily** [4] - 6:1, 17:2, 30:23, 42:12
**necessary** [4] - 27:24, 39:13, 40:15, 45:11
**need** [13] - 5:4, 5:11, 7:17, 11:16, 11:22, 12:4, 15:9, 18:21, 21:10, 22:19, 45:9, 47:13, 48:6
**needed** [1] - 25:24
**negative** [1] - 34:6
**never** [4] - 4:18, 35:17, 45:9, 45:10
**new** [6] - 3:13, 29:20, 30:1, 32:6, 33:6, 33:13
**New** [3] - 1:17, 1:21, 1:23
**next** [5] - 22:25, 32:1, 46:4, 46:5, 48:8
**Nichols** [1] - 45:21
**Nichols'** [1] - 46:19
**night** [2] - 20:1, 20:4
**none** [1] - 19:10
**notes** [1] - 50:5
**nothing** [1] - 49:3
**notice** [3] - 4:13, 13:17, 13:22
**notification** [12] - 12:25, 13:2, 13:5, 15:17, 16:4, 18:20, 19:1, 19:18, 19:24,

22:2, 22:6, 42:3
**notifications** [1] - 20:3
**number** [3] - 5:2, 9:10, 18:17
**numbing** [2] - 16:3, 16:14
**numbskull** [1] - 20:1
**NW** [5] - 1:14, 1:17, 1:23, 2:4, 2:22
**NY** [1] - 1:21

## O

**objection** [2] - 7:12, 7:18
**objections** [2] - 6:25, 7:10
**obligation** [4] - 15:12, 16:7, 22:2, 22:9
**obligations** [2] - 12:25, 19:2
**obstruction** [1] - 34:4
**obviously** [6] - 24:17, 27:13, 35:1, 44:3, 46:24, 46:25
**occurred** [2] - 11:15, 12:17
**OF** [4] - 1:1, 1:3, 1:9, 50:1
**offense** [6] - 5:25, 9:21, 39:15, 39:16, 40:17, 40:20
**offer** [1] - 13:13
**offered** [1] - 40:9
**office** [4] - 4:5, 4:6, 42:21, 43:14
**Office** [1] - 2:7
**OFFICER** [2] - 3:12, 3:18
**Officer** [1] - 3:13
**officer** [1] - 3:13
**OFFICIAL** [1] - 50:1
**Official** [2] - 2:21, 50:10
**OIG** [13] - 11:14, 13:4, 17:4, 18:9, 19:16, 19:17, 20:14, 21:6, 21:11, 21:12, 24:8, 30:4
**once** [2] - 12:11, 29:4
**one** [28] - 5:22, 6:19, 7:15, 9:12, 11:14, 11:16, 15:13, 20:25, 21:4, 21:25, 22:14, 23:2, 26:12, 26:18, 31:14, 32:12, 33:8, 33:24, 35:24, 39:10, 41:18, 44:3, 44:18, 45:7, 47:11, 48:16
**open** [1] - 47:18
**opinion** [2] - 9:11, 9:22
**opportunity** [2] - 47:25, 48:3
**oppose** [1] - 35:11
**opposed** [1] - 42:1
**opposite** [1] - 33:13
**order** [2] - 10:21, 39:10
**ordered** [1] - 40:18
**ordinary** [1] - 17:7
**organizing** [1] - 26:22
**otherwise** [2] - 7:6, 19:17
**ought** [2] - 20:25, 21:23
**outgrowth** [1] - 17:22
**outlined** [1] - 6:18
**outsourced** [1] - 24:4
**overlap** [1] - 33:22
**overwhelmed** [1] - 45:9
**own** [2] - 13:7, 27:13

## P

**P.M** [1] - 1:7
**p.m** [1] - 49:7
**page** [3] - 23:7, 29:1, 29:2
**pages** [1] - 11:4
**paid** [2] - 36:6, 38:1
**paradis** [1] - 27:20
**paragraph** [1] - 16:19
**paragraphs** [1] - 6:10
**PARIS** [1] - 17:22
**part** [6] - 5:19, 12:24, 17:14, 22:4, 24:13, 46:12
**participant** [10] - 28:7, 28:13, 28:21, 29:6, 31:21, 32:9, 33:22, 33:25, 34:3
**participants** [3] - 28:13, 28:15, 28:17
**participated** [2] - 26:21, 32:24
**participation** [5] - 26:25, 27:17, 28:5, 39:14, 47:14
**particular** [5] - 11:9, 17:12, 25:5, 39:20, 39:25
**particularly** [1] - 42:6
**parties** [4] - 9:20, 10:14, 26:13, 43:3
**parties'** [3] - 11:18, 20:24, 34:24
**past** [1] - 28:3
**Patel** [13] - 12:10, 14:10, 14:22, 16:17, 17:18, 20:18, 27:14, 27:16, 29:12, 30:9, 31:4, 45:3
**Patel's** [2] - 13:10, 20:9
**pause** [3] - 35:23, 43:4, 43:6
**pay** [3] - 31:2, 36:1, 36:15
**penny** [1] - 10:5
**people** [4] - 20:3, 24:25, 30:3, 31:19
**per** [2] - 37:24, 38:1
**performed** [1] - 27:1
**performing** [1] - 27:2
**perhaps** [8] - 13:10, 26:14, 27:8, 27:14, 31:2, 32:19, 39:5, 46:17
**period** [1] - 46:6
**perpetrator** [1] - 40:20
**person** [7] - 31:16, 31:20, 31:22, 32:1, 36:20, 40:16, 40:19
**personal** [2] - 41:4, 47:15
**PETERSON** [1] - 2:2
**photographs** [1] - 17:14
**picking** [1] - 46:4
**pieces** [1] - 18:14
**PII** [30] - 10:9, 10:12, 11:13, 12:15, 13:4, 14:21, 15:1, 16:16, 17:10, 18:4, 18:9, 18:15, 18:16, 19:6, 19:16, 19:22, 20:2, 20:7, 20:13, 20:14, 21:9, 40:24, 40:25, 41:7, 41:10, 42:7, 42:10, 43:16, 43:18
**pilot** [2] - 25:2, 25:19
**Plaintiff** [2] - 1:4, 1:13
**plan** [6] - 20:9, 20:20, 27:16, 29:24, 30:5, 30:11
**planning** [3] - 26:21, 30:7, 44:17
**plans** [1] - 35:10
**played** [1] - 27:24
**plus** [1] - 34:5
**pocket** [1] - 37:4
**podium** [1] - 3:4
**point** [22] - 6:9, 14:13, 15:9, 18:3, 20:18, 21:4, 21:25, 23:22, 25:16, 28:20, 29:19, 29:24, 30:15, 30:25, 33:5, 33:15, 34:6, 35:24, 40:10, 43:2, 43:14, 47:21
**points** [3] - 6:20, 11:13, 23:5
**portion** [1] - 6:23
**position** [8] - 13:13, 22:1, 28:19, 40:2, 41:16, 42:8, 46:20, 47:23
**positions** [2] - 31:5, 47:19
**possessed** [2] - 25:2, 25:17
**possible** [2] - 15:17, 15:23
**Postal** [1] - 10:11
**postal** [8] - 11:14, 11:21, 14:25, 15:1, 16:23, 17:21, 18:1, 19:16
**powder** [1] - 31:16
**precedent** [1] - 41:2
**precise** [1] - 10:5
**predominantly** [1] - 29:1
**prefer** [1] - 44:6
**preference** [4] - 44:13, 44:20, 44:22, 44:23
**prejudicial** [1] - 43:25
**preliminary** [1] - 9:14
**premises** [1] - 19:7
**preparation** [1] - 4:14
**prepared** [1] - 46:9
**Present** [1] - 2:7
**presented** [1] - 6:5
**presentence** [17] - 4:4, 4:14, 5:11, 5:21, 5:24, 5:25, 6:16, 6:23, 6:25, 7:7, 7:13, 7:22, 8:12, 8:24, 9:4, 40:3, 43:1
**presumably** [2] - 19:7, 22:9
**pretty** [3] - 6:9, 32:7, 43:8
**previous** [1] - 42:13
**previously** [2] - 16:7, 42:20
**primarily** [1] - 23:21
**primary** [1] - 23:24
**principally** [1] - 25:25
**principles** [1] - 10:15
**Probation** [1] - 2:7
**PROBATION** [2] - 3:12, 3:18
**probation** [7] - 3:13, 4:5, 4:6, 34:16, 34:17, 34:18, 42:21
**problem** [3] - 15:2, 44:16, 46:3
**proceed** [3] - 14:19, 28:1, 46:9
**proceeding** [1] - 5:1
**proceedings** [2] - 39:16, 50:6
**process** [1] - 15:24
**product** [4] - 23:14, 32:5, 33:14
**program** [2] - 17:21, 29:16
**programmers** [1] - 15:3
**project** [1] - 24:16
**prong** [1] - 29:17
**proper** [1] - 7:3
**property** [2] - 3:22, 3:23
**propose** [1] - 21:10
**proposition** [1] - 12:6
**prosecution** [1] - 39:15
**prospects** [1] - 31:9
**proven** [1] - 16:15
**provide** [1] - 37:6
**provided** [2] - 16:25, 17:7
**provides** [1] - 38:21
**providing** [2] - 15:2, 17:3
**provision** [3] - 39:6, 39:25, 40:11
**provisions** [1] - 42:4
**proximately** [2] - 40:17, 40:19
**public** [2] - 25:18, 29:21
**Public** [2] - 1:17, 2:3
**pull** [1] - 7:20
**purely** [1] - 42:25
**purpose** [1] - 23:24
**purposes** [5] - 7:14, 8:24, 13:23, 26:9, 41:5
**push** [1] - 46:7
**put** [5] - 17:1, 20:25, 21:23, 22:24, 39:5

## Q

**qualifications** [1] - 25:2
**qualifies** [1] - 42:6
**qualify** [3] - 19:7, 38:22, 42:12
**quantities** [1] - 31:13
**questions** [2] - 39:20, 47:6
**quickly** [1] - 6:12
**quite** [5] - 6:12, 13:7, 14:18, 45:10, 46:22

**quote** [1] - 11:7
**quoting** [1] - 11:5

## R

**raised** [1] - 28:3
**raises** [1] - 16:2
**RANDOLPH** [1] - 1:9
**range** [1] - 44:14
**rather** [4] - 33:14, 36:22, 39:19, 43:18
**reading** [2] - 10:15, 40:6
**reads** [3] - 39:9, 39:10, 39:12
**ready** [2] - 43:2, 43:23
**real** [2] - 15:2, 28:6
**realized** [1] - 14:1
**really** [12] - 6:24, 7:1, 11:23, 11:24, 19:5, 21:16, 27:20, 29:21, 30:6, 44:18, 45:10, 46:6
**reason** [3] - 17:23, 17:25, 19:5
**reasonably** [1] - 11:11
**reasons** [3] - 23:15, 31:1, 33:24
**receive** [3] - 23:18, 36:20, 37:10
**received** [5] - 4:4, 4:20, 24:21, 35:3, 36:19
**receiving** [1] - 30:24
**recently** [1] - 33:3
**recollection** [1] - 20:5
**recommend** [2] - 34:14, 34:18
**recommendation** [1] - 4:5
**recommended** [2] - 42:21, 42:23
**record** [6] - 3:5, 8:11, 15:15, 33:1, 33:3, 47:12
**records** [1] - 4:2
**recruited** [1] - 31:5
**refer** [1] - 42:12
**reference** [2] - 39:5, 40:3
**referenced** [3] - 13:20, 23:8, 33:9
**references** [1] - 4:14
**referencing** [1] - 44:18
**referring** [1] - 47:9
**reflects** [1] - 30:18
**regarded** [1] - 19:23
**reimburse** [2] - 39:12, 40:15
**related** [1] - 39:16
**relatedly** [1] - 32:4
**relates** [1] - 40:23
**relating** [1] - 5:25
**relatively** [1] - 31:14
**relayed** [1] - 37:12
**release** [3] - 34:13, 34:14, 42:23
**relevant** [3] - 11:5, 11:12, 40:12
**relies** [1] - 23:3
**relying** [1] - 7:12
**remaining** [1] - 33:18
**remedial** [1] - 15:12
**remediation** [10] - 10:2, 10:8, 11:23, 12:13, 14:21, 15:11, 18:21, 21:8, 21:10, 47:8
**remember** [4] - 13:19, 17:13, 32:15, 39:4
**removed** [3] - 17:18, 18:13, 25:13
**repayment** [1] - 31:8
**replaced** [1] - 32:1
**reply** [2] - 48:3, 48:12
**report** [17] - 4:5, 4:14, 5:11, 5:21, 5:24, 5:25, 6:16, 6:24, 6:25, 7:8, 7:13, 7:23, 8:12, 8:24, 9:4, 40:3, 43:1
**Reporter** [3] - 2:21, 2:21, 50:10
**REPORTER** [1] - 50:1
**reporting** [1] - 33:8
**represent** [1] - 35:12
**reputationally** [1] - 31:3
**request** [2] - 4:11, 40:5
**requesting** [2] - 4:23, 44:19
**require** [4] - 13:21, 19:18, 19:23, 39:11
**required** [5] - 13:4, 14:8, 16:4, 38:15
**requirement** [1] - 18:21
**requirements** [2] - 14:2, 22:7
**requires** [1] - 13:2
**resolve** [3] - 5:6, 5:8, 35:2
**resolved** [2] - 5:12, 6:11
**resolving** [1] - 5:13
**resources** [1] - 29:25
**respect** [19] - 5:5, 5:12, 9:5, 9:13, 10:5, 11:4, 11:18, 12:25, 14:21, 14:24, 21:14, 26:6, 27:15, 43:4, 43:22, 47:7, 47:8, 47:13, 47:19
**respectfully** [1] - 41:12
**respond** [1] - 48:1
**responsibility** [1] - 27:1
**responsible** [2] - 10:18, 40:24
**rest** [1] - 21:1
**restitution** [11] - 34:24, 35:11, 37:7, 37:10, 38:14, 38:23, 39:2, 39:11, 40:2, 40:18, 42:24
**result** [4] - 12:18, 14:5, 38:2, 40:17
**resulted** [1] - 11:22
**review** [5] - 4:20, 5:10, 7:22, 8:1, 8:13
**reviewed** [2] - 4:4, 8:12
**rise** [1] - 25:1
**RMR** [2] - 2:21, 50:9
**role** [13] - 6:22, 25:25, 26:1, 26:12, 26:15, 27:6, 27:24, 28:2, 28:5, 29:6, 30:13, 32:20
**room** [2] - 19:11, 45:24
**Room** [2] - 2:22, 50:10
**rules** [5] - 11:5, 13:21, 15:10, 47:7, 47:8
**run** [2] - 34:17, 42:22
**RUTH** [1] - 1:16

## S

**S.B** [6] - 4:15, 39:20, 40:4, 40:9, 40:21, 41:14
**sale** [1] - 30:20
**satisfied** [3] - 7:6, 8:19, 26:7
**SAVARESE** [46] - 1:19, 3:9, 4:24, 6:17, 7:5, 7:9, 7:15, 7:18, 16:13, 16:19, 16:25, 17:6, 17:14, 18:3, 18:7, 18:16, 18:23, 19:10, 19:13, 20:5, 20:11, 20:17, 20:21, 21:4, 21:8, 21:19, 23:21, 24:8, 24:14, 24:19, 26:10, 28:11, 35:3, 35:15, 35:24, 36:4, 41:24, 42:3, 42:19, 44:23, 45:12, 47:3, 47:23, 48:15, 48:19, 49:3
**Savarese** [11] - 3:10, 4:22, 6:14, 12:3, 14:17, 16:9, 23:20, 28:8, 34:25, 42:18, 49:2
**scenario** [1] - 16:1
**schedule** [3] - 44:9, 45:23, 46:17
**scheduled** [1] - 45:20
**scheduling** [1] - 45:25
**scope** [4] - 11:8, 11:10, 26:20, 29:8
**scoured** [1] - 33:3
**second** [3] - 5:12, 26:14, 29:17
**section** [1] - 14:13
**Section** [7] - 1:17, 5:19, 9:17, 34:12, 34:15, 39:7, 39:10
**secure** [1] - 17:8
**Security** [1] - 10:12
**security** [1] - 13:2
**Security's** [1] - 19:17
**see** [8] - 18:6, 36:21, 36:23, 36:25, 39:4, 44:21, 45:22, 49:6
**seeking** [4] - 28:9, 30:3, 40:2, 42:16
**seem** [3] - 37:22, 39:23, 40:6
**sees** [1] - 31:12
**SEFRANEK** [1] - 50:3
**Sefranek** [3] - 2:21, 50:9, 50:9
**sell** [2] - 29:24, 30:3
**selling** [2] - 30:7, 30:8
**send** [1] - 20:2
**sense** [2] - 31:7, 31:18
**sent** [1] - 12:16
**sentence** [12] - 5:17, 5:20, 7:4, 9:15, 9:17, 9:18, 34:12, 38:6, 42:21, 44:4, 44:19, 45:8
**sentences** [1] - 42:22
**SENTENCING** [2] - 1:4, 1:9
**sentencing** [15] - 3:20, 4:6, 4:7, 6:18, 7:14, 8:25, 11:4, 23:4, 23:16, 23:24, 28:24, 33:5, 45:4, 45:6, 45:17
**sentencings** [1] - 46:7
**servers** [5] - 12:21, 24:1, 24:24, 25:4, 25:6
**Service** [1] - 10:11
**service** [8] - 11:14, 11:21, 14:25, 15:1, 16:23, 17:21, 18:1, 19:16
**set** [11] - 4:2, 5:24, 6:16, 7:7, 8:23, 9:3, 11:3, 12:20, 24:24, 25:1, 25:4
**setting** [1] - 21:11
**shall** [2] - 34:17, 39:11
**shared** [1] - 19:4
**Sherry** [2] - 2:7, 3:13
**Shields** [3] - 3:10, 35:20, 40:9
**SHIELDS** [15] - 1:22, 8:8, 8:10, 35:21, 36:11, 36:14, 36:24, 37:2, 37:9, 37:16, 38:5, 38:12, 38:18, 40:10, 41:12
**short** [1] - 23:8
**shorthand** [1] - 47:9
**show** [1] - 47:12
**showing** [1] - 32:20
**shown** [1] - 18:7
**shut** [1] - 27:25
**sic** [1] - 3:14
**side** [2] - 21:24, 31:8
**sides'** [1] - 33:21
**significant** [1] - 21:12
**similarly** [1] - 23:21
**simply** [4] - 11:21, 13:2, 16:21, 31:25
**simultaneous** [1] - 47:20
**sit** [1] - 31:21
**sitting** [1] - 31:15
**situation** [2] - 36:16, 38:20
**skill** [8] - 6:20, 23:17, 25:17, 25:20, 26:3, 26:6, 32:3, 33:23
**skills** [4] - 23:1, 25:11, 34:1, 34:2
**slightly** [2] - 16:2, 41:25
**software** [11] - 12:16, 18:2, 18:4, 19:4, 22:5, 23:12, 24:4, 24:16, 29:16, 32:6
**soldier** [1] - 32:1
**someone** [7] - 15:9, 18:1, 19:21, 19:25, 36:17, 39:1, 42:11
**somewhat** [1] - 16:14
**somewhere** [1] - 28:7
**soon** [1] - 14:10
**sorry** [3] - 3:25, 35:19, 43:5

**sort** [9] - 13:15, 14:7, 15:16, 16:2, 18:20, 27:20, 31:8, 38:13, 44:18
**sought** [1] - 34:25
**source** [3] - 12:13, 37:8, 43:16
**speaks** [1] - 22:18
**special** [11] - 6:20, 23:1, 23:17, 25:11, 25:20, 26:3, 33:23, 34:1, 34:2, 34:23, 42:24
**specialized** [2] - 24:22, 32:3
**specific** [1] - 33:8
**specifically** [1] - 42:9
**specified** [1] - 5:18
**specifies** [1] - 42:10
**spectrum** [2] - 26:5, 29:4
**speculative** [3] - 35:5, 35:12, 37:23
**spent** [1] - 9:24
**squad** [1] - 24:23
**stages** [1] - 20:8
**staggered** [2] - 47:20, 47:24
**stand** [1] - 19:5
**standards** [1] - 47:8
**start** [6] - 5:21, 12:2, 20:20, 28:8, 45:20, 46:13
**started** [1] - 20:19
**starting** [1] - 3:5
**state** [3] - 3:4, 15:22, 28:13
**statement** [7] - 9:3, 15:14, 19:14, 30:16, 37:12, 37:16, 39:19
**statements** [1] - 8:23
**states** [1] - 40:14
**STATES** [3] - 1:1, 1:3, 1:10
**States** [6] - 2:22, 3:3, 3:7, 3:23, 15:8, 39:7
**statute** [5] - 5:18, 13:4, 40:7, 40:8, 40:16
**statutes** [1] - 15:10
**statutory** [2] - 9:15, 39:6
**stay** [1] - 31:7
**stealing** [1] - 33:14
**Steel** [1] - 13:19
**stenographic** [1] - 50:5
**step** [5] - 5:10, 5:12, 5:14, 5:17, 5:19
**steps** [4] - 5:2, 5:4, 15:12, 32:4
**still** [11] - 14:11, 20:16, 22:3, 22:10, 25:24, 31:20, 35:2, 37:4, 37:6, 43:13
**stolen** [2] - 19:21, 19:22
**stood** [2] - 27:3, 27:7
**stored** [1] - 17:4
**Street** [2] - 1:14, 1:20
**stress** [1] - 41:8
**stretch** [1] - 18:8
**structure** [2] - 26:20, 29:9
**studied** [1] - 22:14
**subject** [2] - 9:5, 9:7
**submission** [1] - 23:22
**submit** [7] - 18:24, 22:11, 23:16, 25:1, 39:22, 45:14, 47:4
**submits** [2] - 12:12, 22:8
**submitted** [4] - 4:9, 4:13, 4:15, 23:4
**submitting** [1] - 30:22
**subpoena** [1] - 32:21
**Subsection** [2] - 39:8, 39:12
**subsection** [1] - 40:14
**subsequent** [1] - 43:17
**substantially** [1] - 27:17
**successful** [1] - 30:11
**sufficient** [1] - 21:3
**suggest** [3] - 29:6, 33:7, 46:2
**suggested** [2] - 32:11, 32:12
**suggestion** [1] - 45:1
**suggestions** [1] - 32:5
**Suite** [3] - 1:21, 1:24, 2:4
**Sullivan** [2] - 1:20, 1:23
**supervised** [3] - 34:13, 34:14, 42:23
**supplement** [1] - 4:7
**support** [2] - 4:8, 44:19
**suppose** [4] - 28:8, 37:5, 40:8, 43:2
**supposed** [2] - 26:18, 26:19
**Supreme** [1] - 41:2
**surprised** [2] - 13:1, 19:15
**surprising** [1] - 17:23
**suspect** [2] - 22:16, 30:5
**sustained** [2] - 35:6, 37:17
**system** [3] - 17:22, 23:13, 30:18
**systems** [2] - 17:4, 23:11

## T

**talks** [1] - 38:6
**TAMARA** [1] - 50:3
**Tamara** [3] - 2:21, 50:9, 50:9
**tangible** [1] - 32:25
**team** [2] - 24:19, 43:9
**tech** [3] - 27:21, 27:22, 27:23
**technological** [1] - 12:20
**technology** [2] - 25:24, 25:25
**tendering** [1] - 37:20
**term** [3] - 34:14, 34:15, 34:18
**terms** [18] - 6:8, 6:10, 6:23, 12:6, 13:14, 22:4, 23:9, 23:10, 29:6, 29:7, 29:17, 32:5, 33:3, 33:10, 33:18, 34:16, 44:16, 45:24
**terribly** [1] - 22:17
**testified** [2] - 4:16, 13:19
**testify** [1] - 39:2
**testimony** [10] - 13:22, 17:3, 17:16, 18:25, 32:7, 32:10, 32:11, 33:9, 43:11, 43:17
**text** [2] - 25:7, 29:13
**THE** [116] - 1:1, 1:1, 1:9, 3:2, 3:8, 3:11, 3:12, 3:16, 3:18, 3:19, 4:17, 4:21, 4:25, 6:7, 6:13, 7:1, 7:6, 7:12, 7:16, 7:20, 7:24, 8:1, 8:2, 8:3, 8:5, 8:6, 8:9, 8:13, 8:15, 8:16, 8:18, 8:19, 8:21, 8:22, 9:1, 9:2, 12:23, 14:7, 14:17, 15:21, 16:2, 16:18, 16:21, 17:5, 17:11, 17:17, 18:6, 18:11, 18:18, 19:9, 19:12, 19:14, 20:10, 20:15, 20:19, 20:23, 21:7, 21:14, 21:21, 22:13, 22:22, 23:20, 24:5, 24:10, 24:17, 25:15, 26:11, 28:22, 28:25, 29:18, 31:10, 32:7, 32:17, 33:11, 33:17, 33:21, 34:10, 35:14, 35:16, 35:22, 36:3, 36:9, 36:13, 36:21, 36:25, 37:4, 37:15, 37:18, 37:21, 38:9, 38:17, 38:24, 40:6, 40:22, 41:17, 41:20, 41:22, 42:2, 42:14, 42:18, 42:20, 43:7, 44:21, 45:1, 45:13, 45:22, 46:2, 46:11, 46:25, 47:4, 48:2, 48:10, 48:18, 48:20, 48:25, 49:5
**theft** [7] - 3:22, 3:23, 3:25, 4:1, 16:16, 21:9, 41:1
**theory** [1] - 11:17
**thereafter** [1] - 11:25
**therefore** [4] - 16:6, 22:11, 24:9, 29:24
**thinking** [4] - 9:24, 20:2, 21:25, 31:2
**thinks** [2] - 10:7, 33:24
**third** [1] - 5:14
**thoroughly** [1] - 49:1
**thoughts** [1] - 21:22
**thousands** [3] - 18:9, 18:14, 20:3
**three** [5] - 6:10, 28:16, 47:6, 47:12, 48:6
**threshold** [1] - 19:6
**thresholds** [1] - 19:2
**tied** [1] - 10:8
**tip** [1] - 27:5
**today** [8] - 4:11, 4:14, 4:23, 7:14, 8:25, 35:1, 35:4, 44:6
**today's** [1] - 24:25
**tomorrow** [1] - 46:4
**took** [2] - 18:4, 27:9
**tool** [4] - 29:20, 29:21, 29:23, 30:1
**total** [1] - 15:25
**towards** [2] - 26:8, 27:5
**track** [1] - 6:1
**tradition** [1] - 49:1
**TRANSCRIPT** [1] - 1:9
**transcript** [7] - 14:15, 24:15, 43:10, 43:15, 43:20, 50:4, 50:6
**transferred** [1] - 16:22
**transportation** [1] - 39:13
**travel** [1] - 38:2
**trial** [23] - 3:21, 4:16, 6:1, 6:6, 9:8, 13:24, 14:3, 16:15, 17:3, 18:8, 18:25, 20:6, 23:23, 28:3, 29:9, 30:25, 35:9, 36:15, 38:16, 43:10, 45:19, 45:20, 46:19
**trickier** [1] - 5:23
**tricky** [1] - 14:7
**tried** [1] - 21:18
**trigger** [3] - 18:20, 19:1, 22:6
**triggered** [2] - 15:12, 21:10
**troubleshooting** [1] - 25:8
**true** [3] - 21:7, 50:4, 50:5
**trust** [1] - 14:14
**trustworthy** [1] - 15:7
**try** [5] - 16:10, 24:12, 44:13, 46:17, 47:24
**trying** [1] - 15:22
**tsk** [2] - 18:21
**tsk-tsk** [1] - 18:21
**turn** [5] - 6:24, 7:11, 9:14, 43:2, 45:5
**turns** [1] - 12:24
**two** [9] - 6:19, 6:20, 11:13, 28:8, 35:7, 37:24, 46:4, 46:5, 47:8
**type** [3] - 19:1, 35:25, 40:8
**types** [1] - 36:7
**typically** [4] - 36:1, 36:8, 36:14, 37:2

## U

**U.S** [1] - 10:11
**U.S.C** [5] - 5:19, 9:16, 9:17, 9:18, 34:12
**ultimate** [1] - 15:25
**ultimately** [1] - 12:11
**umpire** [2] - 35:7, 38:3
**umpired** [1] - 37:14
**umpires** [1] - 38:1
**unable** [2] - 28:1, 38:3
**unavailable** [1] - 46:3
**under** [6] - 9:21, 10:19, 13:4, 34:11, 34:15, 40:8
**understood** [9] - 17:20, 22:21, 26:20, 29:8, 29:19, 29:25, 31:24, 45:10, 46:8
**undertake** [1] - 11:9

**undertaken** [1] - 15:24
**unfortunately** [1] - 13:25
**UNITED** [3] - 1:1, 1:3, 1:10
**United** [6] - 2:22, 3:2, 3:7, 3:23, 15:8, 39:7
**unlawful** [1] - 17:25
**unless** [1] - 22:22
**up** [10] - 7:2, 9:5, 9:6, 12:20, 21:13, 24:24, 25:1, 25:4, 34:13, 37:19
**upshot** [1] - 17:6
**USAO** [1] - 1:14
**USDA** [2] - 30:4, 30:11
**USDA-OIG** [1] - 30:4
**USPS** [3] - 18:9, 20:13, 21:12
**USPS-OIG** [2] - 18:9, 21:12

## V

**vague** [1] - 32:7
**variables** [1] - 43:18
**variance** [2] - 26:6, 26:9
**Venkata** [52] - 3:3, 3:10, 3:20, 5:1, 6:21, 7:20, 8:11, 8:14, 10:10, 10:17, 11:15, 12:1, 12:8, 12:11, 12:12, 12:17, 14:22, 18:13, 21:19, 23:9, 24:3, 24:7, 24:16, 25:5, 27:12, 28:1, 28:4, 28:17, 28:20, 29:4, 29:5, 29:10, 30:7, 30:13, 30:16, 30:19, 30:23, 31:5, 31:6, 31:25, 32:4, 32:9, 32:11, 32:12, 32:20, 33:7, 33:25, 34:10, 38:18, 38:23, 40:21, 41:14
**VENKATA** [1] - 1:6
**Venkata's** [12] - 4:7, 13:10, 13:16, 14:5, 22:4, 23:17, 23:24, 24:20, 25:24, 25:25, 26:15, 47:14
**version** [3] - 17:18, 18:13, 18:14
**versus** [3] - 15:25, 18:21, 19:4
**viable** [1] - 30:17
**victim** [13] - 4:15, 35:4, 38:13, 39:12, 39:18, 40:4, 40:12, 40:15, 40:16, 41:7, 42:3, 42:6, 42:12
**Victim** [1] - 4:15
**victims** [2] - 13:17, 41:1
**view** [7] - 6:2, 10:2, 27:5, 28:4, 35:19, 38:22, 40:21
**views** [3] - 11:19, 20:24, 34:24
**violation** [3] - 9:16, 9:17, 9:18
**vs** [1] - 1:5

## W

**wages** [3] - 36:3, 36:22, 37:13
**waiting** [1] - 46:22
**walk** [1] - 6:14
**wants** [1] - 47:2
**warehouse** [1] - 31:15
**Washington** [7] - 1:6, 1:15, 1:18, 1:24, 2:5, 2:23, 50:11
**week** [2] - 38:9, 38:10
**weekend** [2] - 48:17
**weeks** [2] - 46:4, 46:5
**welcome** [5] - 3:16, 8:6, 20:24, 35:20, 47:16
**wherewithal** [1] - 12:20
**whole** [1] - 29:19
**wiggle** [1] - 45:24
**wire** [1] - 3:24
**witness** [11] - 36:2, 36:4, 36:6, 36:20, 36:21, 36:25, 37:2, 38:19, 38:21, 39:22, 39:23
**witnesses** [4] - 36:8, 36:15, 37:10, 38:21
**wonder** [1] - 11:20
**wondering** [1] - 48:16
**world** [2] - 25:23, 29:22
**wrinkle** [1] - 45:18
**written** [1] - 23:22
**wrongfully** [1] - 42:11
**wrote** [1] - 39:21

## Y

**Yamazula** [1] - 3:3
**YAMAZULA** [1] - 1:6
**years** [7] - 9:16, 9:18, 9:19, 34:13, 34:14, 34:16, 42:22
**York** [3] - 1:17, 1:21, 1:23
**you-all** [4] - 43:7, 43:19, 43:24, 44:6
**yourself** [1] - 43:20

## Z

**zero** [1] - 34:6
**zero-point** [1] - 34:6